In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-2475
JOHN M. KLUGE,
 Plaintiff-Appellant,

 v.

BROWNSBURG COMMUNITY
SCHOOL CORP.,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 1:19-CV-02462 — Jane Magnus-Stinson, Judge.
 ____________________

 ARGUED JANUARY 20, 2022 — DECIDED APRIL 7, 2023
 ____________________

Before ROVNER, BRENNAN, and ST. EVE, Circuit Judges.
 ROVNER, Circuit Judge. John M. Kluge brought a Title VII
religious discrimination and retaliation suit against Browns-
burg Community School Corporation (“Brownsburg”) after
he was terminated from his employment as a teacher for re-
fusing to follow the school’s guidelines for addressing stu-
dents. Brownsburg requires its high school teachers to call all
students by the names registered in the school’s official
2 No. 21-2475

student database, and Kluge objected on religious grounds to
using the first names of transgender students to the extent
that he deemed those names not consistent with their sex rec-
orded at birth. After Brownsburg initially accommodated
Kluge’s request to call all students by their last names only,
the school withdrew the accommodation when it became ap-
parent that the practice was harming students and negatively
impacting the learning environment for transgender stu-
dents, other students both in Kluge’s classes and in the school
generally, as well as the faculty. The district court granted
summary judgment in favor of the school after concluding
that the undisputed evidence showed that the school was un-
able to accommodate Kluge’s religious beliefs and practices
without imposing an undue hardship on the school’s conduct
of its business of educating all students that entered its doors.
The district court also granted summary judgment in favor of
Brownsburg on Kluge’s retaliation claim. We agree that the
undisputed evidence demonstrates that Kluge’s accommoda-
tion harmed students and disrupted the learning environ-
ment. Because no reasonable jury could conclude that harm
to students and disruption to the learning environment are de
minimis harms to a school’s conduct of its business, we affirm.
Our dissenting colleague asserts that there are genuine issues
of material fact regarding undue hardship but he mischarac-
terizes the harms claimed by the school and focuses on fact
questions that are not legally relevant to the outcome of the
discrimination claim, in particular suggesting that a jury
should reweigh the harms using information not known to
the school at the time of the occurrences in issue, and not rel-
evant to the ultimate question.
No. 21-2475 3

 I.
 On summary judgment, we must construe the facts in fa-
vor of the nonmovant, and may not make credibility determi-
nations or weigh the evidence. Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986); McCottrell v. White, 933 F.3d 651, 655
(7th Cir. 2019); Payne v. Pauley, 337 F.3d 767, 770 (7th Cir.
2003). We therefore construe the facts in favor of Kluge.
Brownsburg is a public school corporation in Brownsburg, In-
diana. The Indiana Constitution requires the State’s General
Assembly “to provide, by law, for a general and uniform sys-
tem of Common Schools, wherein tuition shall be without
charge, and equally open to all.” Ind. Const. art. VIII, § 1.
School attendance is compulsory in the State by statute. Ind.
Code § 20-33-2-4. Brownsburg is governed by an elected
Board of Trustees. R. 120-1, at 2. At the relevant time, the cor-
poration and school leadership included the Board President,
Phil Utterback; the Superintendent, Dr. Jim Snapp; the Assis-
tant Superintendent, Dr. Kathryn Jessup; the Human Re-
sources Director, Jodi Gordon; and the principal, Dr. Bret
Daghe. R. 120-1, at 2–3; R. 120-2, at 3; R. 113-3, at 5; R. 113-4,
at 5. Brownsburg High School was the sole public high school
in the district. R. 120-2, at 2.
 Brownsburg hired Kluge in August 2014 to serve as the
sole music and orchestra teacher at the high school. R. 113-2,
at 2; R. 120-2, at 3. In that capacity, he taught beginning, inter-
mediate, and advanced orchestra; beginning music theory;
and advanced placement music theory. He also assisted the
middle school orchestra teacher in teaching classes at the mid-
dle school. R. 120-3, at 19–20. Kluge remained employed in
4 No. 21-2475

that capacity until the end of the 2017–2018 academic year.
R. 120-2, at 3.
 Prior to the start of that school year, officials at Browns-
burg became aware that several transgender students were
enrolled as freshmen. R. 120-1, at 3. This awareness led to dis-
cussions among the Brownsburg leadership to address the
needs of these students. Gordon and Drs. Snapp, Jessup, and
Daghe reached a “firm consensus” that transgender students
“face significant challenges in the high school environment,
including diminished self-esteem and heightened exposure to
bullying.” R. 120-1, at 3. According to Dr. Jessup, the Browns-
burg leaders concluded that “these challenges threaten
transgender students’ classroom experience, academic perfor-
mance, and overall well-being.” R. 120-1, at 3. The group be-
gan to discuss and consider practices and policies that could
address these challenges. 1 R. 120-1, at 3–4.
 The staff of the school first became aware of these discus-
sions in January 2017, when administrators invited Craig Lee,
a Brownsburg teacher and faculty advisor for the high
school’s Equality Alliance Club, to speak about transgender-
ism at a faculty meeting. 2 R. 15-3, at 2; R. 58-2, at 1–2. At

1 The policies and practices eventually adopted by Brownsburg to
address concerns about transgender students were not formally ratified
by the Board, but they did operate as directives that teachers were re-
quired to follow. We refer to them as policies for convenience.

2 The Equality Alliance Club is a student club at the school that
meets weekly to discuss social and emotional issues affecting all students,
including LGBTQ students. R. 58-2, at 2; R. 112-5, at 9. Attendance varied
from twelve to forty students at any given meeting, and often included
 (continued)
No. 21-2475 5

another faculty meeting in February 2017, Lee and guidance
counselor Laurie Mehrtens gave a presentation on what it
means to be transgender and how teachers can encourage and
support transgender students. R. 15-3, at 2.
 After these faculty meetings, Kluge and three other teach-
ers approached Dr. Daghe on May 15, 2017, to speak about
issues related to transgender students. R. 15-3, at 2; R. 113-5,
at 6; R. 120-3, at 11. The four teachers presented Dr. Daghe
with a seven-page letter expressing religious objections to
transgenderism, taking the position that the school should not
treat gender dysphoria as a protected status, and urging the
school not to require teachers to refer to transgender students
by names or pronouns that the teachers deemed inconsistent
with the students’ sex recorded at birth. R. 113-1, at 26–32.
Kluge identifies as Christian and is a member of Clearnote
Church. R. 113-1, at 4. Kluge believes that gender dysphoria
“is a type/manifestation of effeminacy, which is sinful.”
R. 113-1, at 5. Kluge describes “effeminacy” as “for a man to
play the part of a woman or a woman to play the part of a
man and so that would include acting like/dressing like the
opposite sex.” R. 120-3, at 6. In addition to believing that gen-
der dysphoria itself is sinful, Kluge believes that it is sinful to
“promote gender dysphoria.” R. 120-3, at 7. Because the
transgender students changed their first names in order to
“present[] themselves as the opposite sex,” Kluge believes

transgender students. R. 120-14, at 6. Dr. Daghe described it more broadly
as a club trying to make the culture and climate of the school the best it
could be. R. 112-5, at 9.
6 No. 21-2475

that calling those students by their preferred names would be
“encouraging them in sin.” R. 120-3, at 10.
 The American Psychiatric Association has a very different
view of gender dysphoria for adolescents and adults, which
it defines as a “marked incongruence between one’s experi-
enced/expressed gender and assigned gender, of at least six
months duration,” and manifested by at least two of the six
listed criteria. Diagnostic and Statistical Manual of Mental
Disorders, Fifth Edition, 2013 (“DSM-5”), at 452. “The condi-
tion is associated with clinically significant distress or impair-
ment in social, occupational, or other important areas of func-
tioning.” DSM-5, at 453. See also Campbell v. Kallas, 936 F.3d
536, 538 (7th Cir. 2019) (describing gender dysphoria as “an
acute form of mental distress stemming from strong feelings
of incongruity between one’s anatomy and one’s gender iden-
tity”). Kluge does not agree with the DSM-5 definition of gen-
der dysphoria. R. 120-3, at 5–6.
 At the May 15, 2017 meeting, Dr. Daghe discussed what
he considered to be an accommodation to these teachers,
namely, a policy that all teachers would use the names and
pronouns recorded in the school’s official student database,
“PowerSchool.” R. 112-5, at 5–6. The PowerSchool database
contained names, gender markers, preferred pronouns and
other data for all students at the school. R. 113-3, at 6; R. 113-5,
at 4. According to Kluge, Dr. Daghe indicated that he had re-
sisted the pressure to change the students’ names in Power-
School but would make this change if it would resolve the
teachers’ concerns regarding how to address transgender stu-
dents. R. 120-3, at 12.
No. 21-2475 7

 The three teachers who had signed onto Kluge’s letter ac-
cepted Dr. Daghe’s suggested practice that they would use
the PowerSchool names and pronouns, and indicated to Dr.
Daghe that they would comply with it going forward.
R. 120-3, at 12. Kluge was shocked that the three other teach-
ers “did an about-face” but he said nothing at that time.
R. 120-3, at 12. According to Kluge, after the meeting with all
four teachers concluded, he went back into Dr. Daghe’s office
and told him to “keep up the good work” of resisting the pres-
sure of changing the names in PowerSchool. R. 120-3, at 12.
Dr. Daghe left these meetings believing that all four teachers
had agreed to this practice. R. 112-5, at 5–6. Kluge, however,
believed that he and Dr. Daghe were “on the same page,” that
he could continue to use the students’ “legal names,” and that
“we would not be promoting transgenderism in our school.”
R. 120-3, at 12.
 The Brownsburg leadership settled on the practice of re-
quiring teachers to use the PowerSchool names and pronouns
(“Name Policy”) as part of the larger plan to address the
needs of transgender students. R. 120-1, at 3–4; R. 112-5, at 5.
In addition to the Name Policy, transgender students were
permitted to use the restrooms of their choice and dress ac-
cording to the gender with which they identified, wearing
school-related uniforms consistent with that gender. R. 112-5,
at 5. Transgender students wishing to change their names,
gender markers or pronouns in PowerSchool were permitted
to do so only if they first presented two letters, one from a
parent and one from a healthcare professional regarding the
need for the changes. R. 120-1, at 4. Dr. Jessup explained that
the Name Policy furthered two primary goals:
8 No. 21-2475

 First, the practice provided the high school fac-
 ulty a straightforward rule when addressing
 students; that is, the faculty need and should
 only call students by the name listed in Pow-
 erSchool. Second, it afforded dignity and
 showed empathy toward transgender students
 who were considering or in the process of gen-
 der transition. Stated differently, the admin-
 istration considered it important for
 transgender students to receive, like any other
 student, respect and affirmation of their pre-
 ferred identi[t]y, provided they go through the
 required and reasonable channels of receiving
 and providing proof of parental permission and
 a healthcare professional’s approval.
R. 120-1, at 4.
 A little more than a week before the start of the 2017–2018
school year, Mehrtens (the guidance counselor) sent emails to
several teachers, including Kluge, informing them that they
would have a transgender student in their classrooms in the
upcoming year. R. 120-3, at 13; R. 15-3, at 3. According to one
email that Kluge received, the student was transitioning from
female to male, and had changed his name and pronouns in
the PowerSchool database. Mehrtens said:
 Parents are supportive and aware—Feel free to
 use “he” and “[student’s preferred name]”
 when communicating.
R. 120-11, at 2 (student’s name redacted in the record). Kluge
received two such emails, one for each of the transgender
No. 21-2475 9

students he would have in his classes that year. R. 120-3, at 13.
At first he was shocked that the school was moving in this
direction, but because the email contained the language “feel
free to use,” he read the emails as “permissive, not manda-
tory,” and planned to use the students’ “legal names.” 3
R. 120-3, at 13–14; R. 15-3, at 3.
 On July 27, 2017, the first day of classes at Brownsburg,
Kluge met briefly with Dr. Daghe and informed him that he
would not call the transgender students by their PowerSchool
names and pronouns. He reiterated that he had a religious ob-
jection to this practice. Dr. Daghe directed him to stay in his
office and consulted the Superintendent, Dr. Jim Snapp.
R. 120-3, at 14; R. 15-3, at 3. Later that morning, Drs. Daghe
and Snapp met with Kluge to discuss the issue. Dr. Snapp told
Kluge that he was required to use the names recorded in the
PowerSchool database. Kluge explained again that it was
against his sincerely held religious beliefs to use anything
other than the names recorded on the students’ original birth
certificates. Dr. Snapp then presented him with three options:

3 As was the case with the district court, we find Kluge’s use of the
terms “transgender names” and “legal names” imprecise. Many transgen-
der people change their legal names and both of the transgender students
in Kluge’s classes did so, albeit after the school year in question. There is
no evidence in the record regarding what name Kluge planned to use if
transgender students changed their legal names, although much of his tes-
timony suggests that his religious objections would remain. Although a
person may be transgender, a name may not be, and so we will refer to the
students’ new names as their “preferred names” or “PowerSchool names.”
This is not to imply that this was a casual preference of the students alone;
as we noted, the students’ parents and healthcare providers signed off on
any changes to the names in PowerSchool.
10 No. 21-2475

comply with the Name Policy; resign; or be suspended pend-
ing termination. When Kluge refused to comply or resign, Dr.
Snapp suspended him pending termination and told him to
go home. R. 120-3, at 14–16; R. 15-3, at 3.
 In the course of that July 27 meeting, Kluge told Dr. Snapp
the name of his pastor, Dave Abu-Sara. R. 120-3, at 15–16.
Kluge did not know who initiated the contact, but soon after
the July 27 meeting, Kluge believed that Dr. Snapp and Abu-
Sara spoke on the phone. According to Kluge, Abu-Sara told
Kluge that he had asked Dr. Snapp to give Kluge the weekend
to think about his options, and Dr. Snapp had agreed.
R. 120-3, at 15–16. On Monday, July 31, Kluge returned to the
school and met with Dr. Snapp and Human Resources Direc-
tor Jodi Gordon. Dr. Snapp and Gordon reiterated that Kluge
had to choose between complying with the Name Policy or
termination. R. 120-3, at 17. They presented him with a memo
and draft agreement from Dr. Daghe stating:
 You are directed to recognize and treat students
 in a manner using the identity indicated in Pow-
 erSchool. This directive is based on the status of
 a current court decision applicable to Indiana.
 You are also directed to not attempt to counsel
 or advise students on his/her lifestyle choices.
 Please indicate below if you will comply with
 this directive. This document must be returned
 to me by noon on Monday, July 31, 2017.
 _____ Yes, I will comply with this directive.
 _____ No, I will not comply with this directive.
No. 21-2475 11

 ___________________ ________________
 John Kluge, teacher Date
 cc: Personnel file
R. 15-1. 4
 Kluge then presented Dr. Snapp and Gordon with two re-
quested accommodations: first, that he be allowed to refer to
all students by their last names only, “like a gym coach;” and
second, that he not be responsible for handing out gender-
specific orchestra uniforms to students. He would treat the
class like an “orchestra team,” he proposed. He agreed that, if

4 Kluge has never objected to the directive that he “not attempt to
counsel or advise students on his/her lifestyle choices.” Neither party ad-
dressed this term of the agreement in the briefing, but Dr. Snapp testified
that Kluge requested “the ability to talk directly to students about their
eternal destination,” which Dr. Snapp told him was not allowed. R. 112-6,
at 6. This directive is consistent with that conversation. See also R. 120-5, at
8 (Dr. Daghe testifying that he included that statement because Kluge’s
“job was to teach the students, not to make sure he was letting them know
his opinion one way or the other,” and because he “did not want one of
my teachers counseling or advising students on their choices.”). The “cur-
rent court decision applicable to Indiana” was likely our decision in Whit-
aker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d
1034 (7th Cir. 2017), abrogated on other grounds by Illinois Republican
Party v. Pritzker, 973 F.3d 760 (7th Cir. 2020), which had been issued two
months prior to this meeting. We held there that a transgender student
had a reasonable likelihood of succeeding on the merits of a Title IX sex
discrimination claim based on a theory of sex-stereotyping. 858 F.3d at
1048–50. Although the dissent asserts that nothing in the record indicates
that Whitaker was the decision to which the school referred, Kluge never
contested the point and instead simply argued that any suit brought by a
student on these facts under Whitaker would be frivolous. Because we de-
cline to address the Title IX issue, we need not address this matter further.
12 No. 21-2475

a student asked him why he was using last names only, he
would not mention his religious objections to using transgen-
der students’ first names and would explain, “I’m using last
names only because we’re a team, we’re an orchestra team,
just like a sports coach says, hey, Smith, hey, Jones. We are
one orchestra team working towards a common goal.”
R. 120-3, at 17. Dr. Snapp and Gordon agreed that this was an
acceptable arrangement. They also agreed to assign the task
of handing out orchestra uniforms to another person so that
Kluge would not be required to hand students clothing that
he believed was inconsistent with their sex recorded at birth.
R. 120-3, at 17. To memorialize this new understanding, Gor-
don altered the document presented to Kluge: after the first
paragraph, she wrote, “We agree that John may use last name
only to address students.” At the bottom of the page, she
wrote, “In addition, Angie Boyer will be responsible for dis-
tributing uniforms to students.” She initialed both changes.
Kluge checked the “I will comply” line, and signed and dated
the form. R. 15-1.
 Kluge then began to teach his regularly assigned classes
which included two transgender students, Aidyn Sucec and
Sam Willis. 5 R. 120-3, at 20. Within a month, Dr. Daghe began
to hear complaints about Kluge from Lee, the faculty advisor
of the Equality Alliance Club. R. 120-2, at 4; R. 58-2, at 2–3;
R. 120-14, at 7–8. Lee was also a member of the school’s three-

5 As we note below, Sam Willis did not change his name and gen-
der marker in PowerSchool until the end of September 2017. R. 120-3, at
20.
No. 21-2475 13

teacher Faculty Advisory Committee. R. 120-2, at 4. In an Au-
gust 29, 2017 email to Dr. Daghe, Lee reported:
 I wanted to follow up regarding the pow-
 erschool/students changed name discussion at
 the Faulty Advisory as some issue[s] have
 arisen in the last few days that need to be ad-
 dressed. … There is a student who has had their
 name changed in powerschool. They are a fresh-
 man who this teacher knew from 8th grade. The
 teacher refuses to call the student by their new
 name. I see this is a serious issue and the stu-
 dent/parents are not exactly happy about it. …
 As the student said, “what more are we sup-
 posed to do?”
R. 120-15, at 2. See also R. 120-12 (September 1, 2017 letter to
the school from parent of student noting child’s transgender
status and reporting problems with a teacher who uses incor-
rect gendered language against the wishes of the parents and
medical providers of the child, leading to confusion for other
students on how to address the child); R. 120-13 (August 30
through September 21, 2017 email chain between parent and
school counselor regarding student’s transgender status, up-
dates to PowerSchool database, and repeated problems with
Kluge using incorrect gendered language that the parent
characterizes as “very disrespectful and hurtful,” and which
causes the child “a lot of distress.”). Lee also described the sit-
uation of a student in the process of a PowerSchool name
change, whose supportive parent asked the teacher to start
using the new name, and the teacher refused, citing the Name
14 No. 21-2475

Policy. R. 120-15, at 2. Lee closed his email by turning the
problem over to Dr. Daghe:
 I know that this is something that must be hard
 to deal with from your perspective. You are try-
 ing to do the right thing for your employees and
 students alike. I absolutely do not envy your po-
 sition and thus far you have been incredibly
 supportive and it means a lot. However, there is
 confusion amongst some teachers and students
 that I think needs clarification and perhaps a
 teacher or two that needs to know that it is not
 ok to disobey the powerschool rule.
 I hope this makes sense mate. Maybe me, you
 and Kat need to sit down and talk about this. I
 am not totally sure and of course I am very bi-
 ased. However, I have always admired your
 leadership and now look to you for the next
 step.
R. 120-15, at 2–3.
 Lee also began to report to Dr. Daghe on comments he was
hearing from students who attended the Equality Alliance
meetings, where Kluge’s behavior became a frequent topic of
conversation. R. 58-2, at 2–4; R. 120-14, at 7–14; R. 120-2, at 4.
According to Lee, both Aidyn and Sam discussed during
those meetings how Kluge was referring to them by their last
names only, a practice they found insulting and disrespectful.
R. 58-2, at 2; R. 120-14, at 7. Lee confirmed that Aidyn and Sam
attributed Kluge’s last names practice to their presence in the
classroom, and this made them feel isolated and targeted.
No. 21-2475 15

R. 58-2, at 2–3; R. 120-14, at 7–8. “It was clearly visible the
emotional distress and the harm that was being caused to-
wards them. It was very, very clear, and, so, that was clear for
everyone to see but that is also what they described as well,”
Lee testified. R. 120-14, at 7–8. When asked if it was his inter-
pretation that Sam and Aidyn “felt as if they were being dis-
criminated against by Mr. Kluge,” Lee replied, “I wouldn’t
describe it so much as an interpretation. It was just very, very
clear at the meetings to see how much emotional harm was
being caused towards Sam and Aidyn. It was clear for every-
one at the meetings just to see how much of an impact it was
having on them. … [I]t was so clearly visible that I don’t feel
like there was anything necessarily to interpret.” R. 120-14, at
8. Lee passed these concerns onto Dr. Jessup as well.
R. 120-14, at 8. Although Kluge asserted that he was perfectly
compliant in the use of last names only, Lee also reported that
students complained that Kluge would occasionally slip up
and use first names or gendered honorifics rather than last
names only. 6 R. 58-2, at 3; R. 120-14, at 8–9.

6 In his deposition, Kluge testified, “From Day 1 I was consistent in
using last names only and using it for all students. I didn’t target stu-
dents.” R. 120-3, at 36. Because we must construe the record in favor of
Kluge on summary judgment, we credit his testimony that he was per-
fectly compliant with the Name Policy and never slipped up. However, in
a letter to the Equal Employment Opportunity Commission, Kluge’s law-
yer stated, “Kluge made a good faith effort to address all students by last
names and to never ‘misgender’ students. He admits that he may have
made occasional mistakes in referring to students he formerly called by
their first names.” R. 120-19, at 7. In any case, we may also credit Lee’s
statement that he conveyed to administrators that students complained
that Kluge did slip up, not for the truth of the matter but to show the state
 (continued)
16 No. 21-2475

 In addition to the complaints of the transgender students,
Lee reported that he had been approached by a student who
was not in the Equality Alliance but was in Kluge’s orchestra
class. R. 58-2, at 3; R. 120-14, at 9. That student, who did not
identify as LGBTQ, told Lee that Kluge’s use of last names
made him feel incredibly uncomfortable. The student de-
scribed Kluge’s practice as very awkward because the student
was fairly certain that all the students knew why Kluge had
switched to using last names, and that it made the
transgender students in the orchestra class stand out. The stu-
dent felt bad for the transgender students, and shared with
Lee that other students felt this way as well. R. 58-2, at 3;
R. 120-14, at 9. Some students believed that Kluge avoided ac-
knowledging transgender students who raised their hands in
class. R. 58-2, at 3; R. 120-14, at 8–9. Kluge denied doing so,
but the evidence is undisputed that these sorts of complaints
were reported to school administrators.

of mind of the school administrators receiving these reports. In addition
to Lee’s testimony, as we discuss below, two transgender students in
Kluge’s classes averred that Kluge sometimes used gendered honorifics or
first names for non-transgender students. Because Kluge denies this, we
assume Kluge’s perfect compliance for the purpose of the summary judg-
ment motion. Kluge does not, however, contest that the students con-
veyed such complaints to teachers and administrators, and this is relevant
to the administrators’ state of mind. See Khunger v. Access Cmty. Health Net-
work, 985 F.3d 565, 575 (7th Cir. 2021) (out-of-court complaints about an
employee are admissible when offered not for their truth but to show the
employer’s state of mind when making a termination recommendation).
Moreover, Kluge submitted no evidence that the teachers and administra-
tors did not honestly believe the reports that Kluge was not fully compli-
ant.
No. 21-2475 17

 The record also contains sworn statements from Sam Wil-
lis and Aidyn Sucec memorializing their experiences in
Kluge’s class. R. 58-1 (Willis Affidavit); R. 22-3 (Sucec Affida-
vit). Sam averred that he knew Kluge from his participation
in music programs in middle school. After deciding to pub-
licly transition at the start of his sophomore year (2017–2018),
Sam emailed the school counselor that he would be using the
name “Samuel” and masculine pronouns going forward. His
mother emailed Kluge directly about the change because
Kluge had known Sam by a different name in middle school.
Kluge did not respond to the email and Sam reported that
Kluge referred to him as “Miss Willis” on several occasions. 7
This led to other students questioning Sam’s sex, which was
upsetting to him. In early fall, Sam’s mother requested that he
be allowed to wear a tuxedo for a fall concert. At that point,
the school informed Sam’s mother about the new Pow-
erSchool Name Policy. Sam’s parents then submitted the re-
quired letters from themselves and Sam’s healthcare pro-
vider, and his name and gender markers were amended in
PowerSchool in time to get the tuxedo. According to Sam,
Kluge then stopped calling him “Miss Willis,” but sometimes
used gendered honorifics such as “Miss” or “Mr.” and gen-

7 Although Sam did not change his name and gender markers in
PowerSchool until late September 2017, Kluge’s use of the term “Miss Wil-
lis” would have violated the Name Policy because of the use of the gen-
dered honorific “Miss.” Kluge understood that his accommodation re-
quired him to use last names only and refrain from using gendered hon-
orifics in all of his classes, whether or not there were transgender students
in the class. R. 120-3, at 18. Nevertheless, Kluge denies ever slipping up,
and we credit that testimony as we discuss above.
18 No. 21-2475

dered pronouns when referring to students who were not
transgender. Sam reported that Kluge’s last names practice
was awkward because most students knew why Kluge had
made the switch, contributing to Sam’s sense that he was be-
ing targeted because of his transgender identity. Sam ex-
plained that he felt hurt by Kluge’s treatment, and that his
family was hurt and angry that Kluge thought he knew better
than they did. He averred that Kluge’s actions exposed him
to widespread public scrutiny in high school. R. 58-1.
 Aidyn Sucec, who began high school the same year that
the Name Policy went into effect, averred that, after years of
struggling with depression and anxiety, he was diagnosed
with gender dysphoria in the spring of 2017. While receiving
treatment from medical providers for that condition, Aidyn
began to take steps to socially transition, including changing
his name and asking others to use male pronouns to refer to
him. He explained, “Being addressed and recognized as Ai-
dyn was critical to helping alleviate my gender dysphoria. My
emotional and mental health significantly improved once my
family and friends began to recognize me as who I am.”
R. 22-3, at 3. Prior to beginning high school, Aidyn’s mother
spoke to a guidance counselor to discuss steps the school
could take to ensure his safety and well-being as a
transgender student. Aidyn’s mother and therapist subse-
quently submitted letters to the school requesting changes to
Aidyn’s name and gender marker in PowerSchool, and the
change was in place at the beginning of the academic year. All
of Aidyn’s teachers except Kluge complied with the Name
Policy. On the first day of class, Aidyn received a folder from
the substitute teacher covering for Kluge with his former first
No. 21-2475 19

name on it. The substitute also referred to him by his former
first name in front of other students, which he experienced as
“intensely humiliating and traumatizing.” Throughout the
fall semester, Kluge refused to call him “Aidyn,” instead re-
ferring to him as “Sucec” or avoiding using any name and
simply nodding or waving in his direction. Aidyn averred
that Kluge sometimes used gendered honorifics with other
students in the class, and less frequently called those students
by their first names. Kluge’s behavior left Aidyn feeling “al-
ienated, upset, and dehumanized.” He dreaded going to class
each day and was uncomfortable each time he had to speak
with Kluge one-on-one. Kluge’s behavior was noticeable to
others in the class, and at one point Aidyn’s stand partner
asked him why Kluge would not just say his name; Aidyn felt
forced to tell him that it was because he was transgender. Ai-
dyn discussed Kluge’s behavior with his therapist as part of
his ongoing treatment for gender dysphoria. He noted that
Kluge’s practice was also discussed multiple times at Equality
Alliance meetings. By the end of the first semester, Aidyn told
his mother that he did not want to continue with orchestra in
his sophomore year. He did not in fact continue with orches-
tra the next year, and due to harassment he faced after Kluge
left the school, Aidyn left Brownsburg at the end of his soph-
omore year. 8 R. 22-3.

8 Kluge characterizes the affidavits of Sam and Aidyn as “after-cre-
ated evidence,” which contained information about events that occurred
after Kluge’s termination. But both affidavits largely describe events that
occurred before the school made the decision to terminate Kluge, and both
affirm the information that Lee passed on to Dr. Daghe from Equality Al-
liance Meetings. The only exception is that the school was not aware that,
 (continued)
20 No. 21-2475

 Students were not the only source of concern about
Kluge’s practice. Lee reported that he had been approached
by three teachers—Jason Gill, Melinda Lawrie, and Justin
Bretz—during that academic year with concerns that Kluge’s
practice was causing harm to students. R. 120-14, at 16–17
(“they felt very strongly that this was harming students, not
just Sam and Aidyn but just students in general who would
potentially be in Mr. Kluge’s class.”). Dr. Daghe was ap-
proached by two additional teachers who were also depart-
ment heads in Fine Arts (the department in which Kluge
taught), Tracy Runyon and Melissa Stainbrook. They too con-
veyed complaints about Kluge’s use of last names only. Dr.
Daghe explained that teachers within the department who
had a complaint about another teacher would convey con-
cerns to the department heads and he was therefore most in
contact with those two teachers in Kluge’s department.
R. 113-5, at 8–9.
 After hearing about concerns from counselors that stu-
dents were uncomfortable in some of their classes with re-
gards to transgender issues, Dr. Jessup attended an Equality
Alliance Club meeting to hear from students herself. R. 120-1,

midway through the school year, Aidyn told his mother that he did not
wish to continue with orchestra the next academic year, and in fact ended
up leaving Brownsburg at the end of the following year due to harassment
he received from other students. Although Brownsburg did not know that
Aidyn would withdraw from orchestra or leave the school, at most the
affidavit confirms that the school accurately predicted the fallout from
Kluge’s failure to follow the Name Policy that was designed to avoid this
very harm to the school’s mission. We do not rely on any information from
the affidavits that post-dates Kluge’s termination.
No. 21-2475 21

at 4; R. 120-6, at 7. Approximately forty students attended the
meeting. Four or five students at the meeting complained
about a teacher using last names only to address students. 9
The other students in attendance appeared to agree with the
complaints. R. 120-1, at 4. Dr. Jessup also heard from students
that they felt singled out by the use of their last names and
that “not all students were called by their last name by Mr.
Kluge.” R. 120-6, at 7. See also R. 113-4, at 9 (Gordon testifying
that she was “made aware that there had been complaints
made to Dr. Daghe from students and staff that Mr. Kluge
wasn’t following those guidelines that he had agreed to at the
start of the year.”).
 Dr. Daghe continued to hear complaints about Kluge’s
last-names-only practice throughout the fall semester, but
hoped that the issue would resolve itself. R. 120-2, at 4. He
therefore did not raise the matter with Kluge until he met with
Kluge on December 13, 2017, after it became apparent that the
accommodation was not working in practice because students
were being harmed, and the learning environment was being
disrupted. R. 120-2, at 4; R. 112-5, at 7. Dr. Daghe testified that
the purpose of the meeting was to tell Kluge that the last-
names-only policy was not working in practice:

9 The Equality Alliance Club had a policy of not using teachers’
names at meetings. R. 120-14, at 11. Nevertheless, because of references to
orchestra class and because Kluge was the only teacher at the school who
had been permitted the last-names-only accommodation, both Lee and Dr.
Jessup understood the students to be referring to Kluge. R. 120-14, at 7;
R. 120-1, at 4.
22 No. 21-2475

 And the purpose of that meeting was to tell him
 that that’s not going well. I’m getting reports
 from students, I’m getting reports from parents,
 I’m getting reports from our teams which are
 done by grade level, I’m getting reports by
 teachers in his own department that students
 are uncomfortable in his class and that they are
 bringing the conversations that occur in his
 class to other classrooms and having discus-
 sions about the uncomfortableness, whether it
 was dealing with a transgender student and last
 names only or whether it was times when last
 names weren’t used or it was times when, you
 know, kids just want it all to go away and act
 like everything is normal. So I called John down
 and told him that’s what’s been given to me.
 And so, to me, as the high school principal try-
 ing to accommodate people and also trying to
 make sure that education can move forward, I
 just told him that.
R. 112-5, at 7.
 According to Kluge’s own description of the meeting:
 Daghe scheduled a meeting with me to ask me
 how the year was going and to tell me that my
 last-name-only Accommodation was creating
 tension in the students and faculty. He said the
 transgender students reported feeling “dehu-
 manized” by my calling all students last-name-
 only. He said that the transgender students’
No. 21-2475 23

 friends feel bad for the transgender students
 when I call transgender students, along with
 everyone else, by their last-name-only. He said
 that I am a topic of much discussion in the
 Equality Alliance Club meetings. He said that a
 number of faculty avoid me and don’t hang out
 with me as much because of my stance on the
 issue.
 Daghe said that parents complain about me. He
 stated that a transgender student’s mother com-
 plained to the principals about my orchestra
 [hair color] policy, that it was an unfair and un-
 warranted policy and should be removed. The
 building principal asked if the other teachers
 had this same policy. I told him “yes” and sent
 him their policies and mine. He responded to
 the parent and the parent backed down. This
 was a policy by my entire performing arts de-
 partment that students must have natural-col-
 ored hair for performances so they don’t dis-
 tract from the music being played.
 Daghe referred to this parent complaint in this
 meeting as being evidence of me being singled
 out while other teachers with the same policies
 did not receive any complaints.
 I explained to Daghe that this persecution and
 unfair treatment I was undergoing was a sign
 that my faith as witnessed by my using last-
 names-only to remain neutral was not coming
24 No. 21-2475

 back void, but was being effective. He didn’t
 seem to understand why I was encouraged. He
 told me he didn’t like things being tense and
 didn’t think things were working out. He said
 he thought it might be good for me to resign at
 the end of the year. I told Daghe I was now en-
 couraged all the more to stay.
R. 15-3, at 4–5. See also R. 120-3, at 21–25. Kluge had not “wit-
ness[ed]” tension, and also had not “witness[ed]” that anyone
was avoiding him. R. 120-3, at 23; R. 112-5, at 7. Although
Kluge believed that he was singled out for complaints about
the department-wide hair color policy because of his religion,
Dr. Daghe concluded that “it was because of the way he was
handling this accommodation.” R. 112-5, at 7. Because Dr.
Daghe would not name the students or faculty who com-
plained, Kluge suspected that Dr. Daghe was lying. R. 120-3,
at 23. Kluge left this meeting believing that his use of last
names only was working and that there was no evidence of
“undue hardship” arising from his practice. R. 120-3, at 23–25.
 On January 17, 2018, Dr. Daghe held another meeting with
Kluge. According to Kluge’s own account of the meeting:
 Daghe scheduled a meeting with me because he
 said he didn’t think he was direct enough in our
 December 13 meeting. He told me in this meet-
 ing plainly that he really wanted to see me re-
 sign at the end of the school year. I told him that
 it was simply because he didn’t like the tension
 and conflict. But I used examples in scripture to
 point to why this is a sign that I should stay. I
No. 21-2475 25

 referenced Acts 19:11-41 with Paul’s conflict in
 Ephesus and 1 Corinthians 16:8-9 when Paul
 was encouraged by the opportunity, saying, “a
 wide door for effective service has opened to
 me, and there are many adversaries.”
R. 15-3 at 5. Kluge also reported that Dr. Daghe asked him if
he was going to resign and offered to write him letters of rec-
ommendation. Kluge deferred the decision, saying he wanted
to wait until a January 22, 2018 faculty meeting when new
transgender policies would be announced. R. 15-3, at 5.
 On January 22, 2018, Dr. Jessup presented the faculty with
a document titled “Transgender Questions.” R. 15-4. The doc-
ument provided policies and guidance for faculty in a ques-
tion/answer format regarding issues relevant to transgender
students. Among the questions posed and answers given
were the following:
 Are we allowed to use the student’s last name
 only? We have agreed to this for the 2017–2018
 school year, but moving forward it is our expec-
 tation the student will be called by the first
 name listed in PowerSchool.
 How do teachers break from their personal bi-
 ases and beliefs so that we can best serve our
 students? We know this is a difficult topic for
 some staff members, however, when you work
 in a public school, you sign up to follow the law
 and the policies/practices of that organization
 and that might mean following practices that
 are different than your beliefs.
26 No. 21-2475

 What feedback and information has been re-
 ceived from transgender students? They ap-
 preciate teachers who are accepting and sup-
 porting of them. They feel dehumanized by
 teachers they perceive as not being accepting or
 who continue to use the wrong pronouns or
 names. Non-transgender students in class-
 rooms with transgender students have stated
 they feel uncomfortable in classrooms where
 teachers are not accepting. For example, teach-
 ers that call students by their last name, don’t
 use correct pronouns, don’t speak to the student
 or acknowledge them, etc.
R. 15-4, at 9–10.
 After this faculty meeting, on February 4, 2018, Kluge sent
an email to Drs. Snapp and Daghe quoting the language in the
Transgender Questions document regarding the prohibition
on the use of last names only. R. 120-16; R. 15-3, at 5. He noted
that his agreement with the school was not limited to the
2017–2018 academic year, and asked if he would be allowed
to use last names only going forward. R. 120-16. In response,
Gordon and Dr. Daghe scheduled a meeting with Kluge for
February 6, 2018. R. 15-3, at 6. Kluge secretly recorded the
meeting, and the transcript appears in the record. R. 112-4, at
20–55; R. 120-3, at 25. Gordon and Dr. Daghe informed Kluge
that, after the 2017–2018 school year, all teachers would be re-
quired to address students by the first name recorded in Pow-
erSchool. R. 15-3, at 6; R. 112-4, at 24. Kluge again explained
that his objection to using the PowerSchool names for
transgender students was religious and that he felt this was a
No. 21-2475 27

reasonable accommodation. R. 112-4, at 25–32. Gordon and
Dr. Daghe disagreed with him, explaining that he worked in
a public school and that the last-names-only practice was not
reasonable because it was “detrimental to kids.” R. 112-4, at
25–28. Kluge said he felt that using the names in PowerSchool
forced him to “encourage” students “in a path that’s going to
lead to destruction, to hell, I can’t as a Christian be encourag-
ing students to hell.” R. 112-4, at 28. He cited a study from a
doctor at Johns Hopkins that likened transgenderism to ano-
rexia. R. 112-4, at 30. Dr. Daghe and Gordon explained to him
that there were doctors on the other side of the issue and that
the administrators had conducted their own extensive re-
search in how to address the issue. R. 112-4, at 30. They held
firm on the school’s Name Policy, and the conversation
turned to Kluge’s resignation/termination. R. 112-4, at 32.
Gordon explained that some teachers were sensitive about let-
ting colleagues and students know that they were leaving,
and she therefore honored requests to not communicate or
process retirements or resignations until the school year con-
cluded. R. 112-4, at 35–37. She discussed the timing of his de-
parture from the school, explaining that because his position
was difficult to fill, the school would need to begin the search
as soon as possible. R. 112-4, at 35–37. Kluge interpreted this
offer as allowing him to submit a conditional resignation that
he could withdraw before some agreed date. R. 15-3, at 6;
R. 120-3, at 26. Gordon believed she was offering only to delay
notifying anyone of the resignation, not that the resignation
could be withdrawn. R. 120-17, at 2; R. 112-4, at 11–12. In fact,
Indiana law and the school’s bylaws do not permit the with-
drawal of a resignation once it has been properly submitted
28 No. 21-2475

to the Superintendent, and Gordon was the Superintendent’s
agent for this purpose. R. 112-4, at 11–12; R. 120-8; R. 120-9.
 Gordon met with Kluge again in March 2018 to set a date
for his decision. She reiterated that Kluge had three options:
comply with the Name Policy; resign; or be terminated. She
explained that if he would not comply and did not resign by
May 1, 2018, the termination process would begin on that
date. R. 15-3, at 6; R. 113-2, at 6.
 On April 30, 2018, Kluge submitted his resignation by
email. R. 120-17, at 2. In the email, he said he would resign as
of early August 2018 when his contract for the academic year
finished. He explained that he was resigning because the
school required teachers to call transgender students by a
name that “encourages the destructive lifestyle and psycho-
logical disorder known as gender dysphoria.” R. 120-17, at 2.
He noted that the school was withdrawing the last-names-
only accommodation that allowed him to remain “neutral” on
the issue. He was resigning because his Christian conscience
“does not allow [him] to call transgender students by their
‘preferred’ name and pronoun,” and the school had directed
him to either resign by May 1, or he would be terminated. He
concluded:
 Please do not process this letter nor notify any-
 one, including any administration, about its
 contents before May 29, 2018. Please email me
 to acknowledge that you have received this
 message and that you will grant this request.
R. 120-17, at 2. Gordon replied the same day, telling Kluge, “I
will honor your request and not process this letter or share
No. 21-2475 29

with BHC administration until May 29.” R. 15-2; R. 120-17, at
2.
 In May 2018, as part of the curriculum, Kluge participated
in an orchestra awards ceremony. R. 120-3, at 32–33. At the
ceremony, he addressed the students, including the transgen-
der students, by their first and last names as they appeared in
PowerSchool. R. 120-3, at 33; R. 58-1, at 4. Kluge explained that
he did this because “it would have been unreasonable and
conspicuous to address students in such an informal manner
at such a formal event as opposed to the classroom setting
where teachers refer to students by last names as a normal
form of address.” R. 120-3, at 33. In his deposition, Kluge also
affirmed the account that his lawyer gave to the EEOC in ex-
plaining the exception he made at this event, asserting that he
did not wish to “bring into doubt my stated rationale for us-
age of last names only.” R. 120-3, at 32–33; R. 120-19, at 7.
Kluge confirmed that his lawyer’s statement was an accurate
account of what transpired at the orchestra award ceremony,
and he adopted some of his lawyer’s language as his own
statement. R. 120-3, at 32–33. His attorney’s statement to the
EEOC explained:
 During classes, Kluge addressed students by
 last names, as a reasonable accommodation for
 his sincerely held Christian beliefs. But during
 the orchestra awards ceremony, because of its
 formal nature, he used the full names for stu-
 dents listed in PowerSchool to address all stu-
 dents as they were receiving their awards—in-
 cluding transgender students—because he was
 trying to work with the school in only
30 No. 21-2475

 requesting what was reasonable. Kluge thought
 it unreasonable and conspicuous to address stu-
 dents in such an informal manner at such a for-
 mal event, as opposed to the classroom setting
 where teachers refer to students by last names
 as a normal form of address. Kluge’s Christian
 faith required that he do no harm to his stu-
 dents, and this acquiescence to the administra-
 tion’s position was done solely out of sincerely-
 held beliefs, and not in agreement with the pol-
 icy.
R. 120-19, at 7 (Letter of Michael J. Cork, Esq. to David A. Tite,
EEOC Investigator). Thus Kluge acknowledged that using
last names only in some settings would be unreasonable, con-
spicuous, and potentially cause harm to his students contrary
to the requirements of his Christian faith.10 He therefore de-
cided to use first and last names, and in keeping with the ac-
commodation, he used the first names from PowerSchool ra-
ther than the students’ former first names.11 Kluge conceded
that a school has an interest in being concerned with the men-
tal health of its students. R. 120-3, at 35.

10 The dissent contends that we are “constru[ing] this statement as
a legal concession” that Kluge’s practice would potentially harm his stu-
dents. No construing is necessary; the statement speaks for itself.
11 Brownsburg contends that Kluge’s use of the PowerSchool names
at this ceremony calls into question the sincerity of his asserted religious
beliefs. Because we resolve the case in favor of Brownsburg, we need not
address the sincerity of Kluge’s beliefs, and we assume his sincerity for
summary judgment purposes.
No. 21-2475 31

 Kluge scheduled a meeting with Dr. Daghe and Gordon
on May 25, 2018, at the Brownsburg Central Office. R. 15-3, at
1. When Kluge arrived for the meeting, Gordon was not pre-
sent, and Dr. Daghe told Kluge, “We have everything we
need. We don’t need to meet. Go back to the high school.” Dr.
Daghe also told Kluge not to meet with Gordon that day.
R. 15-3, at 1. Kluge instead delivered a letter to Gordon’s of-
fice, explaining that he had wanted to meet in order to present
a written “Withdrawal of Intention to Resign and Request for
Continuation of Accom[m]odation.” R. 15-3. A few hours
later, Brownsburg locked Kluge out of school buildings and
online services, and posted his job as vacant. R. 113-2, at 7;
R. 120-3, at 29.
 At the June 11, 2018 school board meeting where resigna-
tions were considered, Kluge was denied a request to speak
during the regular part of the meeting, but gave a brief state-
ment during the public-comment section of the meeting.
R. 120-3, at 29; R. 120-18, at 10. He explained what had hap-
pened, and asked the board to allow him to withdraw his res-
ignation and to reinstate him. R. 120-3, at 29–30; R. 120-18, at
10. The board instead accepted his resignation without com-
ment. R. 113-2, at 7; R. 120-3, at 30; R. 120-18, at 2.
 Kluge sued the school, bringing claims under Title VII for
religious discrimination/failure to accommodate; retaliation;
and hostile work environment. He also brought claims under
the First and Fourteenth Amendments and Indiana law. The
district court dismissed the claims under the First and Four-
teenth Amendments as well as the state law claims, and the
Title VII claim for hostile work environment. Kluge does not
appeal those dismissals. Kluge’s claim for religious
32 No. 21-2475

discrimination/failure to accommodate (for the sake of sim-
plicity, we will call this the discrimination claim) and his re-
taliation claim proceeded to discovery. Ultimately, Kluge
filed a motion for partial summary judgment on his discrimi-
nation claim, and the school countered with a cross-motion
for summary judgment on both of the remaining claims.
 The district court denied Kluge’s motion, and granted
Brownsburg’s cross-motion. On the discrimination claim, the
court framed the ultimate issue as “whether, assuming perfect
compliance with the last names only accommodation, that ac-
commodation resulted in undue hardship to” Brownsburg.
Kluge v. Brownsburg Cmty. Sch. Corp., 548 F. Supp. 3d 814, 839
(S.D. Ind. 2021). For summary judgment purposes, the court
treated Kluge’s forced resignation as an adverse employment
action. The court also accepted that his religious beliefs and
objections to using the PowerSchool names and pronouns of
transgender students were sincerely held. After finding that
there was an objective conflict between Kluge’s sincerely held
religious beliefs and Brownsburg’s policies for transgender
students, the court concluded that Kluge’s refusal to follow
those policies created an undue hardship on Brownsburg’s
mission of educating all of its students. In particular, the court
found that the last-names-only accommodation burdened
Brownsburg’s ability to provide an education for all students
and conflicted with the school’s philosophy of creating a safe
and supportive environment for all students. In finding that
the accommodation created an undue burden, the court relied
on the reports of Aidyn and Sam as well as those of other stu-
dents and teachers. Aidyn and Sam reported feeling targeted
and uncomfortable, and Aidyn grew to dread going to
No. 21-2475 33

Kluge’s orchestra class, ultimately quitting orchestra entirely.
Other students and teachers complained that Kluge’s practice
was offensive or insulting and made his classroom environ-
ment unwelcome and uncomfortable. The court found that
Brownsburg was not required to allow an accommodation
that unduly burdened its business of educating all students in
a supportive manner. The court found an additional undue
burden in that the accommodation opened the school up to
the threat of Title IX discrimination lawsuits that could be
brought by transgender students who felt targeted and dehu-
manized by Kluge’s practice. The court concluded that
Brownsburg had demonstrated as a matter of law that it could
not accommodate Kluge’s “religious belief against referring
to transgender students using their preferred names and pro-
nouns without incurring undue hardship.” Kluge, 548
F. Supp. 3d at 846.
 As for Kluge’s retaliation claim, the court found that
Kluge’s briefing on the matter had been meager, and that he
had simply recited his version of the facts without discussing
how those facts meet the requirements of a retaliation claim.
The court also noted that Kluge failed to address Browns-
burg’s argument that there is no evidence in the record from
which a reasonable fact finder could infer that its non-dis-
criminatory explanation for its action was a pretext for reli-
gious discrimination. Without any explanation of his theory
of retaliation and without any evidence demonstrating pre-
text, the court found that Kluge had waived his claim for re-
taliation. As an alternate basis for granting judgment in favor
of the defendant, the court also noted that Kluge failed to pre-
sent any evidence from which a reasonable fact finder could
34 No. 21-2475

conclude that a causal connection exists between Kluge’s pro-
tected activity and his resignation, any evidence of pretext, or
any evidence that Brownsburg’s action was motivated by dis-
criminatory animus. The court therefore granted summary
judgment in favor of the school on the retaliation claim as
well. Kluge appeals.
 II.
 On appeal, Kluge asks the court to reverse the grant of
summary judgment in favor of Brownsburg on both of his
claims. For the discrimination claim, he asks that we remand
to the district court in order to enter summary judgment in
his favor because Brownsburg withdrew a reasonable accom-
modation and forced him to resign without demonstrating
that the accommodation caused undue hardship.12 Kluge also

12 Kluge appeals both the grant of summary judgment in favor of
Brownsburg and the denial of summary judgment in his favor. Specifi-
cally, he asks that we reverse and remand for judgment to be entered in
his favor as a matter of law. When the district court considers cross-mo-
tions for summary judgment, granting one and denying the other, the de-
nial of summary judgment “has merged into the final judgment and is
therefore appealable” as part of the appeal from the final judgment grant-
ing the opposing party’s motion. Santaella v. Metro. Life Ins. Co., 123 F.3d
456, 461 (7th Cir. 1997). In order to consider Kluge’s request that we re-
verse the denial of summary judgment in his favor, we would be required
to review the facts in the light most favorable to the defendant, Browns-
burg, and draw all reasonable inferences in favor of the school. See Hess v.
Reg-Ellen Machine Tool Corp., 423 F.3d 653, 658 (7th Cir. 2005) (“With cross-
motions, our review of the record requires that we construe all inferences
in favor of the party against whom the motion under consideration is
made.”). As is apparent from our recitation of the undisputed facts, such
a review would demonstrate that Kluge is not entitled to judgment as a
 (continued)
No. 21-2475 35

urges this court to find that he preserved his retaliation claim
and presented sufficient evidence in support of that claim to
merit summary judgment in his favor; in the alternative, he
seeks a trial on the retaliation claim. Brownsburg asks the
court to affirm the district court’s judgment in all respects. We
review the district court’s grant of summary judgment de
novo, and we examine the record in the light most favorable
to the party opposing judgment, in this case Kluge, constru-
ing all reasonable inferences from the evidence in his favor.
Anderson, 477 U.S. at 255; Horne v. Electric Eel Mfg. Co., 987 F.3d
704, 713 (7th Cir. 2021). Summary judgment is appropriate
when there are no genuine disputes of material fact and the
movant is entitled to judgment as a matter of law. Fed. R. Civ.
P. 56(a); Anderson, 477 U.S. at 247–48; Horne, 987 F.3d at 713.
“[S]ince the review of summary judgment is plenary, errors
of analysis by the district court are immaterial; we ask
whether we would have granted summary judgment on this
record.” Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 386
(7th Cir. 2000). See also Tobey v. Extel/JWP, Inc., 985 F.2d 330,
332 (7th Cir. 1993) (“The question whether a movant is enti-
tled to summary judgment is one of law—one therefore that
we review de novo, which is to say without deference for the

matter of law: the school asserts with copious evidence from students, fac-
ulty and administrators that Kluge sometimes failed to follow the accom-
modation (a failure which he conceded through his lawyer during pro-
ceedings before the EEOC), treated transgender students differently than
non-transgender students, and created what can be described at best as a
difficult learning environment for the students in his class. He also alien-
ated his colleagues in the Arts Department and offended parents. Con-
struing the record in favor of Brownsburg, Kluge is not entitled to judg-
ment. In considering Kluge’s appeal of the grant of summary judgment in
favor of Brownsburg, we must construe the record in Kluge’s favor.
36 No. 21-2475

view of the district judge and hence almost as if the motion
had been made to us directly.”).
 A.
 Title VII provides, in relevant part, that “It shall be an un-
lawful employment practice for an employer—(1) to fail or re-
fuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his com-
pensation, terms, conditions, or privileges of employment, be-
cause of such individual’s race, color, religion, sex, or national
origin[.]” 42 U.S.C. § 2000e-2(a)(1). After that provision was
enacted, the EEOC issued a guideline that required “that an
employer, short of ‘undue hardship,’ make ‘reasonable ac-
commodations’ to the religious needs of its employees.” Trans
World Airlines, Inc. v. Hardison, 432 U.S. 63, 66 (1977); 29 C.F.R.
§ 1605.1(b) (1968). Congress later codified that “reasonable ac-
commodation” regulation in its definition of the term “reli-
gion”:
 The term “religion” includes all aspects of reli-
 gious observance and practice, as well as belief,
 unless an employer demonstrates that he is un-
 able to reasonably accommodate to an em-
 ployee’s or prospective employee’s religious
 observance or practice without undue hardship
 on the conduct of the employer’s business.
42 U.S.C. § 2000e(j). The Supreme Court said that “[t]he intent
and effect of this definition was to make it an unlawful em-
ployment practice under [sec. 2000e-2(a)(1)] for an employer
not to make reasonable accommodations, short of undue
No. 21-2475 37

hardship, for the religious practices of his employees and pro-
spective employees.” Hardison, 432 U.S. at 74.
 The statute did not, however, provide guidance for deter-
mining the degree of accommodation required of an em-
ployer, and legislative history was not illuminating. Hardison,
432 U.S. at 74–75. In Hardison, the Supreme Court set out to
determine the reach of the employer’s statutory obligation to
make reasonable accommodation for the religious obser-
vances of its employees, which had not previously been
spelled out by Congress or by EEOC guidelines. 432 U.S. at
75. The plaintiff, Hardison, worked at Trans World Airlines
(“TWA”) in an airplane maintenance department that oper-
ated twenty-four hours a day, every day of the year. All em-
ployees of the department were subject to the terms of a col-
lective bargaining agreement that had a system of bidding for
shift assignments based on seniority. Early in his employment
at TWA, Hardison began following a religion that required its
members to refrain from work from sunset on Friday until
sunset on Saturday. But Hardison lacked the seniority to bid
for a schedule that accommodated his religious beliefs and the
union was unwilling to allow him to bypass the seniority sys-
tem. TWA considered other possible solutions, but each had
a cost to the employer such as breaching the seniority system,
paying premium wages to hire someone to cover the Saturday
shift, or leaving the shift uncovered. The company met sev-
eral times with Hardison in attempts to find a solution, au-
thorized the union steward to search for someone who would
voluntarily swap shifts, and attempted without success to
find Hardison another job within the company. TWA
38 No. 21-2475

eventually discharged Hardison on grounds of insubordina-
tion for refusing to work his assigned shift.
 In a bench trial, the district court entered judgment in fa-
vor of TWA after concluding that the proposed accommoda-
tions presented an undue hardship for the company. The
court of appeals reversed and found in favor of Hardison,
concluding that TWA could have: (1) given Hardison a four-
day work-week and used a supervisor or other worker to
cover the fifth day; (2) filled Hardison’s shift with another em-
ployee; or (3) arranged a swap between Hardison and another
employee for shifts in the sundown Friday to sundown Satur-
day period. The Supreme Court rejected all of these options
because each would have created “undue hardship” under
the statute. In particular, the first option would have caused
other shop functions to suffer; the second would have re-
quired the company to offer premium overtime pay to the
substitute employee; and the third would have violated the
seniority system. Hardison, 432 U.S. at 77–84.
 In considering the “undue hardship” language of the stat-
ute, the Court decided that the duty to accommodate did not
require a company to take steps inconsistent with a valid col-
lective bargaining agreement or seniority system, noting:
 Title VII does not contemplate such unequal
 treatment. The repeated, unequivocal emphasis
 of both the language and the legislative history
 of Title VII is on eliminating discrimination in
 employment, and such discrimination is pro-
 scribed when it is directed against majorities as
 well as minorities. … Indeed, the foundation of
No. 21-2475 39

 Hardison’s claim is that TWA and IAM engaged
 in religious discrimination in violation of [sec.
 2000e-2(a)(1)] when they failed to arrange for
 him to have Saturdays off. It would be anoma-
 lous to conclude that by “reasonable accommo-
 dation” Congress meant that an employer must
 deny the shift and job preference of some em-
 ployees, as well as deprive them of their con-
 tractual rights, in order to accommodate or pre-
 fer the religious needs of others, and we con-
 clude that Title VII does not require an em-
 ployer to go that far.
Hardison, 432 U.S. at 81. The Court relied in part on the statu-
tory preference given to bona fide seniority systems, noting
that, under section 2000e-2(h), “absent a discriminatory pur-
pose, the operation of a seniority system cannot be an unlaw-
ful employment practice even if the system has some discrim-
inatory consequences.” 432 U.S. at 82.
 The Court then considered the other options open to TWA
to accommodate Hardison’s religious practice, such as replac-
ing Hardison on those shifts with supervisory personnel or
personnel from other departments, or replacing him with
other available workers by paying premium overtime wages.
Both alternatives, the Court noted, involved costs to the com-
pany, “either in the form of lost efficiency in other jobs or
higher wages.” 432 U.S. at 84. The Court found that the em-
ployer was not required by the statute to incur either cost, in-
stead holding that, “To require TWA to bear more than a de
minimis cost in order to give Hardison Saturdays off is an un-
due hardship.” 432 U.S. at 84.
40 No. 21-2475

 Like abandonment of the seniority system, to re-
 quire TWA to bear additional costs when no
 such costs are incurred to give other employees
 the days off that they want would involve une-
 qual treatment of employees on the basis of
 their religion. By suggesting that TWA should
 incur certain costs in order to give Hardison Sat-
 urdays off the Court of Appeals would in effect
 require TWA to finance an additional Saturday
 off and then to choose the employee who will
 enjoy it on the basis of his religious beliefs.
 While incurring extra costs to secure a replace-
 ment for Hardison might remove the necessity
 of compelling another employee to work invol-
 untarily in Hardison’s place, it would not
 change the fact that the privilege of having Sat-
 urdays off would be allocated according to reli-
 gious beliefs.
 As we have seen, the paramount concern of
 Congress in enacting Title VII was the elimina-
 tion of discrimination in employment. In the ab-
 sence of clear statutory language or legislative
 history to the contrary, we will not readily con-
 strue the statute to require an employer to dis-
 criminate against some employees in order to
 enable others to observe their Sabbath.
Hardison, 432 U.S. at 84–85.
 The Supreme Court subsequently spoke on reasonable ac-
commodations for religious practice in the employment
No. 21-2475 41

context only two other times. In Ansonia Bd. of Educ. v. Phil-
brook, 479 U.S. 60, 68 (1986), the Court clarified that “where
the employer has already reasonably accommodated the em-
ployee’s religious needs, the statutory inquiry is at an end.
The employer need not further show that each of the em-
ployee’s alternative accommodations would result in undue
hardship.” The Court thus rejected the claim that the accom-
modation obligation includes a duty to accept the proposal
the employee prefers unless that accommodation causes un-
due hardship on the employer’s conduct of his business. 479
U.S. at 68. Instead, in situations where multiple accommoda-
tions are possible, the Court held that an employer has met its
statutory obligation “when it demonstrates that it has offered
a reasonable accommodation to the employee.” 479 U.S. at 69.
 In the Court’s last and most recent foray into the reasona-
ble accommodation provision of Title VII, the Court consid-
ered a case where an employer declined to hire a woman for
a sales position in a clothing store because she wore a head
scarf, which would violate the store’s “Look Policy” that gov-
erned employees’ dress. E.E.O.C. v. Abercrombie & Fitch Stores,
Inc., 575 U.S. 768 (2015). At the time the store made the deci-
sion, the assistant manager who interviewed the woman
found her otherwise qualified to be hired but was concerned
that the scarf violated the Look Policy’s prohibition on caps.
The assistant manager sought guidance from a district man-
ager, informing him that she believed that the prospective
employee wore the scarf for religious reasons. The district
manager directed the assistant manager not to hire the
woman because the scarf would violate the Look Policy as
would all other headwear, whether religious or otherwise.
42 No. 21-2475

The prospective employee prevailed on a Title VII reasonable
accommodation claim in the district court, but the court of ap-
peals reversed, finding that an employer cannot be liable for
failing to accommodate a religious practice until the applicant
or employee provides the employer with actual knowledge of
the need for an accommodation.
 The Supreme Court noted that the statute prohibits em-
ployers from failing to hire an applicant “because of” her re-
ligious practice. The term “because of” imports at a minimum
the “but-for” standard of causation. Abercrombie, 575 U.S. at
772. Title VII relaxes that standard by providing that “an un-
lawful employment practice is established when the com-
plaining party demonstrates that race, color, religion, sex, or
national origin was a motivating factor for any employment
practice, even though other factors also motivated the prac-
tice.” 42 U.S.C. § 2000e-2(m) (emphasis added); Abercrombie,
575 U.S. at 773. The statute also does not impose a knowledge
requirement, but instead “prohibits certain motives, regardless
of the state of the actor’s knowledge.” Abercrombie 575 U.S. at
773. Thus:
 An employer who has actual knowledge of the
 need for an accommodation does not violate Ti-
 tle VII by refusing to hire an applicant if avoid-
 ing that accommodation is not his motive. Con-
 versely, an employer who acts with the motive
 of avoiding accommodation may violate Title
 VII even if he has no more than an unsubstanti-
 ated suspicion that accommodation would be
 needed. … An employer may not make an
No. 21-2475 43

 applicant’s religious practice, confirmed or oth-
 erwise, a factor in employment decisions.
Abercrombie, 575 U.S. at 773. Finally, the Court rejected the
premise that a neutral employment policy cannot constitute
intentional discrimination, finding:
 Title VII does not demand mere neutrality with
 regard to religious practices—that they be
 treated no worse than other practices. Rather, it
 gives them favored treatment, affirmatively ob-
 ligating employers not “to fail or refuse to hire
 or discharge any individual ... because of such
 individual’s” “religious observance and prac-
 tice.” An employer is surely entitled to have, for
 example, a no-headwear policy as an ordinary
 matter. But when an applicant requires an ac-
 commodation as an “aspec[t] of religious ...
 practice,” it is no response that the subsequent
 “fail[ure] ... to hire” was due to an otherwise-
 neutral policy. Title VII requires otherwise-neu-
 tral policies to give way to the need for an ac-
 commodation.
Abercrombie, 575 U.S. at 775.
 The Supreme Court did not address the undue hardship
standard in Philbrook or Abercrombie, leaving in place the
standard it set in Hardison, namely, that the employer need
not “bear more than a de minimis cost” in making an accom-
modation. See also E.E.O.C. v. Walmart Stores East, L.P., 992
F.3d 656, 658 (7th Cir. 2021) (describing Hardison’s de minimis
cost as a “slight burden” to avoid the Latin). Our court
44 No. 21-2475

established a burden-shifting framework for proof of a Title
VII claim for failure to accommodate religion in E.E.O.C. v.
Ilona of Hungary, Inc., 108 F.3d 1569 (7th Cir. 1997), which must
be modified slightly to account for the Supreme Court’s opin-
ion in Abercrombie. To make out a prima facie case, an employee
must demonstrate that: (1) an observance or practice that is
religious in nature, and (2) that is based on a sincerely held
religious belief, (3) conflicted with an employment require-
ment, and (4) the religious observance or practice was the ba-
sis or a motivating factor for the employee’s discharge or
other discriminatory treatment. Abercrombie, 575 U.S. at
772-73; Adeyeye v. Heartland Sweeteners, LLC, 721 F.3d 444, 449
(7th Cir. 2013); Porter v. City of Chicago, 700 F.3d 944, 951 (7th
Cir. 2012); Ilona of Hungary, 108 F.3d at 1575. “If the employee
shows these elements, the burden then shifts to the employer
to show that it could not accommodate the employee’s reli-
gious belief or practice without causing the employer undue
hardship.” Adeyeye, 721 F.3d at 449; Baz v. Walters, 782 F.2d
701, 706 (7th Cir. 1986).
 The district court determined that Kluge established a
prima facie case of failure to accommodate a religious practice.
The court noted that there were issues of fact as to whether
Kluge’s religious beliefs were sincerely held, but taking the
record in the light most favorable to Kluge for the purposes
of summary judgment, there was enough evidence that his re-
fusal to use the preferred names and pronouns of the
transgender students was a religious practice based on a
No. 21-2475 45

sincerely held belief.13 Kluge also presented adequate evi-
dence that his practice conflicted with an employment re-
quirement, in particular, the PowerSchool Name Policy.
Brownsburg does not dispute that forcing Kluge to either
comply with the Name Policy, resign, or be terminated was
an adverse employment action, and the school generally con-
cedes that, for the purposes of this appeal, Kluge has estab-
lished a prima facie case of failure to accommodate.
 B.
 The burden then shifts to Brownsburg to demonstrate that
it could not reasonably accommodate Kluge “without undue
hardship on the conduct of the employer’s business.” 42
U.S.C. § 2000e(j). “Reasonableness is assessed in context, of
course, and this evaluation will turn in part on whether or not
the employer can in fact continue to function absent undue
hardship if the employee is permitted” the requested accom-
modation. Adeyeye, 721 F.3d at 455. Accordingly, “[t]he issue
of undue hardship will depend on close attention to the spe-
cific circumstances of the job[.]” Id. As a public school,
Brownsburg’s “business” is its constitutional and statutory
charge to educate all students who enter its doors. We have
noted that, “pupils are a captive audience. Education is

13 In his response opposing a motion for leave to file an amicus brief
in the district court, Kluge described his sincerely held religious belief as
“what is best for the eternal spiritual well-being of [the transgender stu-
dents] is to avoid affirming them in a moral error.” R. 145, at 7. As we
mentioned earlier, Kluge also believed that it would be sinful for him to
“promote gender dysphoria” by using the transgender student’s Pow-
erSchool names and pronouns. R. 120-3, at 6–10.
46 No. 21-2475

compulsory, and children must attend public schools unless
their parents are willing to incur the cost of private education
or the considerable time commitment of home schooling.”
Mayer v. Monroe Cty. Cmty. Sch. Corp., 474 F.3d 477, 479 (7th
Cir. 2007). Because of the compulsory nature of education, we
have noted in the First Amendment context:
 Children who attend school because they must
 ought not be subject to teachers’ idiosyncratic
 perspectives. Majority rule about what subjects
 and viewpoints will be expressed in the class-
 room has the potential to turn into indoctrina-
 tion; elected school boards are tempted to sup-
 port majority positions about religious or patri-
 otic subjects especially. But if indoctrination is
 likely, the power should be reposed in someone
 the people can vote out of office, rather than ten-
 ured teachers. At least the board’s views can be
 debated openly, and the people may choose to
 elect persons committed to neutrality on con-
 tentious issues. … The Constitution does not en-
 title teachers to present personal views to cap-
 tive audiences against the instructions of elected
 officials.
474 F.3d at 479–80.14

14 The dissent asserts that under the Indiana Constitution, schools
need only admit all children, and that the Constitution does not require or
prescribe any specific standard of educational quality. The dissent also
cites Indiana case law interpreting the State’s education statutes as not re-
quiring “that Indiana school corporations affirm transgender identity.”
 (continued)
No. 21-2475 47

 Brownsburg claims two undue hardships with Kluge’s
use of students’ last names only: first, the school asserts that
Kluge’s last-names-only practice frustrated its efforts to edu-
cate all students because the accommodation negatively im-
pacted students and the learning environment for
transgender students and other students as well. Second,
Kluge’s practice exposed Brownsburg to the risk of Title IX
litigation brought by transgender students who claim sex-
based discrimination based upon a theory of sex-stereotyp-
ing. See Whitaker, 858 F.3d at 1047–48.
 1.
 We begin with Brownsburg’s claim that the last-names-
only practice frustrated the school’s effort to educate all stu-
dents by harming students and negatively affecting student
learning. As we discuss below, the only relevant question at
this point is whether the school could accommodate Kluge
without working an undue hardship on the conduct of its
business. We conclude that the undisputed evidence demon-
strates that Brownsburg met its burden of establishing undue

But Brownsburg never made any claims that the State’s Constitution or
statutes required it to affirm transgender identity. The school instead con-
sistently relied on its own policy choices about how to run its high school,
and how to address the specific challenges faced by a particular group of
students. We have cited to the State’s Constitution and educational stat-
utes only to provide context and to explain the differences between run-
ning schools and managing other kinds of businesses. In addition to the
compulsory nature of education, the school stands in for parents and deals
with the needs not of adult customers or coworkers (the categories into
which the dissent attempts to shoehorn the analysis) but of children.
48 No. 21-2475

hardship as a matter of law, and none of the additional evi-
dence cited by the dissent calls that conclusion into question.
 It is undisputed that, prior to the start of the 2017–2018
school year, Brownsburg recognized an increase in enroll-
ment of transgender students, and concluded that these stu-
dents faced “significant challenges in the high school environ-
ment, including diminished self-esteem and heightened ex-
posure to bullying.” R. 120-1, at 3. It is also undisputed that
Brownsburg administrators determined that “these chal-
lenges threaten transgender students’ classroom experience,
academic performance, and overall well-being.” R. 120-1, at 3.
They therefore began to develop policies and practices for ad-
dressing these challenges.
 As Dr. Jessup averred, a “very practical but critical ques-
tion that arose … is what names staff should use to address
transgender students in class.“ R. 120-1, at 3. Obviously, “a
high school classroom cannot function without teachers ad-
dressing students directly.” R. 120-1, at 3. Brownsburg ulti-
mately adopted the PowerSchool Name Policy as part of its
larger plan to address the special needs of these students. The
goal of the Name Policy was two-fold: to provide the faculty
with a straightforward rule when addressing students; and to
afford dignity and empathy towards transgender students be-
cause the administration considered it important “for
transgender students to receive, like any other student, re-
spect and affirmation of their preferred identity[.]” R. 120-1,
at 4. The requirement that students could change their names
and pronouns in PowerSchool only with the consent of a par-
ent and the approval of a healthcare professional allayed the
religious objections and concerns of three of the four teachers
No. 21-2475 49

who signed the seven-page letter and accompanied Kluge to
the May 15, 2017 meeting with Dr. Daghe. Kluge alone con-
tinued to object. In response to Kluge’s continued concerns,
the school agreed to allow Kluge two accommodations: first,
he would address all students by their last names only; and
second, another adult would hand out gendered orchestra
uniforms, relieving Kluge of that duty.
 The school produced copious evidence that, once these ac-
commodations were in place, Dr. Daghe, teacher Craig Lee,
and Dr. Jessup soon began to receive reports and complaints
about the harms caused by Kluge’s last-names-only practice.
In particular, Dr. Daghe received reports that transgender stu-
dents in Kluge’s class felt insulted and disrespected by
Kluge’s use of last names only. They also felt isolated and tar-
geted. A non-transgender student in Kluge’s class reported to
Lee that the practice was “incredibly awkward.” That student
reported that the practice made the transgender students
stand out, and that he and others in the school felt bad for the
transgender students. Dr. Daghe also received reports that
transgender students in Kluge’s class felt dehumanized by the
last-names-only practice, and Dr. Daghe concluded that the
practice was “detrimental to kids.”
 Dr. Jessup personally attended an Equality Alliance meet-
ing and heard complaints about Kluge’s practice from four or
five students at the meeting, complaints with which the other
thirty-five students in attendance appeared to agree. Dr.
Jessup heard from students and faculty that students felt sin-
gled out by the use of their last names, and that “not all stu-
dents were called by their last name by Mr. Kluge.” R. 120-6,
at 7; R. 120-1, at 4.
50 No. 21-2475

 Dr. Daghe also received reports that Kluge sometimes
slipped up and used first names or gendered honorifics for
non-transgender students. Although we credit Kluge’s denial
that he ever made such mistakes, Kluge has no evidence con-
tradicting assertions by Drs. Daghe and Jessup that they re-
ceived such reports and needed to address them. As Dr.
Daghe testified, Kluge’s practice also disrupted the learning
environment more broadly because students who were un-
comfortable in Kluge’s classes brought their “discussions
about the uncomfortableness, whether it was dealing with a
transgender student and last names only or whether it was
times when last names weren’t used,” to other classrooms.
 Lee heard complaints about Kluge’s practice from stu-
dents regularly at Equality Alliance meetings, and personally
witnessed the emotional pain suffered by the transgender stu-
dents when they discussed the environment in Kluge’s class.
Other faculty in Kluge’s own department reported tension
among students and faculty created by Kluge’s last-names-
only practice.
 All of this was reported to Kluge, mainly by Dr. Daghe, as
Kluge himself acknowledged. See R. 15-3, at 3–6; R. 112-2, at
4; R. 112-5, at 7. See also R. 120-5, at 9 (where Dr. Daghe testi-
fied that he talked to Kluge about the transgender students
but also about the entire class of students, “about the uncom-
fortableness of adults in my building around him with similar
students in theater, in band, in choir, and orchestra that those
teachers share and it was a concern that kids didn’t know how
to behave, didn’t know how to address. And that was the tem-
perament or the way I was addressing the meetings ahead of
time and saying can you follow this second accommodation
No. 21-2475 51

because we’re going to be changing that, as he heard in Janu-
ary, for the following year and I needed this to move forward
as a high school principal in a way that he would follow the
accommodations and that my conversation with him was not
happening the way it was written.”). In describing the Janu-
ary 17, 2018 meeting where Dr. Daghe told Kluge that he
should resign at the end of the school year, Kluge told Dr.
Daghe that “it was simply because he [Dr. Daghe] didn’t like
the tension and the conflict.” R. 15-3, at 5. Kluge interpreted
the tension and conflict that he had caused as a scriptural sign
that he should stay at the school. R. 15-3, at 5.
 Kluge has produced no evidence to the contrary. That is,
he has produced no evidence tending to show that the
transgender students were not emotionally harmed by his
practice or that the learning environment was not disrupted.
A practice that indisputably caused emotional harm to stu-
dents and disruptions to the learning environment is an un-
due hardship to a school as a matter of law. As Kluge himself
conceded, schools have a legitimate interest in the mental
health of their students. R. 120-3, at 35. And as Dr. Daghe ex-
plained, his job as principal was to “make sure that education
can move forward.” R. 112-5, at 7. Education is, indeed, the
business of every school. Thus, emotional harm to students
and disruptions to the learning environment are objectively
more than de minimis or slight burdens to schools.
 Nor did Kluge produce any evidence that Dr. Daghe, Dr.
Jessup, and Lee15 all lied about receiving these reports and

15 The dissent points out that Lee described himself as “very biased”
on the subject of how the school should handle issues related to
 (continued)
52 No. 21-2475

lied about feeling a need to act on them in order to address
the needs of transgender students and the tense educational
environment. At most Kluge claims that he did not believe Dr.
Daghe on occasion because Dr. Daghe did not give him the
names of the students who reported that they were harmed
by Kluge’s use of last names only. But Kluge’s metaphysical
doubt about Dr. Daghe’s credibility does not create a genuine
issue of material fact. “[N]othing requires the district court to
disbelieve defendants’ proffered evidence simply because
[the plaintiff]—without proof—asserts it is false.” Carroll v.
Lynch, 698 F.3d 561, 565 (7th Cir. 2012). See also Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)
(“When the moving party has carried its burden under Rule
56(c), its opponent must do more than simply show that there
is some metaphysical doubt as to the material facts.”); Barnes
v. City of Centralia, IL, 943 F.3d 826, 832 (7th Cir. 2019) (same).
Instead, “the nonmoving party must come forward with ‘spe-
cific facts showing that there is a genuine issue for trial.’”
Matsushita, 475 U.S. at 587; Fed. R. Civ. P. 56(e). See also Car-
roll, 698 F.3d at 565 (plaintiff cannot rest on “metaphysical
doubt” that defendant lied but must produce evidence so
showing).

transgender students. To his credit, Lee candidly admitted that bias when
he made his reports of harm and disruption to school administrators. Dr.
Daghe and other administrators were thus aware of that bias when they
were assessing the scope and severity of the problem. Although the dis-
sent would have a jury reweigh whether the employer should have credited
Lee’s reports, that is not the relevant question, as we discuss below. Infra,
at 53-55 (discussing undisputed evidence known to the school at the time
of the decision).
No. 21-2475 53

 Similarly, Kluge testified that he felt no tension from other
teachers, was unaware of any problems in his classroom, and
felt that his students were not adversely affected by his prac-
tice. Kluge believed that his students were performing well
and not experiencing any problems. But summary judgment
is not defeated by Kluge’s perception that all was well. A fail-
ure to notice that anything problematic was happening is not
evidence that it did not happen; nor is it evidence that
Brownsburg did not receive reports from students, teachers,
and others that it was happening. Moreover, in employment
discrimination cases, the employee’s “own opinion about his
work performance is irrelevant.” Sklyarsky v. Means-Knaus
Partners, L.P., 777 F.3d 892, 897 (7th Cir. 2015). See also Sublett
v. John Wiley & Sons, Inc., 463 F.3d 731, 740 (7th Cir. 2006) (a
plaintiff’s conclusory statements do not create an issue of fact,
and an employee’s self-serving statements about his ability
are insufficient to contradict an employer’s negative assess-
ment of that ability). Indeed, Kluge himself acknowledged
that using last names only in some settings would be unrea-
sonable, conspicuous, and potentially cause harm to his stu-
dents, which is why he used the PowerSchool Names at the
orchestra award ceremony. Kluge also acknowledged creat-
ing tension and conflict at the school. To the extent that Kluge
draws a theological distinction between regular use of the
first names in a classroom setting versus using them on a one-
time basis at a more formal award ceremony, Brownsburg
was within its rights to consider the daily harm of the last
names practice in the classroom paramount.
 Moreover, the evidence that the dissent cites from three
students and a contract teacher is not relevant to the question
54 No. 21-2475

presented here. First, that these three children and a contract
teacher did not experience or notice harm or disruption does
not rebut the truth of the reports of harm and disruption ex-
perienced by others. It was not necessary for the school to find
that Kluge’s practice harmed all of the students before the
school was justified in addressing the situation.
 Second, none of the information from these four affiants is
relevant to the question of whether the decision-makers re-
ceived reports of emotional harm and disruption to the learn-
ing environment from other students, teachers and parents.
We cannot emphasize strongly enough that Kluge has pro-
duced no evidence suggesting that the reported emotional
harms to students and disruptions to the learning environ-
ment did not occur or that the reports were not made.
 Third, to the extent that the dissent relies on this evidence
to demonstrate that Kluge complied perfectly with the accom-
modation, we have already credited his claim of perfect com-
pliance. The reports of emotional harm and disruption came
in nevertheless.
 Fourth, none of the information from these three students
and the contract teacher was known to school administrators
at the time they were making the decision to withdraw the
accommodation. The dissent contends that evidence from
these students and the contract teacher is relevant “whether
or not this information was known by the School District at
the time of the adverse employment decision.” It is axiomatic
that an employer can make decisions based only on the infor-
mation known to it at the time of the decision. The dissent
nevertheless poses the puzzling question, “If, by contextual
No. 21-2475 55

evidence obtained after discharge, an employee plaintiff is not
able to undermine the alleged presence of undue hardship,
when, if ever, can the employee prevail?” The answer is sim-
ple: by uncovering evidence that was before the employer at
the time of the decision, evidence that would contradict the
employer’s claims that students were emotionally harmed
and the learning environment was disrupted. If no one was
harmed and there was no disruption, then the burden of al-
lowing the accommodation would be de minimis. But in the
absence of any evidence known to the employer contradicting
the existence of the harms, there is nothing for a jury to decide.
The evidence, of course, may be obtained after the discharge,
but it must be evidence that the employer knew at the time of
the decision to withdraw the accommodation. To suggest that
the employer may be held liable for a decision to withdraw
an accommodation based on information that did not exist at
the time of the decision holds employers to an impossible
“crystal ball” standard. The dissent asserts that applying a
test that depends on the employer’s knowledge would create
a perverse incentive for employers to avoid investigating
whether hardship would arise from an accommodation. But
there is no claim of a faulty investigation here, and the em-
ployer actually granted the accommodation and then saw in
real time the harms that resulted. If an employer conducted
an inadequate investigation, that could be evidence that the
withdrawal of the accommodation was based on some dis-
criminatory reason rather than on the undue hardship, but
that is simply not the case here.
 The dissent would have a jury second guess whether the
reported harms occurred and whether the employer received
56 No. 21-2475

those reports even in the absence of evidence to the contrary.
In particular, the dissent would have a jury decide the credi-
bility of the students who were emotionally harmed and the
teachers who saw and reported disruptions to the learning
environment when there is no evidence contradicting the re-
ports of harm and educational disruption. Those assessments
were for the school to make based on the information availa-
ble to it at the time. The dissent would also have a jury second
guess whether emotional harm to students (in this case, par-
ticularly vulnerable students) and disruptions to the learning
environment were sufficient to overcome the de minimis un-
due hardship standard when Kluge himself conceded that the
school had a legitimate interest in the mental health of its stu-
dents, and even though learning is the primary purpose for
the existence of the school. These harms were far more than a
slight burden as a matter of law.
 The dissent also contends that the transgender students
were offended not because of any discomfort with the last-
names practice itself but because of the students’ “assump-
tions and intuitions about why Kluge was using only last
names.” The dissent maintains that “[t]he alleged offense
arose from students’ presumptions and guesses as to Kluge’s
motives for using last names only.” There are two problems
with this analysis. First, there is no dispute that the school re-
ceived reports describing emotional harm to students and dis-
ruption to the learning environment, not mere offense. These
were the very harms that the school sought to avoid when it
developed the Name Policy.
 Second, Kluge’s motives for his practice are irrelevant to
the Title VII analysis. The uncontested evidence demonstrates
No. 21-2475 57

that Kluge’s practice caused the harms whether the students
correctly understood his subjective motives or not. As we have
discussed, the school was aware of the issues faced by this
group of students and had identified the use of their Pow-
erSchool names and pronouns as an important means of
providing dignity, empathy, respect and affirmation for this
group of children who faced significant challenges in the high
school environment, including diminished self-esteem and
heightened exposure to bullying. Although some of the stu-
dents appear to have inferred that Kluge’s practice was due
to the presence of transgender students at the school, the stu-
dents had no information regarding why Kluge would not
use the students’ PowerSchool names and pronouns. Whether
his motive was religious, ideological, grammatical or other-
wise was irrelevant because it was the practice, not the un-
known motive that caused the reported harms. The school
stretched to accommodate Kluge with a facially neutral ac-
commodation of using last names only; nonetheless, the un-
disputed evidence showed that the practice resulted in genu-
ine harm to students and real disruption to the learning envi-
ronment.
 Moreover, Kluge’s practice was contrary to the preference
of not only the school and the students, but also the students’
parents and healthcare providers, who had decided that it
was in the best interest of these children to be addressed in a
particular manner, with their PowerSchool names and pro-
nouns. Brownsburg’s “business” for the purpose of analyzing
undue hardship was to provide public education. Unlike a
for-profit corporation, Brownsburg’s mission of education for
all students was mandated by the State’s constitution and
58 No. 21-2475

legislature. In Indiana, public schools play a custodial and
protective role in the compulsory education system, and pub-
lic schools stand in the relation of parents and guardians to
the students regarding all matters of discipline and conduct
of students. Linke v. Nw. Sch. Corp., 763 N.E.2d 972, 979 (Ind.
2002). After conducting its own research, the school reasona-
bly deferred to the judgment of parents and healthcare pro-
viders regarding how to meet the specific needs of
transgender students.
 Although with corporate defendants, our cases analyze
undue hardship by considering financial costs and business
interests, the school’s “business” here is more analogous to
that of the Veterans Administration (“V.A.”) in Baz. In that
case, the V.A. hired a chaplain in a hospital where approxi-
mately two thirds of the patients were psychiatric patients.
The V.A. saw the position of chaplain as a secular one where
proselytizing was prohibited and chaplains were expected to
serve as a “quiescent, passive listener and cautious counse-
lor,” as part of the hospital’s philosophy of total patient care.
Baz instead “saw himself as an active, evangelistic, charis-
matic preacher,” and acted accordingly. 782 F.2d at 703–04.
When he refused to change his approach, the hospital termi-
nated his employment. After a bench trial, the district court
ruled in favor of the hospital.
 On appeal, Baz argued that the hospital had failed to
prove that the health and welfare of the patients were harmed
by his evangelism. We noted that he was confusing “the busi-
ness necessity defense to a disparate impact cause of action
with the ‘undue hardship’ standard used to measure an em-
ployer’s duty to accommodate to an employee’s religious
No. 21-2475 59

observances in a disparate treatment claim of religious dis-
crimination.” 782 F.2d at 706. The latter type of case, the same
one that Kluge brings here, requires the defendant to provide
“evidence to show that accommodation would create a hard-
ship on his business. This hardship has been construed as an-
ything more than a de minimis cost to the employer.” Id. (citing
Hardison, 432 U.S. at 84).
 The defendants are not required to show that
 their philosophy of total patient care is objec-
 tively better than that espoused by Reverend
 Baz; they need only show that it would be a
 hardship to accommodate his theology in view
 of their established theory and practice.
 The defendants here have met this burden. They
 have produced evidence tending to show that
 Reverend Baz’s philosophy of the care of psy-
 chiatric patients is antithetical to that of the V.A.
 To accommodate Reverend Baz’s religious prac-
 tices, they would have to either adopt his phi-
 losophy of patient care, expend resources on
 continually checking up on what Reverend Baz
 was doing or stand by while he practices his (in
 their view, damaging) ministry in their facility.
 None of these is an accommodation required by
 Title VII.
Baz, 782 F.2d at 706–07.
 Kluge makes a similar mistake of law here. Brownsburg
need not show that its philosophy of treating transgender stu-
dents “like any other student, [with] respect and affirmation
60 No. 21-2475

of their preferred identity” was better than that espoused by
Kluge. They needed only to show “that it would be a hardship
to accommodate his theology in view of their established the-
ory and practice.” Baz, 782 F.2d at 706. Brownsburg met this
burden by producing evidence tending to show that Kluge’s
last-names-only practice was “antithetical to that of the”
school. 782 F.2d at 706–07. It is no answer that Kluge called all
students by their last names and was trying to be neutral on
the issue of transgenderism. The last-names-only practice
conflicted with the school’s philosophy of affirming and re-
specting all students because the undisputed evidence
showed that the accommodation resulted in students feeling
disrespected, targeted, and dehumanized, and in disruptions
to the learning environment. Title VII does not require the
school to adopt an accommodation that, although facially
neutral, does not work that way in practice. Brownsburg al-
lowed Kluge to employ the practice for an entire school year,
counseling him along the way about the problems he was cre-
ating and encouraging him to either follow the practice that
every other teacher in the school followed or leave his job be-
cause he was harming students and the educational environ-
ment by failing to follow the school’s philosophy of respect
and affirmation for all students. Title VII does not require an
employer to retain an employee who harms the employer’s
mission. Baz, 782 F.2d at 706–07.
 Nor was any other reasonable accommodation available.
Kluge was the school’s only music teacher, and so students
could not, for example, be transferred to another classroom (if
we assume that transfer to another classroom would not be
equally stigmatizing). There was no other teacher to take
No. 21-2475 61

Kluge’s place in the orchestra class. Kluge himself has never
suggested any other viable accommodation. See Ryan v. U.S.
Dep’t of Justice, 950 F.2d 458, 461 (7th Cir. 1991) (employers are
not required to negotiate with employees about a religious ac-
commodation but only to act on any accommodation that
does not work an undue hardship; an employee who neglects
multiple opportunities during a lengthy disciplinary process
to propose a concrete accommodation makes his own choice).
Because no reasonable jury could conclude that a practice that
emotionally harms students and disrupts the learning envi-
ronment is only a slight burden to a school, and because no
other accommodations were available, under Baz, Browns-
burg has proved undue hardship as a matter of law.16 See also
Walmart Stores East, L.P., 992 F.3d at 658–60 (affirming sum-
mary judgment where the accommodation of the plaintiff’s
religious practice created more than a slight burden on the
employer because it would have increased the burden on
other workers, or resulted in a staffing shortage, or forced the
employer to change its preferred rotation system designed to
train all assistant managers in all departments); Adams v.

16 Kluge asserts that Baz is inapplicable because his religious beliefs
did not preclude him from doing his job, as he claims was the case in Baz.
But the issue in Baz was analogous: Baz was performing his job in a man-
ner that conflicted with the hospital’s requirement that the chaplain serve
as a “quiescent, passive listener and cautious counselor,” as part of the
hospital’s philosophy of total patient care. Kluge was performing his job
in a manner that conflicted with the school’s mission of educating all stu-
dents, and its philosophy of treating all students with respect and affirma-
tion for their identity in the service of that goal. Kluge’s attempt to char-
acterize the school’s goal as somehow “illegitimate” lacks support in Title
VII case law.
62 No. 21-2475

Retail Ventures, Inc., 325 Fed. App’x 440, 443 (7th Cir. 2009) (af-
firming summary judgment in favor of employer on religious
accommodation claim where accommodation would have in-
creased cost, decreased efficiency, or created a scheduling
strain); Noesen v. Medical Staffing Network, Inc., 232 Fed. App’x
581, 584–85 (7th Cir. 2007) (affirming summary judgment in
favor of employer when Catholic pharmacist’s requested reli-
gious accommodation of relief from telephone and counter
duties in order to avoid customers requesting birth control
would have required other employees to assume a dispropor-
tionate share of work, or would have left data input work un-
done).
 Kluge’s attempt to characterize the emotional harm ex-
pressed by the transgender students as “third party grum-
blings” or a “heckler’s veto” has no basis in the record and no
support in Title VII law.17 The dissent echoes this

17 The dissent also suggests that the question of whether the accom-
modation constituted an undue hardship “by way of the School District’s
clients—the students—should be an open question for the factfinder” be-
cause an adverse employment action based on the discriminatory prefer-
ences of others, including coworkers and customers, is unlawful. But there
is no fact question for a jury here because Kluge presented no evidence
that the students, teachers or parents harbored a discriminatory bias
against Kluge or that Brownsburg terminated Kluge based on the discrim-
inatory preferences of others. In fact, one of the parents reporting harm to
her child from Kluge’s practice told the school, “I really don’t care what
he thinks about transgender issues on a personal level. My child deserves
to be treated with respect. His refusal to use [the child’s] preferred name
and pronouns is very disrespectful and hurtful.” R. 120-13, at 2. Acting on
such a report cannot reasonably be construed as giving effect to a discrim-
inatory preference.
No. 21-2475 63

mischaracterization, reducing the harms claimed to “taking
offense,” “disgruntlement,” “grumblings,” and “mere of-
fense,” rather than the harms that the school actually claimed
to students, the learning environment, and to the school’s
mission to treat all students respectfully. Kluge’s complaint of
a “heckler’s veto” sounds in the First Amendment. But the
district court dismissed Kluge’s First Amendment claims, and
he has not appealed that dismissal. R. 70. The district court
correctly held that when Kluge was addressing students in
the classroom, his speech was not protected by the First
Amendment. R. 70, at 13 (noting that Kluge conceded that his
address of students in his classroom was part of his official
duties as a teacher); Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)
(“when public employees make statements pursuant to their
official duties, the employees are not speaking as citizens for
First Amendment purposes, and the Constitution does not in-
sulate their communications from employer discipline.”);
Mayer, 474 F.3d at 479 (citing our well-settled precedent that
“public-school teachers must hew to the approach prescribed
by principals (and others higher up in the chain of author-
ity)”). Title VII provides more protection for an employee’s
religious speech than the First Amendment but its protection
is limited to accommodations that do not work an undue
hardship on the employer. Ryan, 950 F.2d at 461. Cf. Mayer,
474 F.3d at 480 (noting that “the first amendment does not en-
title primary and secondary teachers, when conducting the
education of captive audiences, to cover topics, or advocate
viewpoints, that depart from the curriculum adopted by the
school system”). As we have just held, Kluge’s practice re-
sulted in an undue hardship on his employer as a matter of
law.
64 No. 21-2475

 As for “third party grumblings,” the case law does not
support Kluge in what is essentially a repackaged First
Amendment claim of a heckler’s veto. For example, in Ander-
son v. U.S.F. Logistics (IMC), Inc., 274 F.3d 470 (7th Cir. 2001),
we considered a claim by Elizabeth Anderson, an employee
of a shipping company, U.S.F. Logistics, who wished to use
the phrase, “Have a Blessed Day,” in correspondence with her
co-workers and the company’s customers. Although her co-
workers did not object, an employee of Microsoft, U.S.F. Lo-
gistics’ largest customer, received this religious greeting and
complained that it was unacceptable and must stop. Her em-
ployer directed her to stop using the phrase with customers,
and in particular with Microsoft. After her employer declined
to identify the particular Microsoft contact who had com-
plained, she continued to use the phrase with Microsoft em-
ployees and moved for a preliminary and permanent injunc-
tion allowing her to use the phrase in her work. 274 F.3d at
473–74.
 The district court denied her motion for a preliminary in-
junction, finding that she did not have a likelihood of success
on the merits because her employer reasonably accommo-
dated her by allowing her to use the phrase with persons who
were not offended by it. We affirmed, noting first that Title
VII requires only reasonable accommodation, not the satisfac-
tion of an employee’s every desire. Anderson, 274 F.3d at 475.
U.S.F. Logistics was legitimately concerned about its relation-
ship with its customers. The company required only that she
cease using the phrase with the objecting customer, and we
concluded that her employer reasonably accommodated her.
274 F.3d at 476. Because a Microsoft representative had
No. 21-2475 65

complained that the use of the phrase was inappropriate, per-
mitting Anderson to continue to use the phrase would impose
her religious views on that customer. We concluded that the
evidence therefore suggested that Anderson’s religious prac-
tice could damage her employer’s relationship with Mi-
crosoft. 274 F.3d at 477. But even if her practice had not im-
posed her religious beliefs upon others, the employer was still
entitled to restrict it if it impaired the employer’s legitimate
interests, so long as her belief was reasonably accommodated.
274 F.3d at 477.
 The same applies here, albeit in the non-profit business
setting of a public school engaged in providing compulsory
education to high school students. Brownsburg was entitled
to require Kluge to use a form of address that did not offend
or injure its students or harm the classroom environment. The
school had a legitimate interest in its relationship with its stu-
dents, who together with their parents, are effectively the
school’s customers. See Smiley v. Columbia College Chicago, 714
F.3d 998, 1002 (7th Cir. 2013) (“It is not unreasonable for [a
college] to expect that its instructors will teach classes in a
professional manner that does not distress students.”). Be-
cause Kluge’s practice harmed that relationship, and because
there was no other way to accommodate Kluge’s beliefs with-
out harming the school’s mission and philosophy for educat-
ing all students, his “third party grumblings” claim fails.18

18 In making his “third-party grumblings” argument, Kluge relied
on cases that have either been reversed or are factually distinguishable.
See Cummins v. Parker Seal Co., 516 F.2d 544 (6th Cir. 1975), vacated by Par-
ker Seal Co. v. Cummins, 433 U.S. 903 (1977). The district court’s judgment
 (continued)
66 No. 21-2475

in favor of the employer was eventually summarily affirmed by the Sixth
Circuit on remand from the Supreme Court. Cummins v. Parker Seal Co.,
561 F.2d 658 (6th Cir. 1977). Kluge’s lawyers failed to acknowledge that
they were relying on a case that had been overturned, and even failed to
acknowledge the error in his reply brief after opposing counsel pointed it
out in the response brief. Appellee’s Response Brief, at 36 n.4. “Lawyers
are not entitled to ignore controlling, adverse precedent. We expect (and
are entitled to) better performance by members of the bar.” Jackson v. City
of Peoria, Illinois, 825 F.3d 328, 331 (7th Cir. 2016). See also Practitioner’s
Handbook for Appeals, at 159 (available at www.ca7.uscourts.gov). Nor
are the Ninth Circuit cases that Kluge cited applicable here. Anderson v.
Gen. Dynamics Convair Aerospace Div., 589 F.2d 397, 402 (9th Cir. 1978),
merely found that the defendant’s asserted basis for undue hardship had
no factual basis in the record. The court also noted that, “Even proof that
employees would grumble about a particular accommodation is not
enough to establish undue hardship.” But this is not a case of grumbling
by co-workers; Brownsburg’s undue burden is to its mission of educating
all students and its philosophy of treating all students with respect and
affirmation. The Ninth Circuit repeated this formulation the same day in
another case, Burns v. S. Pac. Transp. Co., 589 F.2d 403, 407 (9th Cir. 1978),
stating that, “undue hardship requires more than proof of some fellow-
worker’s grumbling or unhappiness with a particular accommodation to
a religious belief. … An employer or union would have to show, as in Har-
dison, actual imposition on co-workers or disruption of the work routine.”
In the context of a school, where the requested accommodation primarily
affects students, disruption to the learning environment meets the Hardi-
son standard. The teachers here were not “grumbling” but, as Dr. Daghe
testified, were reporting disruptions to the learning environment because
“students are uncomfortable in [Kluge’s] class and that they are bringing
the conversations that occur in his class to other classrooms and having
discussions about the uncomfortableness, whether it was dealing with a
transgender student and last names only or whether it was times when
last names weren’t used or it was times when, you know, kids just want it
all to go away and act like everything is normal.” R. 112-5, at 7. The teach-
ers similarly reported that children did not know how to address each
 (continued)
No. 21-2475 67

 In sum, the school produced uncontradicted evidence that
Kluge’s last-names-only practice stigmatized the transgender
students and caused them demonstrable emotional harm as
reported to the administration by Lee, who personally wit-
nessed it. Kluge was told that students reported feeling disre-
spected, targeted, isolated, and dehumanized. As Kluge con-
ceded, the school has a legitimate interest in the mental health
of its students, and an accommodation is not reasonable, as
Dr. Daghe told Kluge, “when it’s detrimental to kids.”
R. 113-4, at 28. Kluge’s practice also adversely affected the
classroom environment which both transgender and non-
transgender students considered tense, awkward and uncom-
fortable. Dr. Daghe told Kluge, based on reports from stu-
dents and faculty, that his practice resulted in students being
uncertain about how to behave and how to address their
transgender classmates. Kluge’s practice also disrupted other
classrooms when students brought their concerns and discus-
sions about the practice to other teachers in other classrooms.
It conflicted with the school’s carefully constructed Name
Policy that sought to address the special challenges that
transgender students face in school, and balanced those con-
cerns with the preferences of the students’ parents and
healthcare providers. Allowing Kluge to continue in the prac-
tice thus placed an undue hardship on Brownsburg’s mission
to educate all of its students, and its desire to treat all students

other or how to behave around transgender students and similar students
because of Kluge’s practice. R. 120-5, at 9. The teachers reports of harm to
students as well as classroom and school disruption are a far cry from
“third-party grumblings.”
68 No. 21-2475

with respect and affirmation for their identity in the service of
that mission.
 2.
 Brownsburg claimed a second undue hardship, namely,
that Kluge’s practice unreasonably exposed the school to lia-
bility under Title IX. Close in time to Brownsburg’s adoption
of the Name Policy, our court issued its decision in Whitaker.
In Whitaker, we recognized that transgender students may
bring a sex discrimination claim under Title IX based on a the-
ory of sex-stereotyping. 858 F.3d at 1047–50. We have already
concluded that the district court correctly ordered summary
judgment in favor of Brownsburg because the uncontested
evidence demonstrated that Kluge’s last-names-only practice
harmed students and disrupted the educational environment,
which constituted an undue hardship on Brownsburg’s con-
duct of its business. Thus, we decline to reach the issue of
whether Kluge’s accommodation created an additional un-
due hardship by exposing the school to liability under Title
IX. Our decision to decline to address liability under Title IX
should not be interpreted as agreement with the dissent’s
analysis of this issue. It is simply unnecessary to reach this
issue in this case.
 C.
 Kluge also brought a claim for retaliation against Browns-
burg, alleging that Brownsburg “retaliated against Mr. Kluge
for engaging in protected conduct, when it agreed in writing
to the accommodation Mr. Kluge requested for his religious
beliefs, then removed the accommodation—without any
showing of undue hardship—and told Mr. Kluge he could
No. 21-2475 69

use transgender names and pronouns, resign, or be termi-
nated.” R. 15, at 17–18. Kluge sought to prove his retaliation
claim using the burden-shifting method outlined by the Su-
preme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973). In order make out a prima face case for retaliation under
the burden-shifting method, Kluge must demonstrate that:
(1) he engaged in statutorily protected activity; (2) he suffered
a materially adverse action; and (3) there is a but-for causal
connection between the two events. Robertson v. Dep’t of Health
Servs., 949 F.3d 371, 378 (7th Cir. 2020); Contreras v. Suncast
Corp., 237 F.3d 756, 765 (7th Cir. 2001). The causation standard
in retaliation claims is more stringent than the standard in dis-
crimination claims. Carlson v. CSX Transp., Inc., 758 F.3d 819,
828 n.1 (7th Cir. 2014). Following University of Texas Southwest-
ern Medical Center v. Nassar, 570 U.S. 338, 362 (2013), “the pro-
tected activity of an employee making a retaliation claim must
have been ‘a but-for cause of the alleged adverse action by the
employer.’” In contrast, a “lessened causation standard” ap-
plies in Title VII discrimination cases. Nassar, 570 U.S. at 348.
“The requirement of but-for causation in retaliation claims
does not mean that the protected activity must have been the
only cause of the adverse action. Rather, it means that the ad-
verse action would not have happened without the activity.”
Nassar, 570 U.S. at 346–47. See also Robertson, 949 F.3d at 378
(describing the causation requirement as producing adequate
evidence to establish that “there existed a but-for causal con-
nection” between the protected activity and the adverse ac-
tion). Once the prima facie case of retaliation is established:
 an employer may produce evidence which, if
 taken as true, would permit the conclusion that
70 No. 21-2475

 it had a legitimate non-discriminatory reason
 for taking the adverse employment action. … If
 the employer meets this burden, the plaintiff, to
 avoid summary judgment, then must produce
 evidence that would permit a trier of fact to es-
 tablish, by a preponderance of the evidence,
 that the legitimate reasons offered by the em-
 ployer were not its true reasons but were a pre-
 text for discrimination.
Robertson 949 F.3d at 378. See also Lord v. High Voltage Software,
Inc., 839 F.3d 556, 564 (7th Cir. 2016) (where the employer
demonstrates that the employee would have been fired absent
his protected activity, then the alleged retaliatory motive,
even if unchallenged, was not a but-for cause of the em-
ployee’s harm).
 In the district court, Brownsburg sought summary judg-
ment on this claim, contending that: (1) Kluge could not make
out a prima facie case of retaliation because no reasonable jury
could conclude on this record that there was a causal connec-
tion between the protected activity of seeking a religious ac-
commodation at the start of the school year, and the adverse
employment action which occurred at the end of the school
year after it became apparent that the accommodation was
not working; and (2) even if Kluge was able to establish a
prima facie case, Brownsburg had articulated legitimate, non-
discriminatory reasons for its actions, and Kluge presented no
evidence from which a reasonable jury could infer pretext.
 Kluge responded to Brownsburg’s motion by asserting
that he had engaged in statutorily protected activity by
No. 21-2475 71

identifying a sincerely held religious belief that he should
identify students by their “birth names, instead of their ‘new’
transgender names,” by asking for an accommodation in July
2017, and by asking in February 2018 for the school to confirm
that his accommodation was still valid. R. 153, at 27. For an
adverse employment action, he asserted that the school with-
drew the accommodation, demanded his compliance with the
Name Policy or his resignation, and then coerced him into
submitting a conditional resignation.19 In his district court
briefing, Kluge then flatly stated, “there is a causal connection
between the protected conduct and the adverse employment
action.” R. 153, at 27. The remainder of his argument on retal-
iation was simply a recitation of the same facts that he alleged
in support of his discrimination claim. Namely, he asserted
that the accommodation was implemented in July 2017, the
school indicated its intent to withdraw it in the January 2018
“Transgender Questions” document, he then asked in Febru-
ary for the school to confirm that his accommodation agree-
ment had no end date, and the school indicated that it did in-
tend to require compliance with the Name Policy from all fac-
ulty beginning in the next academic year as explained in the
“Transgender Questions” document. Kluge then asserted that
Gordon told him that he could submit a conditional resigna-
tion, that he did so in reliance of her promise that it would be
conditional, that he attempted to rescind the resignation on
May 28, 2018, but the school would not allow him to rescind

19 In the district court, Brownsburg did not contest for summary
judgment purposes that Kluge could produce evidence in support of pro-
tected activity and an adverse action, focusing instead on the causation
element of the prima facie case, and the lack of any evidence of pretext.
72 No. 21-2475

and instead terminated his employment.20 Kluge did not ad-
dress Brownsburg’s stated nondiscriminatory reason for his
termination, that his refusal to comply with the Name Policy
was detrimental to students and to the learning environment.
He made no attempt to show that this reason was a pretext to
cover religious discrimination.
 As we noted above, the district court found that Kluge
waived his retaliation argument at summary judgment with
meager briefing, simply reciting his version of the facts with-
out discussing how those facts meet the legal requirements of
a retaliation claim. The court also noted that Kluge failed to
address Brownsburg’s argument that there is no evidence in
the record from which a reasonable fact finder could infer that
its nondiscriminatory explanation for its action was a pretext.
The court thus found that Kluge had waived his retaliation

20 The district court found that the record contained no factual basis
for Kluge’s claim that Gordon led him to believe that he could submit a
conditional resignation that could later be withdrawn. Nor was there any
factual basis supporting his contention that he did in fact submit a condi-
tional resignation, according to the district court. On appeal, Kluge cites
no evidence contradicting those findings. As the district court pointed out,
Gordon told Kluge only that she would respect an employee’s wish not to
disclose his resignation to colleagues until the end of the school year. She
never told him that he could withdraw a properly submitted resignation,
and in fact it was not possible to withdraw a resignation made to the Su-
perintendent or his agent (Gordon, in this instance). R. 112-4, at 11–12;
R. 120-8; R. 120-9. Kluge himself recorded the meeting where he asserts
that Gordon made the offer of a conditional resignation, and the transcript
of that meeting does not support his claim. R. 112-4, at 20–55. Nor is there
any language in his actual resignation suggesting that it was conditional.
The issue of the purported breach of a promise to allow a conditional res-
ignation has no merit and we will not give it further consideration.
No. 21-2475 73

claim. As an alternate basis for granting judgment in favor of
the defendant, the court also addressed the merits, noting that
Kluge failed to present any evidence from which a reasonable
fact finder could conclude that a causal connection exists be-
tween Kluge’s protected activity and his resignation, any evi-
dence of pretext, or any evidence that Brownsburg’s action
was motivated by discriminatory animus. The court therefore
granted summary judgment in favor of the school on the re-
taliation claim as well.
 Although Kluge’s briefing on retaliation in the district
court was thin, we find that the argument was not waived and
proceed to the merits. Kluge’s claim fails on the causation el-
ement. That is, he failed to produce evidence that established
a but-for causal link between protected activity and the ad-
verse action, and so failed to make out a prima facie case of
retaliation.21 Indeed, on appeal, Kluge relies on outdated prec-
edent to assert that, to establish a causal link, he must show

21 In his reply brief on appeal, Kluge suggests for the first time that
he meets the causation element with evidence that, in the July 27, 2017
meeting, Dr. Snapp became “very angry” with him the first time that
Kluge mentioned his religious objection to using the transgender students’
PowerSchool first names. Appellant’s Reply Brief, at 20; R. 120-3, at 19. He
also asserts that Dr. Snapp engaged in a theological debate with him, and
told him that his beliefs were wrong. Id. Kluge waived this argument by
not raising it in the district court, and by not raising it on appeal until his
reply brief. Accident Fund Ins. Co. of America v. Custom Mech. Constr., Inc.,
49 F.4th 1100, 1108 (7th Cir. 2022) (arguments raised for the first time in a
reply brief are waived); White v. United States, 8 F.4th 547, 552 (7th Cir.
2021) (same); DM Trans, LLC v. Scott, 38 F.4th 608, 619 (7th Cir. 2022) (is-
sues and arguments raised for the first time on appeal are forfeited, as are
arguments that are not sufficiently developed).
74 No. 21-2475

only “that the protected activity and the adverse action were
not wholly unrelated.” Hunt-Golliday v. Metropolitan Water
Reclamation Dist. of Greater Chicago, 104 F.3d 1004, 1014 (7th
Cir. 1997). But as we explained above, after the Supreme
Court’s decision in Nassar, he must demonstrate that the pro-
tected activity of an employee making a retaliation claim was
a but-for cause of the alleged adverse action by the employer.
Kluge’s evidence falls short of meeting this standard. He says
only that he engaged in protected activity and that when he
refused to either comply with the policy or resign, “his super-
visors subjected him to a [sic] ‘a pattern of criticism and ani-
mosity’ and finally constructively discharged him.” Appel-
lant’s Opening Brief, at 42 (quoting Hunt-Golliday, 104 F.3d at
1014). He cited no record evidence in the district court in sup-
port of this conclusory claim that anyone subjected him to a
“pattern of criticism and animosity,” failed to cite any such
evidence on appeal until his reply brief, and makes no at-
tempt to connect his protected activity to his resignation. Al-
though he cites evidence of protected activity and an adverse
action (both of which Brownsburg conceded for the purposes
of summary judgment), he cites nothing supporting but-for
causation.
 Instead, the undisputed evidence demonstrates that
Brownsburg worked with Kluge to create a workable accom-
modation during the 2017-2018 school year. Only after the
last-names-only practice proved harmful to students and the
learning environment did the school withdraw it, and even
then Brownsburg allowed Kluge to continue the practice
through the end of the school year. Further, Brownsburg did
not disturb the additional accommodation relieving Kluge of
No. 21-2475 75

the task of handing out gender-specific uniforms. The length
of time between the protected activity (of Kluge requesting a
religious accommodation) and the adverse employment ac-
tion, together with the school’s attempt to find a workable so-
lution defeat any inference that Brownsburg asked Kluge to
resign in retaliation for his protected activity.
 Even if we assume that Kluge cleared the hurdle of the
prima facie case, he makes no effort to demonstrate any mate-
rial issue of fact on the question of pretext:
 “Pretext involves more than just faulty reason-
 ing or mistaken judgment on the part of the em-
 ployer; it is [a] ‘lie, specifically a phony reason
 for some action.’” Argyropoulos, 539 F.3d at 736
 (quoting Sublett v. John Wiley & Sons, Inc., 463
 F.3d 731, 737 (7th Cir. 2006)). We have repeat-
 edly emphasized that when “assessing a plain-
 tiff’s claim that an employer’s explanation is
 pretextual, we do not ... second-guess[ ] an em-
 ployer’s facially legitimate business decisions.”
 Id. (internal quotation marks omitted). An em-
 ployer’s reasons for firing an employee can be
 “foolish or trivial or even baseless,’’ as long as
 they are “honestly believed.” Culver, 416 F.3d at
 547 (quoting Hartley v. Wis. Bell, Inc., 124 F.3d
 887, 890 (7th Cir. 1997)).
Lord, 839 F.3d at 564. Instead of producing evidence of pretext,
Kluge simply ties the legitimacy of his retaliation claim to the
validity of his discrimination claim. That is, he asserts that he
need not present evidence of pretext because Brownsburg
76 No. 21-2475

never presented a legitimate, nondiscriminatory basis for ter-
minating his employment, and that his “whole argument was
that the district had no legitimate basis for revoking his accom-
modation and forcing him to resign.” Appellant’s Opening
Brief, at 40. In so arguing, Kluge is essentially conceding that
he has never provided evidence of pretext, apparently resting
entirely on his claim that Brownsburg never produced a legit-
imate, nondiscriminatory reason for his termination. That
was a risky strategy.
 As we have just concluded, Brownsburg did in fact
demonstrate legitimate reasons for withdrawing the accom-
modation. Brownsburg was within its rights as an employer
facing an undue hardship to withdraw the requested accom-
modation when it became apparent that it was not working in
practice and was causing harm to students and to the educa-
tional environment. That was a legitimate, nondiscriminatory
reason for the termination. In the absence of any evidence that
it was a pretext for religious discrimination—i.e., that it was a
lie or a phony reason—we will not second-guess Browns-
burg’s business decision. Lord, 839 F.3d at 564. See also Boss v.
Castro, 816 F.3d 910, 917 (7th Cir. 2016) (“[W]hen an employer
articulates a plausible, legal reason for its action, it is not our
province to decide whether that reason was wise, fair, or even
correct, ultimately, so long as it truly was the reason for its
action;” the “federal courts are not a super-personnel depart-
ment that second-guesses facially legitimate employer poli-
cies.”). “We have said time and again (in more than one hun-
dred reported opinions, by our count) that we are not a super-
personnel department that will substitute our criteria for an
employer’s for hiring, promoting, or disciplining employees.”
No. 21-2475 77

Joll v. Valparaiso Cmty. Sch., 953 F.3d 923, 933 (7th Cir. 2020).
See also Kariotis v. Navistar Int’l Transp. Corp., 131 F.3d 672, 677
(7th Cir. 1997) (“To successfully challenge the honesty of the
company’s reasons [the plaintiff] must specifically rebut those
reasons. But an opportunity for rebuttal is not an invitation to
criticize the employer’s evaluation process or simply to ques-
tion its conclusion about the quality of an employee’s perfor-
mance. Rather, rebuttal must include facts tending to show
that the employer’s reasons for some negative job action are
false, thereby implying (if not actually showing) that the real
reason is illegal discrimination. In other words, arguing about
the accuracy of the employer’s assessment is a distraction …
because the question is not whether the employer’s reasons
for a decision are ‘right but whether the employer’s descrip-
tion of its reasons is honest.’”). Here, the employer conclu-
sively demonstrated that it withdrew the accommodation
solely because it worked an undue hardship on the school’s
business of educating all students. There is no hint in this rec-
ord that this explanation was false and that the real reason for
the termination was discrimination.
 Interestingly, the dissent acknowledges that Kluge’s fail-
ure to demonstrate that Brownsburg’s legitimate, nondis-
criminatory reason for his termination was a pretext dooms
his retaliation claim. Yet even though Kluge himself tied the
success of his two claims together, the dissent does not
acknowledge that Kluge’s failure to rebut the school’s uncon-
tested, nondiscriminatory explanation for withdrawing the
accommodation is also fatal to his discrimination claim.
 Brownsburg began developing the Name Policy before it
ever knew that Kluge would have a religious objection to the
78 No. 21-2475

directive. In the face of his objection, the school made several
efforts to accommodate his beliefs, meeting with him multiple
times, agreeing to allow his use of last names only, and offer-
ing to have another person hand out gender-specific orchestra
uniforms (an accommodation that Brownsburg never with-
drew). The school’s decision to allow students to change their
names and gender markers in the PowerSchool database only
with the approval of a parent and a healthcare provider as-
suaged the religious concerns of three of the four teachers
lodging a religious objection. That the school decided to with-
draw the last-names-only accommodation only when it was
apparent that it was harming students and disrupting the
learning environment was to the school’s credit. See Toledo v.
Nobel-Sysco, Inc., 892 F.2d 1481, 1490 (10th Cir. 1989) (“The em-
ployer is on stronger ground when he has attempted various
methods of accommodation and can point to hardships that
actually resulted.”); Draper v. United States Pipe & Foundry Co.,
527 F.2d 515, 520 (6th Cir. 1975) (same). For all of these rea-
sons, we affirm the grant of summary judgment in favor of
Brownsburg on the retaliation claim.
 III.
 In sum, we affirm summary judgment against Kluge on
his discrimination claim. Brownsburg has demonstrated as a
matter of law that the requested accommodation worked an
undue burden on the school’s educational mission by harm-
ing transgender students and negatively impacting the learn-
ing environment for transgender students, for other students
in Kluge’s classes and in the school generally, and for faculty.
Title VII does not require that employers accommodate reli-
gious practices that work an undue hardship on the conduct
No. 21-2475 79

of the employer’s business; that sometimes means that a reli-
gious employee’s practice cannot be accommodated. Moreo-
ver, Kluge’s retaliation claim fails as a matter of law because
he failed to produce any evidence supporting the causation
element of the prima facie case, or any evidence that the
school’s explanation for its actions was a pretext for religious
discrimination.
 AFFIRMED.
80 No. 21-2475

 BRENNAN, Circuit Judge, concurring in part and dissenting
in part.
 Brownsburg Community School Corporation required
music teacher John Kluge to use the chosen ęȱȱȱ
pronouns of transgender students. Kluge objected on reli-
gious grounds, and a gender-neutral accommodation was ar-
rived at: He would address his students by their last names
only. The School District received some complaints about this
practice, so it revoked the accommodation and told Kluge he
could comply, resign, or be terminated. He tendered his res-
ignation.
 Kluge sued the School District under Title VII for failure
to reasonably accommodate his religious beliefs and for retal-
iation against his accommodation request. The majority opin-
ȱĜȱ¢ȱȱfor the School District on both
claims. On Kluge’s retaliation claim, I disagree with my col-
leagues’ conclusion as to causation but concur in the judg-
ment for the School District. I respectfully dissent on the reli-
gious accommodation claim.
 This case tests the limits of the Supreme Court’s atextual
but controlling interpretation of “undue hardship” in Title
VII’s religious accommodation provision as “more than a de
minimis cost.” Trans World Airlines, Inc. v. Hardison, 432 U.S.
63, 84 (1977); 42 U.S.C. § 2000e(j). Do ȱ ȱ ěȱ
constitute more than a de minimis ǵȱę¢ǰȱȱbeing
ěded by an employee’s religious practice enough to dis-
charge the employer’s duty to reasonably accommodate the
employee’s religious practice? The majority opinion answers
ȱȱĜ. Under its reasoning, Title VII provides no
protections for religious conscientious objectors who in good
faith try to accommodate their employers’ dictates. This court
No. 21-2475 81

has not ruled on whether taking ěȱȱȱȱ
than a de minimis cost, so we should tread carefully.
 I would reverse the district court in part and grant partial
summary judgment for Kluge that his religious beliefs are sin-
cerely held and that he has established a prima facie case for
religious discrimination. Then Kluge’s religious accommoda-
tion claim comes down to a fact-intensive inquiry: Did the
School District demonstrate that Kluge’s gender-neutral ac-
commodation of calling all students by only their last names
causes undue hardship—that is, more than a de minimis cost?
The majority opinion says “yes,” but it sidesteps Kluge’s
countervailing evidence, fails to construe the record in his fa-
vor, and overlooks credibility issues on both sides, which are
reserved for resolution by the factfinder.
 Courts uniformly review context-specific evidence to eval-
uate whether a religious accommodation in fact imposes an
undue hardship. But without supporting authority, my col-
leagues hold that the undue hardship inquiry looks only to
evidence within the employer’s knowledge at the time of the
adverse employment decision. The majority opinion thus re-
solves this case based on the School District’s receipt of some
allegations that the accommodation did not work and caused
tension and discomfort. It deems irrelevant the testimony of
Kluge, three students, and another teacher. Considering the
entire record, there is a genuine issue of material fact on un-
due hardship, which we should remand for trial.
 I. Factual Background
 The majority opinion downplays certain record evidence
that in my view creates a genuine issue of material fact on un-
due hardship. This includes evidence about the School
82 No. 21-2475

District’s Name Policy and Kluge’s last-names-only accom-
modation; complaints about that accommodation; counter-
vailing evidence about Kluge’s accommodation as practiced
in his classroom; the School District’s revocation of the accom-
modation; and Kluge tendering his resignation.
 A. Name Policy & Accommodation
 John Kluge is a Christian and a leader in his church. From
2014 to 2018, he taught orchestra at Brownsburg High School,
part of the Brownsburg Community School Corporation
(School District), west of Indianapolis. But he was not just any
orchestra teacher; many students and former students said he
was a great one. R. 52-5, at 2; R. 52-4, at 2; R. 120-18, at 11, 13.
 In May 2017, discussions surrounding the needs of
transgender students led the School District to adopt the
Name Policy. R. 120-1, at 3–4. Kluge believes that based upon
his religion, ȱȱĜȱȱȱ¢ȱȱȱ
students by calling them by their chosen names. R. 113-1, at
6–9. On July 27, 2017, Kluge objected to the Name Policy
based on his religious convictions, and Principal Daghe and
Superintendent Snapp gave Kluge three choices: comply, re-
sign, or be suspended pending termination. R. 15-3, at 3; R.
120-3, at 14. At this meeting, Kluge says Snapp got “very an-
gry,” explained why Kluge’s beliefs were “wrong,” and ar-
gued that his “beliefs aren’t what’s in the Bible.” R. 120-3, at
19. Kluge responded with scripture that supported his beliefs.
To the contrary, Snapp recalled that he had a “cordial conver-
sation” on their respective religious beliefs. R. 113-6, at 6. In
No. 21-2475 83

the end, Kluge refused to comply, and Superintendent Snapp
gave him the weekend to consider his options. R. 120-3, at 15.
 On Monday July 31, 2017, Kluge met with Snapp and Hu-
man Resources Director Gordon. Id. at 17. Gordon presented
Kluge with a form to indicate whether he would comply with
the Name Policy. R. 15-1, at 1. Kluge proposed a compromise
that he be allowed to refer to students by their last names
only, “like a sports coach,” and the school administrators
agreed. R. 120-3, at 17.
 B. Complaints
 During the 2017–2018 school year—the relevant time
frame for evaluating undue hardship—ȱȱȃęȱ
learned of concerns with Mr. Kluge and how he was address-
ing students in class via an email from Craig Lee … on August
29, 2017.” R. 120-2, at 4. Lee served as the faculty advisor and
host for the Equality Alliance, a student club that met weekly
“to discuss issues that impact the LGBTQ community.” R.
120-14, at 6.
 ěǯȱIn his email, Lee referenced a teacher who refused to
call a transgender student by their new name, but he did not
mention Kluge. R. 120-15. Still, ȱ ȱ Ĵȱ ȱ
ȱ ȱ ęȱ ȱ ȱ ȱ ȱ ȱ ǯȱ R.
120-2, at 4. Among other things, Lee stated, “[T]here is confu-
sion amongst some teachers and students that I think needs
ęȱȱȱȱȱȱ ȱȱȱȱ ȱ
that it is not ok to disobey the powerschool [sic] rule.” R. 120-
15. Lee said he was “not totally sure” of the best next step and
that he was “very biased” on the topic. Id. Lee ęȱsepa-
rately that several students in Equality Alliance meetings
84 No. 21-2475

found Kluge’s last-names-only practice insulting and disre-
spectful. R. 58-2, at 2.
 Assistant Superintendent Jessup also recounted visiting
an Equality Alliance meeting where she heard ȱȱęȱstu-
dents complain about a teacher using last names only. R. 120-
1, at 4. In her view, the other 35 or so ȱȱĴȱ
appeared to agree with the complaints. 1 Id. Again, while the
students did not identify Kluge by name, “it was certainly im-
plied that he was the teacher in question.” Id. She had no
doubt the teacher was Kluge because he was the only ě
member ȱȱȱĴȱȱ-names-only accom-
modation. Id. Deposition testimony also revealed that some
teachers had complained about Kluge’s accommodation. R.
120-14, at 16–17; R. 113-5, at 8–9; see also R. 113-4, at 9.
 Students. Two transgender students in Kluge’s orchestra
class during the 2017–2018 school year, Aidyn Sucec and Sam
Willisǰȱ Ĵȱ . The majority opinion ad-
dresses them at length, so I highlight only a few points. Aidyn
said “Kluge’s behavior was noticeable to other students in the
class.” R. 22-3, at 4. Aidyn recalled, “At one point, my stand
partner asked me why Mr. Kluge wouldn’t just say my name.

 1 The record does not reflect the total number of transgender students

at Brownsburg High School in school year 2017–2018. The evidence shows
three transgender students in Kluge’s classes: Aidyn Sucec, Sam Willis,
and an unnamed third student. R. 22-3; R. 58-1; R. 52-3 at 3. A student in
Kluge’s orchestra class, Lauren Bohrer, said the class averaged about 40
students. R. 52-3 at 2. According to the Indiana Department of Education
Data Reports Archive, Attendance & Enrollment, in the 2017–2018 school
year, Brownsburg High School had 2,646 students. IND. DEP’T OF EDUC.,
School Enrollment by Grade Level, https://www.in.gov/
doe/it/data-center-and-reports/data-reports-archive/.
No. 21-2475 85

I felt forced to tell him that it was because I’m transgender.”
Id. Similarly, Sam opined that “Kluge’s use of last names in
class made the classroom environment very awkward.” R. 58-
1, at 3. Sam said “[m]ost of the students knew why Mr. Kluge
had switched to using last names, which contributed to the
awkwardness and [his] sense that [he] was being targeted be-
cause of [his] transgender identity.” Id. at 3–4.
 Parents. In fall 2017, the high school received two com-
plaints about Klugeǯȱȱęȱ ȱin a Ĵ from the parents
of a transgender student, and the second in an email exchange
between a Brownsburg school counselor and a transgender
student’s parent. R. 120-12; R. 120-13. In the email exchange,
the counselor advised that the administration “require[d] that
students role play” at home “to practice situations in which”
they are called by a name other than the one they prefer. R.
120-13, at 6. The counselor continued, “As a school, we will
certainly do our best to get the name/pronouns right, but we
are all human and there may [be] instances where we don’t
get it quite right. In those moments, we do not want [the stu-
ǾȱȱȱěǰȱȱǰȱȱȱǯȄȱ
Id. at 6–7.
 C. Countervailing Evidence
 These complaints are just one side of the story, however.
Three of Kluge’s students and a fellow teacher, all of whom
observed his classes in the 2017–2018 school year, Ĵ that
the last-names-only practice did not adversely ě the class-
room environment. This evidence, along with Kluge’s
86 No. 21-2475

testimony, create a genuine issue of material fact on undue
hardship.
 Lauren Bohrer Declaration. Lauren Bohrer and Aidyn were
students in Kluge’s orchestra class. R. 52-3, at 2. Bohrer at-
tested that she “did not hear Mr. Kluge ever call students by
ȱę¡ǯȄȱId. She explained that orchestra is a larger
class, so individual interactions were few. “It was rare that
Mr. Kluge had occasion to call on any individual student di-
rectly unless they raised their hand to ask a question.” Id. Boh-
rer ȱȱȱȱęȱ ȱ ȱȱǰȱKluge
ȱȱȱȱȱȱȱĴȱȱȱ
ȱĴȱ¢ȱȱȱȱ ȱǯ
 According to Bohrer, “Mr. Kluge never once brought up
the use of only last names or made known to our class his rea-
ȱȱȱ¢ȱȱǯȱ ȱȱȱęȱȱȱȱǯȱ
Kluge did not seem uncomfortable addressing us in this fash-
ion. I never suspected that it was anything other than the eas-
ȱ ¢ȱȱȱȱȱȱȱȱȱȱȱȱęȱ
in PowerSchool.” Id. at 3. Bohrer also said she had a
transgender stand partner—not Aidyn—and that she “never
saw Mr. Kluge treat [her] stand-ȱ¢ȱě¢ȱȱis-
gender students.” Id. “[She] never saw or heard about any an-
imosity between them.” Id. “[Her] stand mate never told [her]
that they disliked Mr. Kluge’s behavior or that Mr. Kluge had
been unfair to them.” Id.
 Bohrer did not know Aidyn personally, but she was hesi-
tant to engage or interact with him “due to [his] reputation for
confrontational and aggressive behavior toward people who
did not strictly conform to [his] mindset.” Id. In fall semester
2018—after Kluge’s termination—Bohrer alleges that she was
called to the principal’ȱ Ĝȱ based on Aidyn’s false
No. 21-2475 87

accusations of her calling him a “f----t.” Id. at 4. Per Bohrer,
the principal conceded that it was unlikely that Aidyn’s accu-
sations were true. Id. at 5.
 Kennedy Roberts Declaration. Kennedy Roberts, another or-
chestra student, said Kluge was a “favorite teacher[].” R. 52-
4, at 1. Roberts recalled that “the energy [Kluge] put into
conducting [their] orchestra and creating a fun classroom en-
vironment is incomparable to any teacher [he’d] had.” Id. at 1.
Roberts said, “During the school year, [Kluge] always called
everyone by their last names, which I never knew the reason
as to why, but I never really thought anything of it. It’s just
what he did.” Id. at 2. Roberts corroborated Bohrer’s testi-
mon¢ȱȱ ȱȱȱȱȱȱĴȱȃȱ
ęǰȱ¢ȱś-8 times over the year.” Id. From what Roberts
could tell, Kluge “treated everyone this way, no one was sin-
gled out in front of the class or intentionally treated disre-
spectfully.” Id.
 Mary Jacobson Declaration. A third student, Mary Jacobson,
was in both Kluge’s Music Theory and Advanced Orchestra
classes. R. 52-5, at 2. ȱĴȱǰȱetween these two
classes, “[she] never heard Mr. Kluge refer to students by their
ęȱǰȱȱ¢ȱ¢ȱȱę¡ȱȱǯȄȱId. at 2.
She “never heard Mr. Kluge discuss his use of last names with
any student or give any explanation for it. His use of last
names was not unnatural sounding. I never heard any stu-
dents question him about it, and I never brought up the topic
to him myself.” Id. at 2. And she “did not see or hear Mr.
 ȱȱĚȱ ȱny students nor did [she] witness any
ȱ ȱ ěȱ ȱ ȱ ȱ ȱ ȱ ȱ
class received.” Id. She also added that Kluge was a
88 No. 21-2475

“wonderful teacher” whose “kindness and fairness” made for
an “open and honest classroom demeanor.” Id. at 2–3.
 Natalie Gain Declaration. In addition to these student dec-
larations, Natalie Gain, a teacher who led private music les-
sons at the school ȱ ȱ ¢ǰȱ Ĵȱ ȱ ȱ
stating that she “never heard [Kluge] use gendered language
in the classroom.” R. 52-2, at 3. “[She] only heard him use last
names with the students” and “never heard any of the stu-
dents discussing the [sic] Mr. Kluge’s use of last names, or any
references to his agreement with the administration.” Id.
“[A]s far as [she] could tell, Mr. Kluge’s accommodation was
not common knowledge … .” Id. She also said Kluge “had
mostly used last names … the previous school year anyway,
with ‘Mr./Ms.’ for students to encourage a respectful teaching
environment, like college classes.” Id. at 2.
 Kluge’s Testimony. Kluge also aĴȱthere were no issues
with the last-names-only accommodation. He said that in the
2017 fall semester leading up to a meeting with Principal
Daghe on December 13, 2017, “there were no student protests,
ȱ ȱȱ ĴȱȱȱǽǾȱȱȱȱȱ
for all students, there were no classroom disturbances, and
there were no cancelled classes.” R. 113-2, at 4. Kluge said he
did not witness tension in the students and faculty. R. 120-3,
at 23. He did not see animosity from the students toward him.
Id. Instead, Kluge averred that “the accommodation worked
as intended and [his] students excelled,” some winning
awards for their performances during the 2017–2018 school
year. R. 113-2, at 4. ȱǰȱȃȱȱĴȱȱ
ever in our orchestra competitions. Students’ grades on their
AP [Music Theory] exam were great. There was a lot of par-
ticipation in the extracurricular programs, a lot of students
No. 21-2475 89

ȱȱȱ¢ȱ¡ȱěȱȱ¢ȱȱȱȱȬ
chestra.” R. 120-3, at 23–24.
 D. Revocation of Kluge’s Accommodation
 On January 22, 2018, Assistant Superintendent Jessup pre-
sented faculty with a document entitled “Transgender Ques-
tions” accompanied by a presentation titled “Transgender
Considerations.” Both stated that the last-names-only accom-
ȱ ȱȱȱĴȱȱ ȱȱ¢ǯ
R. 15-4; R. 120-20. The majority opinion refers to excerpts from
only the Transgender Questions document. Other portions of
that document include:
 Where is the line drawn on “pleasing” stu-
 dents and their beliefs? It is our job to make all
 students feel welcome and accepted in the pub-
 lic school environment.
 …
 How do we deal with a student exploding in
 anger with being called the wrong name or
 gender? If it’ȱȱęȱȱȱ ȱȱěȱ
 member has messed up the pronoun, then the
 ěȱȱȱȱȱȱǯȱ  ǰȱ
 if the student explodes on one small mistake, we
90 No. 21-2475

 would address the student behavior as we nor-
 mally would.
R. 15-4, at 9–10.
 The Transgender Considerations presentation stated in
relevant part:
 Considerations
 …
 x ȱȱęȱȱ ȱȱ
 alternatives—instead of “ladies and gentleman”
 [sic] or “boys and girls” try using “everyone,”
 “people” or “folks”
 x If you are creating a form for students, consider
 whether you really need to have a question
 about sex or gender; if so, provide gender op-
 tions
 x Try not to make assumptions about the genders
 of students … .
 …
 x Avoid using boy/girl methods to divide stu-
 dents—seating charts, lining up, groups, etc.
 x If possible, provide gender neutral uniforms
 …
 Other Guidance
 x Creating a safe and supportive environment for
 all students is important
 x Be respectful and nonjudgmental; do not
 show skepticism and/or disapproval
R. 120-20, at 5–7.
 On February 6, 2018, Kluge, Principal Daghe, and Human
Resources Director Gordon met, and the school administra-
tors ęȱ ȱ ȱ ȱ not be allowed his
No. 21-2475 91

accommodation in the next school year. R. 113-2, at 6. In this
meeting, the three discussed how Kluge might announce his
departure if he resigned. ȱȱȱěȱȱȱȱ
not told anybody—without “any fanfare.” R. 113-4, at 39. She
suggested that Kluge did not have to talk about his retirement
 ȱěȱȱǯȱȱGordon ęǰȱȃ’s kind of
up to you.” Id.
 E. Kluge Tenders Resignation
 ȱ Ĵȱ ȱ  Ĵ on April 30, 2018,
and continued to teach for the rest of the school year. In May,
he presided over the school’s orchestra awards ceremony,
where he referred to all students by their  ȱęȱ
and last name. R. 120-3, at 32. On May 25, 2018, the School
ȱȱ ȱȱȱȱǰȱěȱȱȬ
ignation. R. 15-3, at 1; R. 113-2, at 7. Two weeks later at a
School District Board meeting, Kluge asked the Board of Trus-
tees not to accept his resignation and requested that he be re-
instated. R. 113-2, at 7; R. 120-3, at 29–30; R. 120-18, at 10. The
Board heard comments from Kluge and the community—
some in support of termination and others against—and ulti-
mately accepted Kluge’s resignation, ending his employment.
R. 113-2, at 7; R. 120-18, at 9–13. ȱ¢ȱȱȱěȱ
comments at the Board meeting. R. 120-18, at 11.
 ȱȱǰȱ ěȱ ¢ǰȱȱȱȱȱȱȱ
student, recalled that Kluge addressed the Board with passion
and wept when he found out that he would not retain his po-
sition. R. 52-6, at 3. Gracey opined that Aidyn’s comments
were “confrontational,” and that he “seemed well coached”
and “enthused about the prospect of Mr. Kluge losing his
job.” Id. Gracey said that Aidyn’s comments before the Board
92 No. 21-2475

ȃȱȱȱȱĴȱȱȱȱȱȱȱȱ
use their voices to reinforce their ideology.” Id. at 4.
 II. Legal Framework
 Kluge’s religious accommodation and retaliation claims
and the record evidence are considered under the familiar law
of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,
et seq. Still, close review of the law on failure-to-accommodate
claims is critical in this case because some ȱȱȱȱĚ¡ȱȱ
the law that is unclear bears directly upon the claims we de-
cide.
 A. Title VII
 Title VII makes it unlawful for an employer “to fail or re-
fuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his com-
pensation, terms, conditions, or privileges of employment, be-
cause of such individual’s … religion.” 42 U.S.C. § 2000e-
2(a)(1). The statute ęȱȃȄȱȱȱȃȱȱ
of religious observance and practice, as well as belief, unless
an employer demonstrates that he is unable to reasonably ac-
commodate to an employee’s or prospective employee’s reli-
gious observance or practice without undue hardship on the
conduct of the employer’s business.” 42 U.S.C. § 2000e(j).
 To make a prima facie case based on an employer’s failure
to provide a religious ǰȱȱěȱȱ Ǳȱ
(1) an observance or practice that is religious in nature;
(2) ȱ Ěȱ ȱ ȱ ¢ȱ ǲȱ ȱ
(3) that the need for a religious accommodation was a moti-
vating factor in the adverse employment decision or other dis-
criminatory treatment. EEOC v. Ilona of Hungary, Inc., 108 F.3d
1569, 1575 (7th Cir. 1997) ǻȱ ĴǼ; EEOC v.
No. 21-2475 93

Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 772–73 (2015)
(modifying the former third factor—the employer’s actual no-
tice of the employee’s need for a religious accommodation).
In addition, the employee must show his religious belief is
sincerely held. Adeyeye v. Heartland Sweeteners, LLC, 721 F.3d
444, 448 (7th Cir. 2013) (citing Redmond v. GAF Corp., 574 F.2d
897, 901 n.12 (7th Cir. 1978)).
 Whether an accommodation is reasonable is necessarily
linked to the question of ȱǱȱȃȱȱěȱ
has established a prima facie case of discrimination, the bur-
den shifts to the employer to make a reasonable accommoda-
tion of the religious practice or to show that any reasonable
accommodation would result in undue hardship.” Porter v.
City of Chicago, 700 F.3d 944, 951 (7th Cir. 2012) (citing Ilona,
108 F.3d at 1575–76). “Reasonableness is assessed in context,
of course, and this evaluation will turn in part on whether or
not the employer can in fact continue to function absent undue
hardship” with the accommodation in place. Adeyeye, 721 F.3d
at 455 (emphasis added). Undue hardship is an objective in-
quiry that “ ȱȱȱȱĴȱȱȱęȱȬ
cumstances of the job” and the nature of the accommodation.
Id.
 B. Hardison’s De Minimis Cost Test
 The Supreme Court interpreted “undue hardship” to
mean “more than a de minimis cost” in Trans World Airlines,
Inc. v. Hardison, 432 U.S. 63, 84 (1977). Hardison involved a
Sabbatarian employee who refused to work on Saturdays on
religious grounds. Id. at 66. In holding that accommodating
Hardison’s schedule would impose more than a de minimis
cost, the Court observed that replacing him with other em-
ployees “would involve costs to TWA, either in the form of
94 No. 21-2475

ȱ Ĝ¢ȱ ȱ ȱ ȱ ȱ ȱ ,” and require
TWA to “carve out a special exception to its seniority system”
of giving senior employees priority in choosing their sched-
ule. Id. at 83–84. Accordingly, this court has observed that
Hardison is most instructive when there is an existing system
ȱĴȱȱȱȱreligious and non-religious
preferences of employes—such as by a seniority system or
collective bargaining agreement. Adeyeye, 721 F.3d at 456; see
also EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 315
(4th Cir. 2008) (discussing pre-existing company policies to
accommodate employees’ work scheduling preferences). Har-
dison’s core is that “Title VII does not require an employer to
ěȱȱ‘accommodation’ that comes at the expense of other
workers.” EEOC v. Walmart Stores E., L.P., 992 F.3d 656, 659
(7th Cir. 2021).
 Since Hardison, the Supreme Court has reĜȱe de
minimis cost test in Ansonia Bd. of Educ. v. Philbrook, 479 U.S.
ŜŖǰȱŜŝȱǻŗşŞŜǼǯȱ ȱȱǰȱȱȱȱęȱȱȱȬ
ployer’s duty to accommodate under § 2000e(j) ends “where
the employer has already reasonably accommodated the em-
ployee’s religious needs.” Id. at 68. The Court, in its only other
Title VII religious accommodation case post-Hardison, did not
mention the de minimis cost test because the Court remanded
for further proceedings under its holding that the need for a
religious accommodation need only be a motivating factor for
the employer’s adverse employment decision. EEOC v. Aber-
crombie & Fitch Stores, Inc., 575 U.S. 768, 772–73, 775 (2015).
ȱȱ¢ȱĴȱȱǯ
 So the de minimis cost test remains controlling law absent
a contrary indication from the Supreme Court. See Bosse v. Ok-
lahoma, 580 U.S. 1, 3 (2016). But remember, Hardison’s test is
No. 21-2475 95

“more than a de minimis cost,” ȱȱȱȱȱęȱ
how much more. 432 U.S. at 84 (emphasis added). The Court
Ĝȱ ȱ Abercrombie that “Title VII does not demand
mere neutrality with regard to religious practices—that they
be treated no worse than other practices.” 575 U.S at 775. “Ra-
ǰȱȱȱȱȱǰȱĜtively obligating
employers not ‘to fail or refuse to hire or discharge any indi-
vidual ... because of such individual’s’ ‘religious observance
and practice.’” Id. (citing §§ 2000e-2(a)(1), 2000e(j)). “Title VII
requires otherwise-neutral policies to give way to the need for
an accommodation.” Id. So the Court apparently reads the de
minimis cost test to have some substance.
 Since Hardison, the de minimis cost test has come under crit-
icism. 2 Most importantly, the Supreme Court has recently

 2 E.g., Ĵȱǯȱȱǯ, 140 S. Ct. 685 (2020) (Alito, Thomas,

and Gorsuch, Js., concurring) (“Hardison’s reading does not represent the
most likely interpretation of the statutory term ‘undue hardship.’”); Small
v. Memphis Light, Gas & Water, 141 S. Ct. 1227, 1229 (2021) (Gorsuch and
Alito, JJ., dissenting) (referring to Hardison as a “mistake … of the Court’s
own making” and observing “it is past time for the Court to correct it”);
Small v. Memphis Light, Gas & Water, 952 F.3d 821, 826–29 (6th Cir. 2020)
(Thapar, J., concurring) (discussing how the Hardison test is contrary to
ordinary, contemporary meaning and incongruent with the treatment of
“undue hardship” in other federal statutory contexts); Debbie N. Kaminer,
Religious Accommodation in the Workplace: Why Federal Courts Fail to Provide
Meaningful Protection of Religious Employees, 20 Tex. Rev. L. & Pol. 107, 122
(2015) (“In relying on the de minimis standard, the Court essentially held
ȱĴȱȱȱȱȱȱȱȱ¢ȱ ȱ
ǯȄǼǲȱĴ ȱǯȱ¢ǰȱBetween a Stone and a Hard Place: How the
Hajj Can Restore the Spirit of Reasonable Accommodation to Title VII, Note, 62
ȱǯ ǯȱŗŖŘşǰȱŗŖŚŖȱǻŘŖŗřǼȱǻȃǰȱȱȱ ȱȱȱęȱȱȱǰȱ
which it did by severely limiting employers’ duty to accommodate their
employees.”).
96 No. 21-2475

granted certiorari in ěȱ ǯȱ  ¢, 143 S. Ct. 646 (2023)
(mem.). That case presents a classic Sabbatarian scenario, as
in Hardison. The Third Circuit held that the employee’s re-
quested accommodation to be exempted from work on Sun-
day caused more than a de minimis cost to the employer. See
 ěȱǯȱ ¢, 35 F.4th 162, 175 (3d Cir. 2022), cert. granted, 143
S. Ct. 646 (2023). The questions presented in ě on which
the Court has granted certiorari are squarely relevant here:
“1. Whether this Court should disapprove the more-than-de-
minimis-cost test for refusing Title VII religious accommoda-
tions stated in Trans World Airlines, Inc. v. Hardison, 432 U.S.
63 (1977)[;] 2. Whether an employer may demonstrate ‘undue
hardship on the conduct of the employer’s business’ under Ti-
tle VII merely by showing that the requested accommodation
burdens the employee’s co-workers rather than the business
itself.” Petition for Writ of Certiorari, ě, No. 22-174, at i;
Questions Presented Report, ě, No. 22-174.
 ǯȱȃȱ Ȅȱǭȱě
 1. Statutory Text
 The statutory text of 42 U.S.C. § 2000e(j) ȱ Ĵȱ
help in answering ȱ ěȱ ȱ ȱ Ȭ
ship. At enactment, “hardship” generally meant “‘adversity,’
‘ě’ or ‘a thing hard to bear.’” Small, 952 F.3d at 826–
827 (quoting THE AMERICAN HERITAGE DICTIONARY OF THE
ENGLISH LANGUAGE 601 (1969); BLACK’S LAW DICTIONARY 646
(5th ed. 1979); WEBSTER’S NEW TWENTIETH CENTURY DICTION-
ARY OF THE ENGLISH LANGUAGE 826 (2d ed. 1975)). The ordi-
nary meaning of “hardship” does not exclude non-economic
No. 21-2475 97

Ĝ such as hurt feelings, albeit connoting a degree of
severity given the adjective “undue.”
 Hardison’s controlling test uses the word “cost,” 432 U.S.
at 84, which ȱȱȱȱȱȱęȱȱ
to the employer. As mentioned above, Hardison was focused
on “costs to [the employer]” by scheduling around the Sabba-
tarian employee’s schedule—“ȱ ȱ ȱ ȱ ȱ ȱ ĜȬ
ciency in other jobs or higher wages.” Id. at 84. So, from the
outset, the Supreme Court appears to have set an operational
or economic gloss on “hardship.”
 2. EEOC Regulation
 While neither the statute’s text nor Hardison provide an-
 ȱȱ ȱěȱȱǰȱȱȱ¢ȱ
Opportunity Commission has issued informative regulations
and guidance. For Title VII, the EEOC may issue procedural
but not substantive regulations to carry out the statutory pro-
visions. 42 U.S.C. § 2000e-12(a); Edelman v. Lynchburg Coll.,
535 U.S. 106, 113 (2002) ǻȱĴǼ. Nonetheless, the
regulations are persuasive (albeit nonbinding) guidance, mer-
iting lesser deference under Skidmore in light of the “special-
ized experience and broader investigations and information”
available to the agency. United States v. Mead Corp., 533 U.S.
218, 234 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134,
139 (1944)); Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338,
360–61 (2013); Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 399
(2008) (explaining that the EEOC’s interpretive statements are
entitled to a “measure of respect” (quoting Alaska Dept. of
Env’t Conservation v. EPA, 540 U.S. 461, 487–88 (2004))).
 In 29 C.F.R. § 1605.2(e), the EEOC states that it will deter-
mine “undue hardship” as “more than a de minimis cost” in
98 No. 21-2475

accordance with Hardison. In making the “undue hardship”
determination, the EEOC gives “due regard [] ȱȱęȬ
able cost in relation to the size and operating cost of the em-
ployer, and the number of individuals who will in fact need a
particular accommodation.” Id. “In general, the Commission
interprets this phrase as it was used in the Hardison decision
to mean that costs similar to the regular payment of premium
wages of substitutes, which was at issue in Hardison, would
constitute undue hardship.” Id. But administrative costs for
providing a religious accommodation, such as “costs in-
volved in rearranging schedules and recording substitutions
for payroll purposes” “will not constitute more than a de min-
imis cost.” Id. Coworker or customer feelings, preferences, and
complaints are not mentioned in § 1605.2.
 3. EEOC Guidance
 An EEOC Guidance addresses coworker complaints and
customer preferences. U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMM’N, Section 12: Religious Discrimination (2021),
ĴǱȦȦ ǯǯȦ /guidance/section-12-religious-
discrimination#h_2550067453639161074986%207844 (EEOC
Guidance).
 As to coworker complaints, the Guidance states, “Alt-
hough infringing on coworkers’ abilities to perform their du-
ties or subjecting coworkers to a hostile work environment
will generally constitute undue hardship, the general dis-
gruntlement, resentment, or jealousy of coworkers will not.”
Id. ǻȱĴǼ. “Undue hardship requires more than
ȱȱȱ ȱȱȱȱěȱ¢ȱȱ
unpopular religious belief or by alleged ‘special treatment’ af-
forded to the employee requesting religious accommodation;
a showing of undue hardship based on coworker interests
No. 21-2475 99

generally requires evidence that the accommodation would
actually infringe on the rights of coworkers or cause disrup-
tion of work.” Id. ǻȱĴǼǯ “Applying this standard,
it would be an undue hardship for an employer to accommo-
date religious expression that is unwelcome potential harass-
ment based on race, color, sex, national origin, religion, age,
disability, or genetic information, or based on its own internal
anti-harassment policy.” Id. So in general, the EEOC requires
more thaȱ ȱȱȱěȱ¢ȱȱ¢’s
religious observance or practice to constitute an undue
hardship. The religious accommodation must cause some op-
erational disruption, or rise to such a level that it can be con-
sidered harassment or to cause a hostile work environment.
Id.
 As to customer preference, the Guidance states, “An em-
ployer’s action based on the discriminatory preferences of
others, including coworkers or customers, is unlawful.” Id. It
provides an illustrative example:
 Employment Decision Based on Customer
 Preference
 Harinder, who wears a turban as part of his Sikh
 religion, is hired to work at the counter in a cof-
 fee shop. A few weeks after Harinder begins
 working, the manager notices that the work
 crew from the construction site near the shop no
 ȱ ȱ ȱ ȱ ěȱ ȱ ȱ ǯȱ
 When he inquires, the crew complains that Ha-
 rinder, whom they mistakenly believe is Mus-
 lim, makes them uncomfortable in light of the
 ȱŗŗȱĴǯȱȱȱȱ Ȭ
 rinder that he has to let him go because the
100 No. 21-2475

 customers’ discomfort is understandable. The
 manager has subjected Harinder to unlawful re-
 ligious discrimination by taking an adverse ac-
 tion based on customers’ preference not to have
 a cashier of Harinder’s perceived religion. Ha-
 rinder’s termination based on customer prefer-
 ence would violate Title VII regardless of
 whether he was – or was misperceived to be --
 Muslim, Sikh, or any other religion.
Id.
 This example shows that the EEOC does not tolerate reli-
gious discrimination based on the preferences, opinions, and
feelings of customers about an employee’s religious ob-
servance or practice.
 It can be debated whether a public-school student is more
like a coworker or a customer. A customer gives voluntary
patronage to a business, while a public school requires stu-
ȱĴȱ(unless alternative schooling is available). So
a public-school student may be more akin to a coworker than
a customer. If a student is seen as a coworker, the Guidance
suggests that the student’s disgruntlement at employee con-
duct is not enough for undue hardship. But if the employee
conduct constitutes harassment of the student or causes a hos-
tile educational environment, then it would be enough. If a
public-school student is closer to a customer of a school, the
Guidance suggests that the student’s disgruntlement is not
enough for undue hardship. The majority opinion situates the
ȱ ěȱ ȱ ser to customer preference, which
No. 21-2475 101

categorically would not provide a basis for undue hardship
under the EEOC Guidance.
 4. Caselaw
 The post-Hardison caselaw is sparse on whether coworker
ȱȱěȱȱȱȱȱȱȱde minimis cost
to the employer. This court has not addressed the question,
ȱȱȱȱȱ¢ȱęȱȱȱȱ
ȱěȱȱȱȱȱ to constitute undue hard-
ship.
 Customer Sentiments. The majority opinion cites Anderson
v. U.S.F. Logistics (IMC), Inc., 274 F.3d 470 (7th Cir. 2001), for
the proposition that customer complaints—and thus student
complaints—¢ȱ Ĝȱ ȱ ȱ ȱ ȱ ȱ
upon the employer. Anderson involved a Christian employee
who sought to use the phrase “Have a Blessed Day” in signing
ěȱn ĴȱȱȱȱȱȬ
tions. Id. at 473. The employer became concerned when one of
its clients complained that the employee’s use of the phrase
was “unacceptable” and “must stop.” Id. The ¢ȱęȱ
suit for a preliminary injunction that allowed her to use the
phrase in communications with the employer’s customers,
which the district court denied. Id. at 474.
 ȱ Ĝȱ ȱ ȱ ǰȱ this court observed that
“Anderson’s religious practice did not require her to use the
‘Blessed Day’ phrase with everyone” and that the employer
was “concerned about its relationship with its customers.” Id.
at 476. We also recognized that the employer had a “legitimate
interest[]” in protecting its relationship with clients. Id. at 477.
Ultimately, we concluded that the employer had reasonably
accommodated its employee by allowing Anderson to use the
102 No. 21-2475

phrase with co-workers but not clients. Id. at 474–76. Recall
that the employer’s Title VII duty to accommodate “is at an
end” when “where the employer has already reasonably ac-
commodated the employee’s religious needs.” Ansonia, 479
U.S. at 68. Therefore, in Anderson this court did not consider
whether customer objections to an employee’s religious belief
or practice were enough to constitute more than a de minimis
cost to the employer.
 More importantly, Anderson is distinguishable from the
facts in this case. Anderson sought to use a religious phrase,
which the district court had found to impose her religious be-
liefs on the employer’s clients or vendors. Anderson, 274 F.3d
at 477–78. As the majority opinion recognizes, Anderson held
that the employer could restrict the employee’s religious
speech with clients in providing the reasonable accommoda-
tion. Id. But here, an employer seeks to force an employee to
engage in transgender-Ĝȱ ȱ ¢ȱ ȱ ȱ Ȭ
gious beliefs. Whether Kluge’s gender-neutral accommoda-
tion constitutes an undue hardship by way of the School Dis-
trict’s clients—the students—should be an open question for
the ęǯ Recall that the EEOC opines that employers’
adverse employment “action based on the discriminatory
preferences of others, including coworkers or customers, is
unlawful.” EEOC Guidance.
 Coworker Sentiments. Other courts have addressed whether
 ȱěȱȱȱto constitute undue hardship. In
Anderson v. Gen. Dynamics Convair Aerospace Div., 589 F.2d 397
(9th Cir. 1978), the Ninth Circuit held that coworkers’ “gen-
eral sentiment against” a “free rider[]” employee who refused
to join an employer-mandated union on religious grounds
was not an undue hardship. Id. at 402. The court stated,
No. 21-2475 103

“Undue hardship means something greater than hardship.
Undue hardship cannot be proved by assumptions nor by
opinions based on hypothetical facts. Even proof that employ-
ees would grumble about a particular accommodation is not
enough to establish undue hardship.” Id. And in a factually
similar case, the Ninth Circuit reiterated that “undue hard-
ship requires more than proof of some fellow-worker’s grum-
bling or unhappiness with a particular accommodation to a
religious belief.” Burns v. S. Pac. Transp. Co., 589 F.2d 403, 407
(9th Cir. 1978) (citing General Dynamics, 589 F.2d at 402).
Though General Dynamics did not discuss Hardison’s de mini-
mis cost test, the Ninth Circuit cited the case and operated un-
der its regime. Id. at 400–01 (citing Hardison, 432 U.S. 63).
Burns ĜȱGeneral Dynamics’s core principle that grum-
blings ȱȱĜȱin an explicit analysis under Hardison.
Burns, 589 F.2d at 406–07. Whether students are closer to
coworkers or customers, General Dynamics, Burns, and the
EEOC Guidance provide that grumblings are not enough for
undue hardship.
 In ȱǯȱ  Ĵ-Packard Co., 358 F.3d 599, 607–08 (9th
Cir. 2004), the Ninth Circuit explained that an employer
“need not accept the burdens that would result from allowing
actions that demean or degrade, or are designed to demean or
degrade, members of its workforce.” The relevant employee
had publicly posted in the workplace Bible scriptures con-
demning sodomy in response to his employer’s poster pro-
moting inclusion of gay workers. Id. at 601–02. So the Ninth
Circuit’s law generally accords with the EEOC Guidance’s
104 No. 21-2475

suggestion that, while coworker grumblings are not Ĝ
to establish undue hardship, coworker harassment is. 3
 How much more than de minimis? In Burns and General Dy-
namics, the courts entered a judgment in favor of the em-
ployee, reversing bench trial decisions and concluding that
the employer had failed to demonstrate that no reasonable ac-
commodation could be provided without undue hardship.
Burns, 589 F.2d at 407–08; General Dynamics, 589 F.2d at 402–
03. That these cases and numerous other court decisions on
the de minimis cost issue have been resolved by trial—some in
favor of the employer, others for the employee—shows that
the test, even if more than a de minimis cost, has some teeth. 4

 3 Kluge also cited a decision that was later vacated, Cummins v. Parker

Seal Co., 516 F.2d 544 (6th Cir. 1975), aff’d, Parker Seal Co. v. Cummins, 429
U.S. 65 (1976), vacated on reh’g, 433 U.S. 903 (1977). Another Sixth Circuit
decision, Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 520–21 (6th Cir.
1975), stands for the principle for which Kluge cited it: that coworker
grumblings are not enough for undue hardship. Whether Draper’s holding
on coworker grumblings remains good law in the Sixth Circuit after Har-
dison is an open question.
 4 See, e.g., Beadle v. City of Tampa, 42 F.3d 633 (11th Cir. 1995) (judgment

for employer); Mann v. Frank, 7 F.3d 1365 (8th Cir. 1993) (same); Cook v.
Chrysler Corp., 981 F.2d 336 (8th Cir. 1992); Ryan v. U.S. Dep’t of Just., 950
F.2d 458 (7th Cir. 1991) (same); United States v. Bd. of Educ. for Sch. Dist. of
Phila., 911 F.2d 882 (3d Cir. 1990) (same); Baz v. Walters, 782 F.2d 701 (7th
Cir. 1986) (same); Turpen v. Missouri-Kansas-Texas R. Co., 736 F.2d 1022 (5th
Cir. 1984) (same); Wren v. T.I.M.E.-D.C., Inc., 595 F.2d 441 (8th Cir. 1979).
But see, e.g., Opuku-Boateng v. California., 95 F.3d 1461, 1469 (9th Cir. 1996)
(Sabbatarian case in which the Ninth Circuit concluded that the district
court clearly erred in finding undue hardship and granted judgment for
employee); Brown v. Polk County, 61 F.3d 650, 656–57 (8th Cir. 1995) (partial
reversal and remand for judgment and relief for employee because em-
ployer had not demonstrated that “occasional spontaneous prayers and
No. 21-2475 105

At least one circuit court has remanded for a new jury trial on
the de minimis cost issue. Heller v. EBB Auto Co., 8 F.3d 1433,
1439–41 (9th Cir. 1993). So, it follows that this fact-laden issue
is often decided by trial.
 Even when the de minimis cost issue is decided at summary
judgment, our fellow circuits vary greatly in construing the
test. 5 But religious accommodation caselaw ęȱȱthe

isolated references to Christian belief” caused undue hardship); Protos v.
Volkswagen of Am., Inc., 797 F.2d 129, 134–35 (3d Cir. 1986) (upholding on
clear error review the district court’s finding of no undue hardship based
on the lower court’s familiarity with the evidence and witness credibility
findings); Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO, 643
F.2d 445, 452 (7th Cir. 1981) (affirming judgment for plaintiff because the
employer failed to present evidence of undue hardship).
 5 See, e.g., Groff v. DeJoy, 35 F.4th 162, 175 (3d Cir. 2022) (judgment for

employer), cert. granted, 143 S. Ct. 646 (2023); EEOC v. Walmart Stores E.,
L.P., 992 F.3d 656 (7th Cir. 2021) (judgment for employer); EEOC v. GEO
Grp., Inc., 616 F.3d 265 (3d Cir. 2010) (same); Webb v. City of Philadelphia,
562 F.3d 256 (3d Cir. 2009) (same); Peterson v. Hewlett-Packard Co., 358 F.3d
599 (9th Cir. 2004) (judgment for employer where there was harassment
of coworkers); Virts v. Consol. Freightways Corp. of Del., 285 F.3d 508 (6th
Cir. 2002) (judgment for employer); Bruff v. N. Miss. Health Servs., Inc., 244
F.3d 495 (5th Cir. 2001) (same); Daniels v. City of Arlington, 246 F.3d 500
(5th Cir. 2001) (same); Seaworth v. Pearson, 203 F.3d 1056 (8th Cir. 2000)
(same); Weber v. Roadway Exp., Inc., 199 F.3d 270 (5th Cir. 2000) (same); Lee
v. ABF Freight Sys., Inc., 22 F.3d 1019 (10th Cir. 1994) (same); Cooper v. Oak
Rubber Co., 15 F.3d 1375 (6th Cir. 1994) (same); Eversley v. MBank Dallas,
843 F.2d 172 (5th Cir. 1988) (same). But see, e.g., Tabura v. Kellogg USA, 880
F.3d 544, 557–58 (10th Cir. 2018) (remanded for trial because defendant
did not move for summary judgment on undue hardship issue); Davis v.
Fort Bend County, 765 F.3d 480 (5th Cir. 2014) (genuine issue of material
fact on undue hardship issue); Antoine v. First Student, Inc., 713 F.3d 824
(5th Cir. 2013) (same); Adeyeye v. Heartland Sweeteners, LLC, 721 F.3d 444,
455–56 (7th Cir. 2013) (same); Balint v. Carson City, 180 F.3d 1047 (9th Cir.
106 No. 21-2475

de minimis cost test has some weight. Application of that test
to an accommodation is necessarily fact-intensive, and many
cases are resolved ¢ȱ ȱ ę. The majority opinion’s
reading of the de minimis cost test ě¢ȱ ȱ ȱ
duty of the employer to provide reasonable religious accom-
ȱ ȱȱȱȱȱěǯ
 III. Religious Accommodation Claim
 At the heart of this appeal is the district court’s grant of
summary judgment to the School District on Kluge’s religious
accommodation claim. We review that decision de novo. Mar-
kel Ins. Co. v. Rau, 954 F.3d 1012, 1016 (7th Cir. 2020). When
reviewing cross-motions for summary judgment, as here, we
view the facts “in favor of the party against whom the motion
under consideration is made,” drawing all reasonable infer-
ences in its favor. Id. ǻȱĴǼǲȱHess v. Bd. of Trs. of S.
Ill. Univ., 839 F.3d 668, 673 (7th Cir. 2016) ǻȱĴǼ.
 I conclude ęȱthat Kluge has demonstrated his religious
beliefs are sincerely held and he has established a prima facie
case for religious discrimination. In reaching this partial sum-
mary judgment for Kluge, I construe all facts in favor of the
School District. Then the burden shifts to the School District
to show that any reasonable accommodation would in fact re-
sult in undue hardship. Porter, 700 F.3d at 951; Adeyeye, 721
F.3d at 455. We do not have to postulate a reasonable accom-
modation as one is provided: Kluge’s last-names-only accom-
modation as used in the 2017–2018 school year. The question
then is whether, construing the evidence and reasonable in-
ferences in favor of Kluge, the School District has carried its

1999) (same); EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1577, 1583 (7th
Cir. 1997) (affirming summary judgment for employee).
No. 21-2475 107

burden to prove that the accommodation caused more than a
de minimis cost to it. In performing this analysis, “[c]redibility
determinations, the weighing of the evidence, and the draw-
ing of legitimate inferences from the facts” are reserved for
ȱęǯȱAnderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986); Ĵȱǯȱ, 933 F.3d 651, 655 (7th Cir. 2019). To
me, the School District has not ęȱȱȱȱa gen-
uine issue of material fact remains for trial.
 A. Sincerity
 The School District concedes for purposes of appeal that
Kluge made his prima facie case, but it challenges the sincer-
ity of Kluge’s religious beliefs in the alternative.
 To show sincerity, Kluge “must present evidence that
 ȱ ȱȱȱ¢ȱȱęȱȱǻŗǼ ’the belief for
which protection is sought [is] religious in [the] person’s own
scheme of things’ and (2) that it is ‘sincerely held.’” Adeyeye,
721 F.3d at 451 (quoting Redmond, 574 F.2d at 901 n.12). When
 ȱȱě’s sincerity, courts do not review an indi-
vidual’s “motives or reasons for holding the belief.” Id. at 452.
Nor do courts “dissect religious beliefs because the believer
admits that he is ‘struggling’ with his position or because his
beliefs are not articulated with the clarity and precision that a
more sophisticated person might employ.” Id. at 452–53
(quoting Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707,
715 (1981)). “In such an intensely personal area, … the claim
of the [practitioner] that his belief is an essential part of a re-
ligious faith must be given great weight.” United States v. See-
ger, 380 U.S. 163, 184 (1965). Title VII does not “require perfect
consistency in observance, practice and interpretation when
ȱ ȱ ȱ ȱ ¢ȱ ęȱ ȱ ȱ ȱ ȱ
whether a person’s belief is sincere.” Adeyeye, 721 F.3d at 453.
108 No. 21-2475

“[A] sincere religious believer doesn’t forfeit his religious
rights merely because he is not scrupulous in his observance.”
Grayson v. Schuler, 666 F.3d 450, 454 (7th Cir. 2012) (“[F]or
where would religion be without its backsliders, penitents,
and prodigal sons?”) (citing Reed v. Faulkner, 842 F.2d 960, 963
(7th Cir. 1988)). It is not within the court’s “province to eval-
uate whether particular religious practices or observances are
necessarily orthodox or even mandated by an organized reli-
gious hierarchy.” Adeyeye, 721 F.3d at 452.
 Kluge has proved the sincerity of his beliefs. He is an ac-
tive leader at his local church and believes in the absolute
truth of the Bible, a fact he repeatedly told the School District
when voicing concerns over its new policies. R. 120-3, at 4–5,
7, 19; R. 113-1, at 6–9; R. 113-2, at 2. He believes that, per his
religion, ȱȱĜ transgender identity by calling his
ȱȱ¢ȱȱęȱ ȱǯȱ
R. 120-3, at 14; R. 120-19, at 6. All of this is uncontested, and
“[t]he validity of what he believes cannot be questioned.” See-
ger, 380 U.S. at 184; see also Adeyeye, 721 F.3d at 452.
 Kluge and Superintendent Snapp recount discussing their
contrasting Christian beliefs on July 27, 2017, and I credit
Snapp’s testimony that it was a “cordial” chat. R. 113-6, at 6–
7; R. 120-3, at 19. During that conversation, Kluge said he ex-
plained his beliefs with scripture. R. 120-3, at 19. Nothing in
Snapp’s recollection of the discussion suggests this is untrue.
R. 113-6, at 6–7. In that meeting, Kluge ultimately refused to
comply with the School District’s Name Policy because his re-
ligious beliefs would not permit it. R. 120-3, at 14; R. 120-19,
No. 21-2475 109

at 6. So when opposed, Kluge defended his religious beliefs
and practices.
 The School District’s sole rejoinder to these undisputed
facts is Kluge’s deviation from the last-names-only accommo-
dation during the May 2018 orchestra awards ceremony.
Kluge ęȱȱcomplied with the Name Policy on that oc-
casion because he believed “it would have been unreasonable
and conspicuous” to refer to his students by only their last
names at the ceremony. 6 R. 120-3, at 33. Kluge said he was
ȃȱȱȱěȱȱ ȱ ȱthe bounds of [his] ac-
commodation,” and believed an exception for this “special”
and “formal” event complied with his religious beliefs be-
cause it was not “ordinary” or regular behavior. Id. at 33–34.
On this point, hȱ Ĵ¢’s EEOC submission states,
“Kluge’s Christian faith required that he do no harm to his
students, and this acquiescence to the administration’s posi-
tion was done solely out of sincerely-held beliefs.” R. 120-19,
at 7.
 No evidence is presented to the contrary. The School Dis-
trict notes ȱ ȱęȱȱȱȱ ȱȱȱ
appropriate and consistent with his religious beliefs to ad-
dress a transgender student by the student’ȱęȱǰȱȱ
ȱȱęȱȱěȱȱȱ’s biological sex. R.
120-3, at 8–9. This is consistent with Kluge balancing his
Christian beliefs ȱ ȱ Ĝȱ ȱ ¢ȱ ȱ
doing no harm. The School District also cites evidence that
Kluge’s religious denomination does not take a hardline

 6 The majority opinion construes this statement as a legal concession

that using last names only would potentially cause harm to his students,
but Kluge did not concede this point in his briefs or at oral argument.
110 No. 21-2475

stance in requiring a transgender child to use the bathroom of
her birth sex. R. 120-4, at 12. But even construing the record in
the light most favorable to the School District, I do not see
how this evidence impugns Kluge’s otherwise regular reli-
gious belief and practice of not using the PowerSchool names.
 The evidence shows Kluge balancing his Christian values
of not “regularly calling students by transgender names” with
his duty to “do no harm.” R. 120-3, at 33; R. 120-19, at 7. In
evaluating sincerity, we are not to criticize Kluge’s balancing
or take issue with a one-time exception. Adeyeye, 721 F.3d at
453–54 (rejecting employer’s contention that the court should
probe and disapprove of employee’s religious beliefs);
Grayson, 666 F.3d at 454 (overlooking that Nazirite believer
followed certain biblical proscriptions but not others). At the
ceremony, Kluge chose a path in accord with his balancing of
his Christian values. This does not detract from his sincerity
or create a genuine issue of material fact on the issue. Con-
struing all facts in the School District’s favor, I conclude that
Kluge has established the sincerity of his religious beliefs and
practices.
 B. Prima Facie Case
 The majority opinion proceeds under the School District’s
concession on appeal that Kluge established a prima facie case
for the religious accommodation claim. I conclude that Kluge
is entitled to partial summary judgment on the prima facie
case for his religious accommodation claim.
 Recall that to make a prima facie case based on an em-
ployer’s failure to provide a religious accommodation, a
ěȱȱ ǱȱǻŗǼ an observance or practice that is reli-
gious in nature; (2) ȱ Ěȱ ȱ ȱ ¢ȱ
No. 21-2475 111

requirement; and (3) that the need for a religious accommo-
dation was a motivating factor in the adverse employment de-
cision or other discriminatory treatment. Ilona, 108 F.3d at
1575; Abercrombie, 575 U.S. at 772–73. There is no question that
Kluge’s refusal to adhere to the Name Policy is a religiously
motivated practice. TȱȱĚȱ ȱȱȱȬ
trict’s Name Policy. Further, the School District does not dis-
pute that requiring Kluge to choose between Name Policy
compliance, resignation, or termination was an adverse em-
ployment action. So, the prima facie case turns on whether
Kluge’s need for a religious accommodation was a motivating
factor for his forced resignation.
 There is no doubt that it was, viewing the record in the
School District’s favor. Its asserted reason for forcing Kluge to
resign was the “[c]omplaints from the high school commu-
nity” regarding the very last-names-only accommodation that
Kluge had requested in July 2017. R. 121, at 45. The School
District said it had “received complaints that the accommoda-
tion was not conducive to a well-run classroom and nega-
tively impacted students.” Id. Thus, the reason for the adverse
employment action is the accommodation that Kluge re-
quested and received for the 2017–2018 school year. Kluge
had three choices at the end of that school year: comply with
the Name Policy, resign, or be terminated. R. 113-2, at 6; R. 15-
3, at 6.
 If Kluge did not need a religious accommodation for the
Name Policy and complied with its terms, he could stay. So,
there is no genuine issue of material fact that Kluge’s need for
a religious accommodation was a motivating factor behind
the School District’s adverse employment decision. The Su-
ȱȱęȱȱAbercrombie that Title VII supplies a
112 No. 21-2475

“motivating factor” standard even lower than “the traditional
standard of but-for causation.” 575 U.S. at 773 (citing 42 U.S.C.
§ 2000e-2(m)). Under this lenient standard Kluge proved the
motivating factor element and thus a prima facie case for his
religious accommodation claim.
 Having established the prima facie case, the burden shifts
to the School District to show that any reasonable accommo-
dation would result in undue hardship—that is, more than a
de minimis cost. Porter, 700 F.3d at 951; Hardison, 432 U.S. at 84.
Viewing the evidence and reasonable inferences in Kluge’s fa-
vor, there is a genuine issue of material fact on the question of
undue hardship. The School District points to two sources of
hardship: fear of Title IX liability and interference with its
ability to educate students. I consider these two grounds in
the next two sections.
 C. Fear of Title IX Liability
 The evidence is lacking that the School District considered
and was concerned about Title IX liability. Under current
caselaw, the alleged fear amounted to speculation.
 Only a single piece of evidence might indicate that the
School District contemplated Title IX liability: one sentence in
the form presented to Kluge on July 31, 2017, which stated,
“This directive is based on the status of a current court deci-
sion applicable to Indiana.” R. 15-1, at 1. Nothing suggests
what the School District meant by this sentence. Yet the
majority opinion states, without record support, that “[t]he
‘current court decision applicable to Indiana’ was likely our
decision in Whitaker ex ǯȱȱǯȱ ȱęȱǯȱǯȱ
No. 1 Bd. of Educ., 858 F.3d 1034 (7th Cir. 2017), abrogated on
other grounds by ȱȱ¢ȱǯȱĵ, 973 F.3d
No. 21-2475 113

760 (7th Cir. 2020), which had been issued two months prior
to” the July 31 compromise meeting. Presumably the majority
opinion juxtaposes the timing of the School District’s form
and Whitaker to conclude that the District was likely referring
to that case. But without record evidence, that inference
stretches too far. In addition, this speculation runs counter to
the requirement at this stage that facts and inferences be con-
strued in favor of Kluge. Properly viewed, the sentence on the
School District’s form is an unclear statement of concern
about ȱȱȱȱęȱȱǯ
 Even if we were to accept that the School District consid-
ered Whitaker, at best that case creates only a speculative risk
of Title IX liability based on Kluge’s actions. First, Whitaker
concerned a district court’s grant of preliminary injunction
based on a Title IX theory of transgender sex-stereotyping by
a school district. 858 F.3d at 1038–39. In that case this court
concluded only that the transgender students in question
 ȱĜ¢ȱ¢ȱȱȱȱȱȱȱȱȱ
IX sex discrimination claim against the school district to war-
rant a preliminary injunction. Id. at 1046–50. That said, the Su-
preme Court has held that, under Title VII, an employer who
discriminates against an employee for being transgender dis-
criminates on the basis of sex. Bostock v. Clayton County, 140 S.
Ct. 1731, 1743 (2020). But the Court has not held that the same
construction of sex discrimination applies to Title IX.
 Second, Whitaker concerned a transgender student who re-
quested preliminary injunctive relief to allow him to use the
boys’ bathroom in violation of the school district’s bathroom
policy. Whitaker, 858 F.3d at 1038–39. So, assuming that “on
the basis of sex” is interpreted in accordance with Bostock, the
school district’s policy of excluding transgender students
114 No. 21-2475

from non-birth-sex restrooms only arguably violated Title
IX’s provision that no person “shall, on the basis of sex, be
exclȱȱȱǰȱȱȱȱęȱǰȱȱ
be subjected to discrimination under any educational pro-
ȱ ȱ ¢ȱ ȱ ȱ ęȱ ǯȄȱ ŘŖȱ
U.S.C. § 1681(a); see also 34 C.F.R. § 106.31(a). Such legal as-
sumptions, without ȱęȱȱȱȱȱȱ
Circuit authorities establishing Title IX liability for
transgender discrimination, present merely speculative risk
of Title IX liability for the School District.
 Even more, it is unlikely that Kluge conforming with the
Name Policy constitutes ȱęȱȱȱ¢ȱȱȬ
cational program. Further, Kluge’s last-names-only practice is
gender-neutral and generally applicable, so it is doubtful that
the practice constitutes discrimination on the basis of sex.
Even if we assume that the School District considered the im-
plications of Whitaker and Title IX liability, any risk it faced
was speculative. Construing the record in Kluge’s favor, I con-
clude that the School District may not rely on fear of Title IX
liability in the undue hardship equation.
 D. Interference with Educational Mission
 This leaves the School District with its other alleged basis
for undue hardship—interference with its educational
mission. The majority opinion agrees with the district court’s
conclusion that “Kluge’s use of the last names only accommo-
dation burdened [the School District’s] ability to provide an
ȱȱȱȱȱĚȱ ȱȱ¢ȱȱ
creating a safe and supportive environment for all students.”
I evaluate this ground by examining: (1) the School District’s
educational mission; (2) the complaints of ěȱ ȱ to
Kluge’s last-names-only accommodation and whether they
No. 21-2475 115

constitute more than a de minimis cost; and (3) other consider-
ations, including caselaw and the practical impact of the ma-
jority opinion.
 1. The School District’s Educational Mission
 Before assessing the evidence, it is important to under-
stand what the School District’s educational mission is for its
students and its grounds for claiming this mission.
 Indiana Constitution. The School District relies ęȱȱȱ
Education Clause (Article 8, Section 1) of the Indiana Consti-
ȱȱęȱits educational mission. That provision states
in relevant part that it “shall be the duty of the General As-
sembly … to provide, by law, for a general and uniform sys-
tem of Common Schools, wherein tuition shall be without
charge, and equally open to all.” IND. CONST. art. VIII, § 1. The
district court suggests that this charge to provide public edu-
cation “equally open to all” meant the School District has a
ȱȱȱĜȱȱȱin pub-
lic schools.
 But the text and history of the Education Clause ęȱ
that the phrase “equally open to all” refers only to the equal
admission of students. The text of the Indiana Constitution
expresses “a duty to provide for a general and uniform system
of open common schools without tuition.” Bonner ex rel. Bon-
ner v. Daniels, 907 N.E.2d 516, 520 (Ind. 2009). The Education
ȱ ȃȱ ȱ ȱ ȱ Ĵȱ ȱ ¢ȱ ȱ ȱ
resulting educational quality.” Id. at 521. “The phrases ‘gen-
eral and uniform,’ ‘tuition … without charge,’ and ‘equally
open to all’ do not require or prescribe any standard of edu-
ȱȱȱȱȱĴȱ¢ȱȱ¢ȱȱ
common schools.” Id. Contemporary dictionaries ę this
116 No. 21-2475

ǯȱȱ¡ǰȱȃȄȱ ȱęȱȱȃǽǾĴȱȱ
persons without restraint; free to all comers.” Open, AN AMER-
ICAN DICTIONARY OF THE ENGLISH LANGUAGE 571 (1841). On its
face, the text of the Education Clause “says nothing whatso-
ever about educational quality.” Bonner, 907 N.E.2d at 521.
 The historical context of the Education Clause supports
this plain meaning interpretation. In the years preceding the
Education Clause’ȱ ęǰȱ ȱ ȱ ȱȬ
bly had engaged in a series of constitutional and legislative
ěȱȱȱȱȱȃȱȄȱǯȱNagy ex
rel. Nagy v. Evansville-Vanderburgh Sch. Corp., 844 N.E.2d 481,
484–89 (Ind. 2006); 2 DONALD F. CARMONY, THE HISTORY OF IN-
DIANA 381 (1998); DONALD F. CARMONY, THE INDIANA CONSTI-
TUTIONAL CONVENTION OF 1850–1851 103–04 (1931). The
phrase “common school” referenced schools that were “open
to the children of all the inhabitants of a town or district.”
Nagy ex rel. Nagy, 844 N.E.2d at 489 (quoting AN AMERICAN
DICTIONARY OF THE ENGLISH LANGUAGE 988 (1856))
 By the 1850–1851 Indiana Constitutional Convention—in
which the Education Clause was drafted—the common
ȱȱȱȱȃȱĴȄȱȱ
support for the idea that the state should be responsible for
providing every child the opportunity for elementary educa-
tion. Embry v. O’Bannon, 798 N.E.2d 157, 162–63 (Ind. 2003).
The convention debates centered on the need to provide for
the “education of every child in the State.” 2 REPORT OF THE
DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVI-
SION OF THE CONSTITUTION OF THE STATE OF INDIANA 1858–61
(1851). The Convention also adopted a resolution to describe
the relevant changes in the Indiana Constitution it had
drafted, which stated: “It is also provided, that the Legislature
No. 21-2475 117

shall establish a uniform system of common schools, wherein
tuition shall be free.” INDIANA HISTORICAL COMMISSION, CON-
STITUTION MAKING IN INDIANA 410 (1916) (quoting An Address
to the Electors of the State (Feb. 8, 1851)). The Education Clause
 ȱȱęȱȱȱȱȱȱȱŗŞśŗǯȱIND.
CONST. art. VIII, § 1; WILLIAM P. MCLAUCHLAN, THE INDIANA
STATE CONSTITUTION 16 (2011).  ȱęǰȱȱȬ
cember 1851, Governor Joseph A. Wright addressed the Gen-
eral Assembly, stating that it was their “duty to husband this
fund … to provide for the education of the youth of every
county, township, and district.” Horner v. Curry, 125 N.E.3d
584, 599 (Ind. 2019) (quoting Indiana House Journal at 20 (Dec.
2, 1852)).
 ȱ ȱ ȱ ęȱ ȱ ȱ ¡ȱ ȱ ȱ ȱ
Constitution’s Education Clause only charges the School Dis-
trict with Ĵing all children into its schools. It does not
ȱȱȱ¢ȱęȱȱȱȱȬ
ity.
 Statutory Directive. In identifying the School District’s ed-
ucational mission, the district court also relied on the fact that
“[t]he Indiana Supreme Court has recognized that public
schools play a ‘custodial and protective role,’ which has been
ęȱ¢ȱȱȱȱȱ¢ȱȱ
laws that mandate the availability of public education. Linke
v. Nw. Sch. Corp., 763 N.E.2d 972, 979 (Ind. 2002).” The major-
ity opinion also relies on Linke. But the Indiana Supreme
Court in Linke ¢ȱęȱȱȱ ȱȱ
ȱ ęȱ ¢ȱ ȱ Ĵȱ ȱ ȱ
school corporations’ supervision over all pupils in accordance
with the Education Clause. Linke, 763 N.E.2d at 979, 983 (cit-
ing IND. CONST. art. VIII, § 1 and the then-ěȱIND. CODE
118 No. 21-2475

§ 20–8.1–5.1–3). That court did not read into the Education
ȱȱȱȱ ȱȱȱĜȱ
transgender identity.
 The School District’s Policy. Without a purported constitu-
ȱȱ¢ȱȱȱĜȱȱ¢ǰȱ
the School District is left with its own recent policy to inform
its educational mission. The principles and mission underly-
ing the Name Policy were outlined in the January 22, 2018
Transgender Questions document and accompanying
Transgender Considerations presentation in the middle of the
2017–2018 school year. R. 15-4; R. 120-20. While styled as
“Questions” and “Considerations” and couched in precatory
language on gender-neutral practices, as applied to Kluge and
in practice, they were more than suggestions.
 For example, the Queȱ ȱ ȱ ȱ ěȱ
should “make all students feel welcome and accepted in the
public school environment.” R. 15-4, at 9. And the Considera-
tions presentation said, “Creating a safe and supportive envi-
ronment for all students is important.” R. 120-20, at 7. The
Considerations presentation also had several gender-neutral
best practices such as providing “gender neutral uniforms”;
avoiding using “boy/girl methods to divide students”; and
using gender-ȱ ęȱ Ȧȱ ȱ ȱ
“everyone” or “people” instead of “ladies and gentlemen.” Id.
at 5. ȱĜȱȱ¢ȱȱȱȱȱȱȱȬ
cational mission to create a safe and supportive learning en-
ȱȱȱȱǰȱȱę¢ǰȱȱ
students.
No. 21-2475 119

 2. ȱȱě
 The question then becomes whether the complaints of of-
fense taken by ȱěȱȱs to Kluge’s use of last
names are enough to constitute more than a de minimis cost to
the School District’s mission of creating a transgender-sup-
portive learning environment. Considering Kluge’s gender-
neutral accommodation, teacher and student complaints
about that accommodation, evidence in Kluge’s favor, and
various credibility questions, I conclude that there is a genu-
ine issue of material fact on this evidentiary record.
 i. Gender-neutral Accommodation
 The last-names-only accommodation was, obviously, gen-
der-neutral. Kluge called students by their last names in the
2017–2018 school year. The evidence Ěȱȱȱwhether
he was perfectly consistent in this practice. See R. 58-2, at 3; R.
120-19, at 7; R. 120-3, at 36; R. 52-3, at 2; R. 52-4, at 2; R. 52-5,
at 2. But Kluge, another teacher, and three of his students dur-
ing the 2017–ŘŖŗŞȱȱ¢ȱĴȱȱhe was consistent.
R. 120-3, at 36; R. 52-2, at 3; R. 52-3, at 2; R. 52-4, at 2; R. 52-5,
at 2. Construing the record in Kluge’s favor and crediting his
testimony leads to the conclusion that he adhered to the ac-
commodation.
 Even if Kluge’s testimony is not credited, the school ad-
ministration acknowledged that mistakes could happen. A
Brownsburg High School counselor acknowledged that there
may be instances where schoȱěȱȃ’t get” a transgender
student’s name or pronoun “quite right.” R. 120-13, at 5. And
the Considerations presentation stated, “Try not to make as-
sumptions about the genders of students.” R. 120-20, at 5 (em-
phasis added). The Questions document even addressed how
120 No. 21-2475

to handle a “student exploding in anger with being called the
wrong name or gender.” R. 15-4, at 10. For the most part,
Kluge consistently referred to all students in a gender-neutral
manner by their last names only, so undue hardship either
did not arise or the record presents a factual dispute.
 ii. Teacher Complaints
 ȱȱȱȱǰȱȱ ȱęȱȱȬ
partment heads, complained about how Kluge was address-
ing students to the school administration. R. 120-2; R. 120-14,
at 16–17; R. 113-5, at 8–9. Lee averred the complaints of three
teachers arose out of concerns that Kluge’s practice “was
harming students.” R. 120-14, at 17. Lee did not mention any
harm or harassment of the teachers themselves. But he added
that none of the three teachers told him that they had visited
 Ȃȱȱȱ ȱȱȱęǯȱId. And Princi-
ȱȱĴȱȱȱȱȱȱȱ
mostly arose from “continued issues” relayed from students
“that were in [Kluge’s] classes.” R. 113-5, at 8. Unlike in Peter-
son, where the employee posted scriptures demeaning or de-
grading gay coworkers, 358 F.3d at 601–02, 607, nothing in the
record shows Kluge harassing his coworkers by adhering to
the last-names-only accommodation.
 Uȱȱȱȱȱ ȱěȱ¢ȱ
a religious belief or practice. It requires actual infringement
on the rights of coworkers—such as by harassment—or the
disruption of work. See EEOC Guidance; General Dynamics, 589
F.2d at 402; Burns, 589 F.2d at 407. Viewing the record in favor
of Kluge, the evidence does not show that his coworkers’
ȱ ȱ ȱ ȱ ȱ ȱ ȱ ěǯȱ ȱ
fact, the teacher complaints relay student complaints, which
No. 21-2475 121

form the real core of the School District’s case for undue hard-
ship.
 iii. Student Complaints
 Two transgender students ȱȱęȱȱȱ
other students complained that Kluge’s use of last names only
oěȱǯ Teacher Craig Lee relayed that at Equality Al-
liance meetings, Aidyn and Sam said they found the practice
“insulting and disrespectful.” R. 120-14, at 7. He could not
“recall any other students … who are transgendered [sic]”
talking about the subject. Id. at 6–7. Lee’s declaration said stu-
dents in Kluge’s class felt likewise. R. 58-2, at 2. Assistant Su-
perintendent Jessup’s recollection of an Equality Alliance
meeting accords with this report. R. 120-1, at 4.
 Aidyn and Sam also spoke on their own behalf. Aidyn said
Kluge’s practice “made [Aidyn] feel alienated, upset, and de-
humanized.” R. 22-3, at 4. Sam Ĵȱ“Mr. Kluge’s use of
last names in class made the classroom environment very
awkward” and that, even now, Kluge’s actions hurt him and
cause him anxiety. R. 58-1, at 3–4. Their complaints were con-
sistent with one Ĵȱ ȱ one email chain from parents of
ȱ ǰȱ ȱ ȱ Ĵed to the school
administration in fall 2017. R. 120-12; R. 120-13. The parents
of one transgender student, in reference to a teacher that “rou-
tinely refers to [our child] by his last name only,” said the
practice was “ok, but we do wonder if the teacher does this
with other students or if it is only [our child].” R. 120-12. So at
least one transgender student’s parents thought Kluge’s prac-
ȱ ȱęȱif consistently applied.
 The majority opinion repeatedly states that Kluge’s last-
names-only practice caused classroom “disruption,” citing
122 No. 21-2475

portions of Principal Daghe’s affidavit and deposition. R. 120-
2, at 4; R. 112-5, at 7. Daghe does not mention disruption. In-
stead, he notes “tension,” “uncomfortableness,” and that the
accommodation was “not going well.” R. 120-2, at 4; R. 112-5,
at 7–8. He asserts such “tension … was affecting the overall
functioning of the performing arts department.” R. 120-2, at
4. But neither Daghe nor the record reveals how Kluge’s last-
names-only practice hampered the department’s operations,
and there is much countervailing evidence. Besides, we are to
draw all reasonable inferences in Kluge’s favor.
 My colleagues also infer that Kluge acknowledged creat-
ing tension and conflict at the school when he said Principal
Daghe wanted him to resign “simply because [Daghe] didn’t
like the tension and conflict.” R. 15-3, at 5. But the context of
this quote demonstrates that Kluge was referring to Daghe’s
perception of tension and conflict—not his own. In the para-
graph directly before this quote, Kluge recounted that Daghe
said “he didn’t like things being tense and didn’t think things
were working out.” The majority opinion again fails to view
the record in Kluge’s favor.
 There is a crucial distinction here: No evidence shows that
Kluge revealed to students his motivations for calling them
by their last names in the 2017–2018 school year. Lee’s retell-
ing of a student’s complaint said that the student “was fairly
certain that all the students knew why Mr. Kluge had
switched to using last names.” R. 58-2, at 3. Aidyn alleged that
“Kluge’s behavior was noticeable to other students in the
class.” R. 22-3, at 4. But Aidyn also recalled, “At one point, my
stand partner asked me why Mr. Kluge wouldn’t just say my
name. I felt forced to tell him that it was because I’m
transgender.” Id. The record says nothing about Aidyn telling
No. 21-2475 123

the stand-mate about his intuitions of Kluge’s motive. And
importantly, Aidyn’s recollection of his stand partner asking
him about Kluge’s last-names-only practice corroborates
other testimony that students did not know Kluge’s motives.
Similarly, Sam said “[m]ost of the students knew why Mr.
Kluge had switched to using last names.” R. 58-1, at 3–4. But
Sam did not explain how the students knew Kluge’s motives
for using last names only.
 In contrast, the record is replete with evidence that Kluge
never revealed his religious motives and that students did not
know the reason why Kluge used last names only. Three stu-
dents—Lauren Bohrer, Kennedy Roberts, and Mary Jacob-
son—Ĵȱ ȱ ȱ ¢ȱ ȱ ȱ ȱ ¢ȱ
their last names and did not explain his motives for doing so.
R. 52-3, at 3; R. 52-4, at 2; R. 52-5, at 2. Roberts “never really
thought anything of it. It’s just what he did.” R. 52-4, at 2. And
fellow music teacher Natalie Gain averred that she “never
heard [Kluge] use gendered language in the classroom”;
“only heard him use last names with the students”; and
“never heard any of the students discussing the [sic] Mr.
Kluge’s use of last names, or any references to his agreement
with the administration.” R. 52-2, at 3. “[A]s far as [she] could
tell, Mr. Kluge’s accommodation was not common knowledge
… .” Id.
 The evidence shows ȱȱȱȱěȱat
Kluge’s last-names-only practice came not from any discom-
fort with the practice itself but from students’ assumptions
and intuitions about why Kluge was using only last names.
Neither this nor any other court has ȱȱȱěȱat
an employee’s religious observance or practice is enough for
undue hardship. And the facts here are a step removed: The
124 No. 21-2475

alleged ěȱ ȱ ȱ ’ presumptions and
guesses as to Kluge’s motives for using last names only. The
majority opinion breaks new ground here. This distinction, as
well as the evidence in Kluge’s favor, presents a genuine issue
of material fact on undue hardship.
 iv. Evidence for Kluge
 The record also contains the testimony of Kluge, three stu-
dents, and a teacher, who contradict the complaints about
Kluge’s last-names-only accommodation. The district court
failed to give due weight to this evidence. But the majority
opinion goes further, stating that Kluge’s evidence is not
relevant to undue hardship. To my colleagues, the undue
hardship inquiry ended once the School District received
some reports that the accommodation did not work and
caused tension and discomfort.
 Every court to consider undue hardship has framed the
inquiry as an objective one, dependent on the factual context
of the case. See, e.g., ě, 35 F.4th at 174 (“The undue hard-
ship analysis is case-ęǰȱȱȱȱȱȱȱ‘both
the fact as well as the magnitude of the alleged undue hard-
ship’ … .” (quoting GEO Group, 616 F.3d at 273)); Tabura, 880
F.3d at śśŞȱǻȱȱȱȱĴǼȱǻȃȱȱ
employer will incur an undue hardship is a fact question that
turns on the particular factual context of each case.”); Adeyeye,
721 F.3d at 455. In a similar vein, cases evaluating undue hard-
ship—including Hardison—address factors such as the need
to rearrange schedules or the additional work burden on
coworkers. See, e.g., Hardison, 432 U.S. at 83–84; Adeyeye, 721
F.3d at 455; Ilona, 108 F.3d at 1576–77. Because undue hard-
ship depends on the factual context, the reports of three stu-
dents and a teacher that contradict the alleged harms caused
No. 21-2475 125

by Kluge’s last-names-only practice are relevant, whether or
not this information was known by the School District at the
time of the adverse employment decision.
 The majority opinion holds that the undue hardship in-
quiry considers only evidence within the employer’s
knowledge when the adverse employment decision is made.
But no authority is cited for this proposition. Under this rea-
soning, an employer’s sole focus on allegations of Ĝȱ
arising from a religious accommodation would defeat any
employee’s failure-to-accommodate claim. Such an outcome
creates a perverse incentive for employers to avoid investigat-
ing undue hardship. If, by contextual evidence obtained after
ǰȱȱ¢ȱě is not able to undermine the
alleged presence of undue hardship, when, if ever, can the
employee prevail? Before his termination, the employee
 ȱȱȱȱȱȱ¢ȂȱĴ evidence con-
trary to the reports of undue hardship.
 Consider the evidence for Kluge. Three students and a
ȱĴȱȱȱ ’s practice did not
diminish the classroom environment. Bohrer ĴȱȱȬ
cause the orchestra class was large, Kluge rarely had occasion
to call on any individual student directly. R. 52-3, at 2. Roberts
corroborated that Kluge called last names ȱĴendance “at
ęǰȱ¢ȱś-8 times over the year.” R. 52-4, at 2. This evi-
dence tends to show that Kluge’s last-names-only practice did
not have more than a de minimis impact on classroom opera-
tions.
 A number of students said Kluge’s practice did not cause
ęȱ ȱ ȱ ȱ ȱ ǯ
Bohrer, Roberts, and Jacobson ȱ ęȱ ¢ȱ ȱ
Kluge’s use of only last names was not unnatural, odd, or
126 No. 21-2475

uncomfortable. R. 52-3, at 3; R. 52-4, at 2; R. 52-5, at 2. Bohrer
said she never saw Kluge treat her transgender stand partner
ě¢ȱȱȱthe stand-mate “never told [her] that they
disliked Mr. Kluge’s behavior or that Mr. Kluge had been un-
fair to them.” R. 52-3, at 3. Fellow teacher Natalie Gain added
that Kluge “had mostly used last names … the previous
school year anyway, with ‘Mr./Ms.’ for students to encourage
a respectful teaching environment, like college classes.” R. 52-
2, at 2. As such, she “saw no reason as to why there would be
issues with Mr. Kluge’s compromise.” Id.
 Kluge also alleged that there were no issues with his use
of last names—no protests, classroom disturbances, cancelled
classes, student animosity, or tensions. R. 113-2, at 4; R. 120-3,
at 23. Instead, Kluge says the accommodation worked with-
out undue hardship. His students excelled, winning awards,
scoring high on their AP Music Theory exams, and participat-
ing in extracurricular music activities. R. 113-2, at 4; R. 120-3,
at 23–24. The School District contests none of these objective
measures of pedagogical success.
 v. Credibility Issues
 The record also revealed potential biases and credibility
issues with many of the witnesses. A few notable examples
underscore the fact-intensive nature of the undue hardship
decision. Weighing the evidence on undue hardship and mak-
ing credibility determinations are ȱȱȱęǯ
Liberty Lobby, 477 U.S. at 255; Ĵ, 933 F.3d at 655. Only
ȱęȱȃȱȱ ȱȱȱvariations in demeanor and
tone of voice that bear so heavily on the listener’s understand-
ing of and belief in what is said.” Anderson v. Bessemer City,
No. 21-2475 127

470 U.S. 564, 575 (1985); see also Kadia v. Gonzales, 501 F.3d 817,
819–20 (7th Cir. 2007).
 Kluge is biased to give testimony in his favor. His student
Bohrer is a professed Christian, so her testimony may have
ȱěȱȱfavor Kluge. R. 52-3, at 3. Aidyn also has cred-
ibility issues. Bohrer alleged that Aidyn falsely accused her of
calling him a “f----t.” Id. at 4. A parent, ěȱ ¢, also opined
that Aidyn seemed motivated to put Kluge out of a job. R. 52-
6, at 3–4. And Craig Lee, the teacher who relayed student
complaints about Kluge to the school administration, admit-
ted he was “very biased.” R. 120-15.
 * * *
 The evidence on undue hardship cuts for and against
Kluge. Three students, a teacher, and Kluge all Ĵ that the
last-names-only accommodation worked without issue. But
Aidyn and Sam, some students in secondhand accounts, and
some teachers complained the accommodation did not work.
Both sides have credibility issues. The witnesses Ěȱas to
whether and to what degree Kluge’s accommodation was of-
fensive. Even more, the evidence shows that any alleged of-
fense came from students’ assumptions about Kluge’s mo-
tives for the last-names-only practice—not from the practice
itself. The record also shows that Kluge’s practice was infre-
quent and not critical to how his music classes operated. Of
course, at this posture, we must draw inferences from the
facts in favor of Kluge, and reserve credibility issues and
weighing of ȱ ȱ ȱ ȱ ęǯ This record
demonstrates a genuine issue of material fact as to whether
128 No. 21-2475

the accommodation caused more than a de minimis cost to the
School District’s educational mission.
 3. Caselaw and Practical Impact
 In examining the School District’s alleged basis for undue
hardship—interference with its educational mission—there
are also other considerations, including consistency with
caselaw and the practical impact of the majority opinion’s
analysis.
 Caselaw. Concluding that a fact issue exists on this record
accords with this court’s caselaw on the employer’s duty to
provide reasonable religious accommodations under Title
VII. In Walmart, this court stated Hardison’s core is “that Title
VII does not require an ¢ȱȱěȱȱ‘accommodation’
that comes at the expense of other workers.” Walmart, 992 F.3d
at 659 (citing Hardison, 432 U.S. at 78–79). As mentioned ear-
lier, there was no evidence that Kluge’s accommodation bur-
ȱȱȱěǯ
 The majority opinion cites Smiley v. Columbia College Chi-
cago, 714 F.3d 998, 1002 (7th Cir. 2013), for the proposition that
a school has a legitimate interest in ensuring that its “instruc-
tors will teach classes in a professional manner that does not
distress students.” While correct, Smiley involved a teacher
who singled out and harassed a student for being Jewish. Id.
at 1000. The teacher was terminated for unprofessional con-
duct that “distress[ed] students.” Id. at 1002. Kluge’s last-
names-¢ȱȱȱěnt in kind, not just degree.
 The majority opinion also analogizes the facts here to
those in Baz, in which a V.A. hospital chaplain actively prose-
lytized and held “Christian evangelical service[s]” in contra-
vention of the hospital’s purpose for his role that he serve as
No. 21-2475 129

a “quiescent, passive listener and cautious counselor.” 782
F.2d at 703–04, 709. The V.A. had “instituted … an ecumenical
ȱȱȱ¢ȱ ȱȱĴȱȱȱȬ
tive needs of its patient population.” Id. at 709. Reverend Baz’s
self-ascribed “active, evangelistic, charismatic” preaching and
proselytization went against the hospital’s mission and pur-
pose for his role. Id. at 709. This court held that the V.A. had
met its burden of producing evidence “tending to show that
Reverend Baz’s philosophy of the care of psychiatric patients
is antithetical to that of the V.A.” Id. at 706–07. “To accommo-
date Reverend Baz’s religious practices, they would have to
either adopt his philosophy of patient care, expend resources
on continually checking up on what Reverend Baz was doing
or stand by while he practices his (in their view, damaging)
ministry in their facility.” Id.
 Here, of course, Kluge did not proselytize. He did not re-
veal to his students why he used only last names, and he
never shared his religious beliefs with them. He used last
names only with all his students, and Bohrer and Roberts sug-
gested that even this last name usage was relatively infre-
quent. R. 53-3, at 2; R. 52-4, at 2. The question is whether this
infrequent use of last names only when referring to students
caused more than a de minimis cost as to render the practice
unreasonable.
 This court stated in Adeyeye that “[r]easonableness is as-
sessed in context … and this evaluation will turn in part on
whether or not the employer can in fact continue to function
absent undue hardship” under the accommodation. 721 F.3d
at 455. Adeyeye involved an employee who sought several
weeks of unpaid leave to lead his father’s religious burial
rites. Id. at 447. This court held that the employer was not
130 No. 21-2475

entitled to summary judgment “that any reasonable jury
 ȱ ȱ ȱ ęȱ ȱ Ĵȱ ¢¢ȱ ȱ ȱ ȱ
weeks of unpaid leave in conjunction with his week of vaca-
tion would have created an undue hardship.” Id. at 455. Sim-
ilarly in Ilona, this court upheld the district court’s factual
ęȱȱȱ¢ȱȱȱemonstrated that allow-
ȱ ȱ¢ȱȱȱěȱȱ¢ȱȱȱ ȱresulted
in more than a de minimis cost to the employer. 108 F.3d at
1572, 1576–77. ȱȱȱěȱȱ ȱdoes not establish
more than a de minimis cost, perhaps neither does allowing a
teacher to use last names only.
 In the district court, the School District argued that using
a student’ȱȱęȱȱȱȱȃ¢ȱȄȱȱ
or duty. R. 145, at 9-10; R. 121, at 24, 28. So it should come as
no surprise that Kluge’s accommodation required no adjust-
ment to the School District’s operation, scheduling, or curric-
ulum. Our and other circuits’ caselaw shows that the de mini-
mis cost test has substance.
 Practical Impact. Under the reasoning of the majority opin-
ion, once an employer receives ȱȱěȱabout an
employee’s religious observance or practice, undue hardship
has been established ȱȱȱȱěȱȱȱ¢ǯ
But reviewing those complaints and the credibility of those
complainants—including assessing any biases and motiva-
tions—are context-ęȱquestions for ȱę, which
our caselaw requires. See Adeyeye, 721 F.3d at 455; Kadia, 501
F.3d at 819–20.
 Consider a variation of the facts here. What if a teacher
does not take issue with a transgender student’s chosen ęȱ
names, but that teacher does take issue—on religious
grounds—with the use of chosen pronouns (they / them /
No. 21-2475 131

their). So, the teacher insists on calling students by their cho-
sen ęȱǯȱSay a transgender student feels uncomfortable
with the teacher’ȱěȱȱȱȱall students ¢ȱȱęȱ
name where a pronoun ȱ Ĝǯ Would the students’
ȱȱȱȱĜȱȱȱȱȱȱ
use the chosen pronouns where appropriate or be termi-
nated? Under the majority opinion’s reasoning, the answer is
“yes.” The facts here are close to this hypothetical.
 Recall the EEOC Guidance’ȱ ¡ȱ ȱ ȱ ȱ ěȱ
shop employee, Harinder, who sought to wear his religiously
mandated turban at work. Is Harinder out of luck if the café
ȱȱȱ¢ȱȱȱȱěȱ
¢ȱ ȱ ȱ ȱ ȱ Ĝȱ ¢ǵ The EEOC is con-
cerned that the already lenient de minimis cost test may be
read out of existence by customer preferences or opinions.
The majority opinion realizes these fears.
 Properly interpreted and applied, Title VII should provide
protection for conscientious religious objectors who in good
faith try to accommodate their employers’ dictates. The un-
due hardship provision should not become “an exemption
from the accommodation requirement altogether,” whenever
an employer receives some complaints of emotional hurt aris-
ing from protected religious activity. Ilona, 108 F.3d at 1577.
More broadly, the purpose of Title VII is to protect minorities
against those who disagree with their beliefs. See 42 U.S.C
§ 2000e–2. Under the majority opinion, if some people—on
this record, at most a few transgender students in Kluge’s
classes—¢ȱ¢ȱȱěǰȱȱȱȱȬ
ent has no right to a reasonable accommodation.
 On Kluge’s religious accommodation claim, I conclude
that a genuine issue of material fact exists about whether the
132 No. 21-2475

last-names-only accommodation would result in more than a
de minimis cost. So I would reverse the district court’s grant of
summary judgment to the School District on this claim and
remand the undue hardship issue for trial.
 IV. Retaliation Claim
 Although at least a genuine issue of material fact exists as
to whether Kluge’s protected activity was a but-for cause of
his forced resignation by the School District, I concur with my
ȱȱĜȱthe judgment for the School District on
his retaliation claim. The record does not contain Ĝȱev-
idence from which a reasonable jury could infer that the
School District’s nondiscriminatory explanation for its ad-
verse employment action was pretext for religious discrimi-
nation. 7
 Kluge’s claimed protected activity was his July 2017 re-
quest for the last-names-only religious accommodation. R. 15,

 7 Kluge’s failure to show that the School District’s nondiscriminatory

explanation was pretext does not also doom his religious accommodation
claim. A different version of the McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973), burden-shifting framework applies to failure-to-accommodate
cases, as opposed to retaliation or disparate treatment cases. See Tabura,
880 F.3d at 549–50; Porter, 700 F.3d at 951; Firestone Fibers & Textiles Co.,
515 F.3d at 312. Neither discriminatory intent nor pretext are elements of
a failure-to-accommodate claim. See Walmart Stores East, 992 F.3d 656;
Adeyeye, 721 F.3d at 449; Porter, 700 F.3d at 951; Anderson, 274 F.3d at 475;
Rodriguez v. City of Chicago, 156 F.3d 771, 775 (7th Cir. 1998); Ilona, 108 F.3d
at 1574–75; Ryan, 950 F.2d 458; Redmond, 574 F.2d at 901. After Kluge es-
tablished a prima facie case, the burden was on the School District “to
show that any reasonable accommodation would result in undue hard-
ship.” Porter, 700 F.3d at 951 (citing Ilona, 108 F.3d at 1575–76). Because a
genuine issue of material fact exists on undue hardship, that issue should
No. 21-2475 133

at 17–18; R. 121, at 44–45. The School District does not contest
that forcing Kluge to comply with the Name Policy, resign, or
be terminated is an adverse employment action. The nondis-
criminatory reason for forcing Kluge to comply or resign was
the “[c]omplaints from the high school community” about the
accommodation that Kluge had requested in July 2017. R. 121,
at 45.
 Recognizing the obvious tie between the School District’s
claimed reason for terminating Kluge and the religious ac-
commodation requested, in my view Kluge has established
but-for causation. (The prima facie causation standard for Ti-
tle VII retaliation claims is but-for—not proximate—causa-
tion. Robertson v. Dep’t of Health Servs., 949 F.3d 371, 378 (7th
Cir. 2020).) At a minimum, construing all the facts in his favor,
there is a genuine issue of material fact on this question. This
is not a case where the employer has a separate nondiscrimi-
natory reason—such as poor work performance—unrelated
to the protected accommodation activity. See, e.g., Logan v.
City of Chicago, 4 F.4th 529, 537 (7th Cir. 2021); Igasaki v. Ill.
Dep’t of Fin. & Pro. Regul., 988 F.3d 948, 954 (7th Cir. 2021). The
employer’s asserted nondiscriminatory reason is the alleged
harm caused by the protected accommodation requested and
granted. So this case presents enough facts to establish but-for
cause. Ultimately though, I agree with my colleagues that

proceed to trial. A retaliation claim, however, is governed by the standard
McDonnell Douglas framework. See Rozumalski v. W.F. Baird & Assocs., Ltd.,
937 F.3d 919, 926 (7th Cir. 2019); Miller v. Am. Fam. Mut. Ins. Co., 203 F.3d
997, 1007 (7th Cir. 2000). So once the School District supplied a nondis-
criminatory reason for forcing Kluge to resign, he had to come up with
enough evidence of pretext to raise a genuine issue of material fact, which
he did not.
134 No. 21-2475

Kluge has faȱȱȱĴȱȱȱto show pretext, so I con-
cur that the judgment for the School District on Kluge’s retal-
ȱȱȱȱĜǯ
 V. Conclusion
 Title VII’s religious accommodation provisions do not ap-
ply only in a community accepting of the tenets of an em-
ployee’s religion. “If relief under Title VII can be denied
merely because the majority group … will be unhappy about
ǰȱȱ ȱȱĴȱȱȱȱȱ ȱȱ ȱ
the Act is directed.” Franks v. Bowman Transp. Co., 424 U.S. 747,
775 (1976) (quoting United States v. Bethlehem Steel Corp., 446
F.2d 652, 663 (2d Cir. 1971)).
 For the reasons explained above, I respectfully DISSENT on
the religious accommodation claim, and I conclude that a gen-
uine issue of material fact exists on undue hardship and
would remand that issue for trial. I respectfully CONCUR in
the judgment for the School District on Kluge’s retaliation
claim.